UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| XIAO BAO HE,<br><br>          *Petitioner,*<br><br>      **-** against **-**<br><br>JOSEPH FREDEN, in his official capacities, as Deputy Field Office Director, Buffalo Field Office and Administrator, Buffalo Federal Detention Facility, U.S. Customs & Immigration Enforcement; THOMAS BROPHY, in his official capacity as Field Office Director, Buffalo Field Office, U.S. Immigration & Customs Enforcement; SIRCE E. OWEN, in her official capacity as Acting Director, Executive Office of Immigration Review, U.S. Department of Justice; KRISTI NOEM, in her official capacity as Secretary, U.S. Department of Homeland Security; and PAMELA BONDI, in her official capacity as Attorney General, U.S. Department of Justice.<br><br>          *Respondents.* | **PETITION FOR WRIT OF HABEAS CORPUS**<br><br>Case No. _____ |

## PRELIMINARY STATEMENT

1.      Xiao Bao He is a survivor of physical, emotional, and financial abuse, as well as labor trafficking. He also entered the United States lawfully on an F-1 student visa. Moreover, while he was incarcerated for a crime committed against his abuser, he demonstrated stellar rehabilitation, including composing music that has been performed at Carnegie Hall, Julliard, and Trinity Church Wall Street, obtaining a master's degree in theology, and serving as a teaching assistant in his prison's English as a Second Language classes, and did not receive a single disciplinary ticket. Nonetheless, the government has sought to deport Mr. He to the People's Republic of China and has detained him pending the resolution of his immigration proceedings.

2.      Mr. He has strong arguments on the merits of his claims for asylum, deferral of removal under the Convention against Torture, and withholding of removal: if deported to China, he would face persecution for his Roman Catholic faith and, as a Chinese citizen who committed a crime against another Chinese citizen in the United States—a crime committed as a direct result of the abuse he suffered at that person's hands—he would likely be placed into a reeducation camp and tortured.

3.      Moreover, even if the government were to obtain an administratively final order of removal against Mr. He, it is far from clear the government would be able to remove Mr. He to China. As Mr. He has resided in the United States for over 15 years, his Chinese passport has expired, and he has missed censuses in China. In these circumstances, the Chinese government would be unlikely to grant him a new passport or accept his repatriation, potentially causing him to languish in immigration detention for years.

4.      Against this backdrop, Mr. He's continued detention is unlawful and unconstitutional. The immigration judge ("IJ") who presided over Mr. He's bond hearing required that Mr. He bear the burden of proof that he was not a danger to the community or a risk of flight— even though the Second Circuit has recently affirmed the longstanding principle that, when seeking to justify civil detention, the government must bear the burden by clear and convincing evidence of demonstrating that the individual is a danger or a flight risk. *See Black v. Decker*, 103 F.4th 133, 155–57 (2d Cir. 2024); *see also Velasco Lopez v. Decker*, 978 F.3d 842, 854 (2d Cir. 2020). And even if Mr. He's initial bond hearing complied with due process, the ongoing and increasingly prolonged nature of his detention compels a second hearing with the burden of proof on the government.

## PARTIES

5.     Petitioner Xiao Bao He was born in 1986, in Tianjin, China. Declaration of Xiao Bao He under Penalty of Perjury ("He Decl."), ¶ 2. Mr. He is a survivor of labor trafficking and domestic violence who originally came to the United States to study at Northeastern University as a graduate student in 2009. *Id.* ¶¶ 7–9; Declaration of Laura Berger, Esq. ("Berger Decl."), ¶ 2 & Exhibit 3 to Berger Decl., Excerpts of Request for Custody Redetermination ("Bond Evidence"), Exhibit C (New York State Notice of Confirmation of Human Trafficking from Office of Temporary and Disability Assistance dated June 16, 2023); Bond Evidence, Exhibit F (Bellevue Hospital Records). While at Northeastern, Mr. He entered into a relationship with a fellow Chinese graduate student. During their relationship, she physically, economically, and psychologically abused him. He Decl., ¶ 9. By August 2011, Mr. He's girlfriend had been, for months, purposefully isolating him from friends and family, depriving him of sleep, and denying him food or money to buy himself food. *Id.* ¶ 10. On August 17, 2011, Mr. He was emaciated and in a state of severe physical and mental dysregulation when his girlfriend attacked him and Mr. He killed her and tried to die by suicide. *Id.* After completing his sentence for his conviction of criminally negligent homicide due to this incident, Mr. He was detained and placed in removal proceedings on October 10, 2024. Mr. He is currently incarcerated at the Buffalo Federal Detention Facility in Batavia, New York, at the direction of the U.S. Immigration and Customs Enforcement ("ICE").

6.     Respondent Joseph Freden is named in his official capacities as the Deputy Field Office Director of the Buffalo Field Office and Administrator of the Buffalo Federal Detention Facility in Batavia, New York, where Mr. He is currently detained. In this capacity, he is a legal custodian of Mr. He Mr. Freden's address is 4250 Federal Drive, Batavia, NY 14020.

7.      Respondent Thomas Brophy is named in his official capacity as the Field Office Director of the Buffalo Field Office for ICE within the DHS. In this capacity, he is responsible for the administration of immigration laws and the execution of detention and removal determinations, and as such is a legal custodian of Mr. He Mr. Brophy's address is Buffalo ICE Field Office Director, 250 Delaware Avenue, Floor 7, Buffalo, NY 14202.

8.      Respondent Sirce E. Owen is named in her official capacity as the Acting Director of the Executive Office of Immigration Review ("EOIR") in the U.S. Department of Justice. In this capacity, she is responsible for the administration of the immigration laws pursuant to 8 U.S.C. § 1103(g). She is legally responsible for administering Mr. He's removal proceedings and the standards used in those proceedings. As such, she is a legal custodian of Mr. He Ms. Owen routinely transacts business in the Western District of New York. Ms. Owen's address is Executive Office for Immigration Review, 5107 Leesburg Pike, Falls Church, VA 22041.

9.      Respondent Kristi Noem is named in her official capacity as the Secretary of the Department of Homeland Security. In this capacity, she is responsible for the administration of the U.S. immigration laws, and as such is a legal custodian of Mr. He Ms. Noem routinely transacts business in the Western District of New York and supervises Mr. Brophy. Mr. Noem's address is Secretary of Homeland Security, U.S. Department of Homeland Security, Washington, DC 20528.

10.     Respondent Pamela Bondi is named in her official capacity as the Attorney General of the United States in the U.S. Department of Justice. In this capacity, she is responsible for the administration of the immigration laws as exercised by the EOIR pursuant to 8 U.S.C. § 1103(g). She is legally responsible for administering Mr. He's removal proceedings and the standards used in those proceedings. As such, she is a legal custodian of Mr. He Ms. Bondi routinely transacts

business in the Western District of New York. Ms. Bondi's address is U.S. Department of Justice, 950 Pennsylvania Avenue, N.W., Washington, DC 20530.

## JURISDICTION AND VENUE

11.    This Court has subject matter jurisdiction over this Petition pursuant to: its power to grant habeas corpus, 28 U.S.C. § 2241; federal question jurisdiction, 28 U.S.C. § 1331; civil rights jurisdiction, 28 U.S.C. § 1343(a)(4); the Suspension Clause of the United States Constitution, Article I, § 9, cl. 2; and Article III of the United States Constitution. The Court has additional remedial authority under the All Writs Act, 28 U.S.C. § 1651, and the Declaratory Judgment Act, 28 U.S.C. § 2201. This Court also has the authority to grant declaratory and injunctive relief. 28 U.S.C. §§ 2201, 2202.

12.    Federal district courts have jurisdiction under 28 U.S.C. § 2241(c)(3) to hear habeas corpus claims by non-citizens challenging the lawfulness and/or constitutionality of their detentions when ICE holds them pursuant to 8 U.S.C. § 1226(a). *See Demore v. Kim*, 538 U.S. 510, 516–17 (2003); *Zadvydas v. Davis*, 533 U.S. 678, 687 (2001); *see also Rajesh v. Barr*, 420 F. Supp. 3d 78, 84 (W.D.N.Y. 2019).

13.    Venue is proper in the Western District of New York under 28 U.S.C. § 2241 because Mr. He is currently detained at the Buffalo Federal Detention Facility in Batavia, New York, which is within the Western District of New York.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.    Mr. He's claims of unlawful detention are not subject to any statutory exhaustion requirement. "Courts are in agreement that 'there is no statutory requirement of administrative exhaustion before immigration detention may be challenged in federal court by a writ of habeas corpus.'" *Gonzalez Evangelista v. Decker*, 2021 WL 101201, at *2 (S.D.N.Y. Jan. 12, 2021)

(quoting *Velasco Lopez v. Decker*, 2019 WL 2655806, at *2 (S.D.N.Y. May 15, 2019), *aff'd*, 978 F.3d 842 (2d Cir. 2020)); *see Lopez v. Barr*, 458 F. Supp. 3d 171, 176 (W.D.N.Y. 2020).

15.    Even if the Court requires administrative exhaustion as a prudential matter, Mr. He's case falls within an exception because his petition raises "constitutional questions that the [BIA] does not have jurisdiction to adjudicate." *Blandon v. Barr*, 434 F. Supp. 3d 30, 37 (W.D.N.Y. 2020); *see also Beharry v. Ashcroft*, 329 F.3d 51, 62 (2d Cir. 2003) (noting prudential exhaustion may be waived when "a plaintiff has raised a substantial constitutional question"). Indeed, this Court regularly finds that "exhaustion . . . as a prudential matter" is waived where the issue presented is the standard of proof to be applied at a bond hearing, noting that "the available administrative remedies provide no genuine opportunity for adequate relief because the burden of proof the IJ would use at a bond hearing in the absence of an order from this Court does not comply with due process." *See Blandon v. Barr*, 2019 WL 7759228, at *4 (W.D.N.Y. Oct. 28, 2019); *see also Lopez v. Barr*, 458 F. Supp. 3d 171, 176 (W.D.N.Y. 2020) ("The Court will not require exhaustion here. [The] petition argues that § 1226(a) and the Constitution require the government to bear the burden of proof during a bond hearing. Such statutory and constitutional questions cannot be decided by an IJ or the BIA, and accordingly [the petitioner] was not required to exhaust his administrative remedies before bringing this claim in federal court.") (internal quotation marks omitted).

16.    Regardless, Mr. He has exhausted all the administrative remedies available to him. Mr. He sought release on bond before an IJ on October 31, 2024, and appealed the IJ's denial of bond to the Board of Immigration Appeals ("BIA") on December 5, 2024.

## FACTS

***Mr. He's Early Life in China and Arrival in the United States***

17.     Mr. He was born in Tianjin, China, a large city southeast of Beijing. *See* He Decl., ¶ 2. His father worked as a Chinese Communist Party officer. *See* Bond Evidence, Exhibit H (Affidavit of Yushi Liu), ¶ 4; He Decl., ¶ 2. His mother was forced to quit her job when Mr. He was born. *See* He Decl., ¶ 2. Due to the "One Child Policy," Mr. He is an only child. *See* He Decl., ¶ 2; Affidavit of Yushi Liu, ¶ 3.

18.     Mr. He's father physically and psychologically abused Mr. He. *See* He Decl., ¶¶ 3, 4; Affidavit of Yushi Liu, ¶¶ 5, 6. If Mr. He failed to get perfect grades, his father would slap, beat, and kick Mr. He repeatedly—often threatening to break Mr. He's legs. *See* He Decl., ¶ 3. These beatings happened regularly, sometimes for no reason at all, at home, at a relative's home, or in public. *See* He Decl., ¶ 3. Mr. He parents also ignored Mr. He for days at a time, a punishment known as "cold violence" in Chinese, meant to signal that they did not care about him. *See* He Decl., ¶ 4.

19.     Most of this abuse centered on Mr. He's performance at school, where Mr. He was a model student. In fact, he consistently finished at the top of his class year after year. *See* He Decl., ¶ 3; Affidavit of Yushi Liu, ¶ 7.

20.     After high school, Mr. He's father wanted him to become a Chinese Communist Party officer, but Mr. He instead attended and graduated from Tianjin Normal University. *See* Affidavit of Yushi Liu, ¶¶ 8, 9. Following graduation, he convinced his parents to support his dream of studying in the United States. *See id.* ¶ 9; He Decl. ¶ 6.

21.     Mr. He arrived in the United States in December 2009 on an F-1 student visa to attend Northeastern University's Global Pathway Program as a full-time graduate student. *See* He Decl., ¶¶ 7, 8; *see* Bond Evidence, Exhibit J (Affidavit of Chenling Lu), ¶¶ 3, 4.

22.     From January to May 2010, Mr. He completed his program's mandated ESL classes and was prepared to start classes relating to his chosen major, Financial Services, in the fall of 2010. During these first five months, Mr. He's classmates at Northeastern described Mr. He's demeanor as very outgoing, friendly, respectful, and focused. *See* Affidavit of Chenling Lu, ¶ 6.

***Mr. He's Relationship with S.L.***

23.     In May 2010, Mr. He was introduced to S.L., another international graduate student at Northeastern, and they quickly entered into a relationship. *See* He Decl., ¶ 9.

24.     S.L. isolated Mr. He from his friends, at first demanding expensive gifts and later physically abusing him. *See* He Decl., ¶ 9.[1] When he attempted to break up with her, she also stalked him, contacted his friends, and pressured him to get back together with her. *See* He Decl., ¶ 9; Affidavit of Yushi Liu, ¶ 19; Bond Evidence, Exhibit I (Affidavit of Qin Chen) (describing S.L.'s abuse of Mr. He around this time), ¶¶10–19. She also pressured him to drop out of school to make money, which she kept for herself. *See* He Decl., ¶ 9; Bond Evidence, Exhibit C (New York State Notice of Confirmation of Human Trafficking from Office of Temporary and Disability Assistance dated June 16, 2023). As a result of S.L.'s abuse, including depriving Mr. He of food

---

[1] Though male domestic violence survivors like Mr. He have historically been overlooked as victims of interpersonal violence, a National Intimate Partner and Sexual Violence Study conducted by the Centers for Disease Control and Prevention found that lifetime prevalence of domestic violence victimization was 47.3% of women and 44.2% of men. Centers for Disease Control and Prevention, *The National Intimate Partner and Sexual Violence Survey: 2016/2017 Report on Intimate Partner Violence*, at 4 (Oct. 2022), *available at* https://www.cdc.gov/violenceprevention/pdf/nisvs/NISVSReportonIPV_2022.pdf. Additionally, studies exploring the prevalence of female-to-male domestic violence have identified substantial physical abuse, significant levels of verbal aggression, psychological abuse, and sexual abuse. Benjamin Hine et al., *Exploring the Experiences of Telephone Support Providers for Male Victims of Domestic Violence and Abuse*. J. INTERPERSONAL VIOLENCE, Vol. 37(7-8), at NP5596 (Apr. 2022), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC8980445/.

and sleep, Mr. He began experiencing hallucinations, hearing voices, and feeling euphoria disconnected to reality. *See* Bond Evidence, Exhibit F (Medical Records from Bellevue Hospital).

25.    On August 17, 2011, Mr. He worked a full day without food. When Mr. He returned home in the evening, S.L. screamed at Mr. He and broke his guitar, a treasured possession. *See* He Decl., ¶ 10. Mr. He then killed S.L. and attempted to take his own life. *See* He Decl., ¶ 10.

26.    After his arrest, Mr. He was diagnosed with psychosis (including auditory and visual hallucinations), depression, psychomotor slowing, and suicidal thoughts. *See* Medical Records from Bellevue Hospital).

27.    On October 1, 2014, Mr. He pled guilty to first-degree manslaughter before Justice D'Emic in exchange for a promised sentence of 18 years in prison with 5 years post-release supervision. *See* Berger Decl., Exhibit 1 (Criminal History Documents).

***Mr. He's Post-Conviction Successes***

28.    Mr. He's post-sentencing achievements are remarkable. Mr. He has never had a disciplinary ticket while in DOCCS custody. *See* Bond Evidence, Exhibit EE (Disciplinary Record Print-Out). He has never received less than the highest possible marks on every job and educational review while in DOCCS custody. While incarcerated, he became a Teaching Assistant for ESL classes and a member of the Inmate Grievance Resolution Committee. He has completed both the basic and advanced Alternatives to Violence Project programs and a Restorative Justice Course.

29.    While at Green Haven correctional facility in New York, Mr. He was invited to play the guitar at church services, offering Mr. He a second chance at life. *See* He Decl., ¶ 11. Mr. He then became a member of the St. Paul Chapel Choir at Green Haven and began studying to become a Catholic. *Id.*

30.     In 2017, Mr. He was accepted to the New York Theological Seminary to study theology and transferred to Sing Sing Correctional Facility, where the program was offered. *Id.* ¶ 12. While at Sing Sing, Mr. He was involved in the Our Lady of Hope chapel and ministry and participated in Bible study, where he would play music for the services. *Id.* ¶¶ 13–14.

31.     At Sing Sing, Mr. He was baptized, and then he was confirmed by Cardinal Timothy Dolan, Archbishop of New York. *Id.* ¶ 15. Archbishop Dolan later submitted a letter in support of Mr. He's resentencing. *See* Bond Evidence, Exhibit G (Dolan Letter).

32.     In July 2017, Mr. He married Y.R., whom he had met through a paid program called Friends Beyond the Wall. He Decl., ¶ 24. Over the following months, their relationship grew toxic. *Id.* ¶ 25. However, having endured a highly abusive relationship before, Mr. He recognized the signs, sought advice from his mentors at the church, and withdrew from Y.R., ending communication. *Id.* Mr. He has not been in regular contact with Y.R. for more than six years. *Id.*

33.     In 2018, Mr. He obtained his master's degree from New York Theological Seminary. *See* Bond Evidence, Exhibit X (Letter from Dr. W. Francois III, Director); He Decl., ¶ 19. He has also enrolled in college courses for non-credit since he already has his undergraduate and master's degrees. Additionally, he served as the Special Subjects Clerk at Sing Sing and became a member of the Carnegie Hall Musical Connections and Musicambia programs. *Id.*

34.     As Special Subjects Clerk, Mr. He assisted the Prison Superintendent with coordinating all special events at Sing Sing, including religious events, rehabilitation programs, and cultural events. *See* Bond Evidence, Exhibit FF (Capra Letter); He Decl., ¶ 20. In this role, he has been given outstanding evaluations in addition to several raises. Mr. He also participated in a Foundations of Ministry course, which equipped him with the tools to practice his music ministry at Our Lady of Hope Chapel. He Decl., ¶ 21.

35.     Most notably, Mr. He has used his time in custody to pursue his extraordinary talent as a jazz musician and jazz composer. Mr. He expanded the church choir; and twice a month, he volunteered to do music therapy in two different mental health units at Sing Sing. *Id.* ¶ 22.

36.     Mr. He has also connected with professional musicians from prominent institutions including Carnegie Hall and Julliard, who believe his talent is so great that they have taken measures to ensure his compositions are brought outside prison walls and onto professional stages. *Id*. ¶ 30. To date, Mr. He's original compositions have been performed at Carnegie Hall, Lincoln Center, and Trinity Church of Wall Street. *Id*. His songs, performed either by him or by others, are available on YouTube. *See* https://youtu.be/p_muLH9mADQ; https://youtu.be/H45AMDORzAE; https://youtu.be/xhTjImkCqgg. The music was recorded in a studio, and an album of his compositions will be released in 2025. *Id*.

37.     Remarkably, Mr. He received letters in support of his resentencing from the following individuals:

- Cardinal Timothy Dolan, Archbishop of New York (Bond Evidence, Exhibit G)
- Dr./Sister Joanna Chan, Community Leader & Playwright, Member of the Maryknoll Sisters of St. Dominic, and Volunteer at Sing Sing Correctional Facility (Bond Evidence, Exhibit K)
- Former Superintendent of Sing Sing Michael Capra (Bond Evidence, Exhibit FF)
- Manuel Bagorro, Creative Advisor at Carnegie Hall (Bond Evidence, Exhibit L)
- Dr. Elliot Cole, Program Director of Musicambia (Bond Evidence, Exhibit AA)
- Ayanna Cole, Director of Social Impact Programs at Carnegie Hall (Bond Evidence, Exhibit M)
- Father Zachariah Presutti, SJ, Executive Director at Thrive For Life (Bond Evidence, Exhibit O)
- Sebastian Budinich, Supportive Services Coordinator at Thrive For Life (Bond Evidence, Exhibit N)
- Brad Balliett, Faculty of Musicambia (Bond Evidence, Exhibit Q)
- Laura Weiner, Faculty of Musicambia (Bond Evidence, Exhibit R)
- Charles Moore, Director of Programs & Operations for the Rehabilitation Through the Arts Program at Sing Sing Correctional Facility (Bond Evidence, Exhibit S)
- Christopher Estberg, Office of Mental Health, Department of Corrections and Community Supervision (Bond Evidence, Exhibit T)

- John Mahoney, RPL II - Department of Corrections and Community Supervision (Bond Evidence, Exhibit U)
- Craig Littrell, RPL I - Department of Corrections and Community Supervision (Bond Evidence, Exhibit V)
- James, Correctional Officer at Sing Sing Correctional Facility (Bond Evidence, Exhibit BB)
- Knowlden, Correctional Officer at Sing Sing Correctional Facility (Bond Evidence, Exhibit CC)
- Father Matthew Ugwoji, Catholic Chaplain at Sing Sing Correctional Facility (Bond Evidence, Exhibit W)

38.    In 2024, Mr. He's conviction for manslaughter was vacated and Mr. He instead pleaded guilty to criminally negligent homicide and was resentenced to 1 year, 4 months to 4 years. *See* Berger Decl., Exhibit 1 (Criminal History Documents).

## PROCEDURAL HISTORY

### *Bond Proceedings*

39.    Upon Mr. He's release from DOCCS custody on October 10, 2024, ICE detained Mr. He pursuant to 8 U.S.C. § 1226(a). Mr. He then requested a bond hearing.

40.    On October 31, 2024, Mr. He received a bond hearing before IJ Eric Schultz. *See* Berger Decl. ¶¶ 8–11; *id.* Exhibit 4 (Memorandum Denying Bond). At the hearing, ICE confirmed that it was detaining Mr. He pursuant to 8 U.S.C. § 1226(a), and IJ Schultz placed the burden on Mr. He to show that he was not a danger to the community or a flight risk. *Id.* at 2. Thus, IJ Schultz refused to set bond unless Mr. He demonstrated that his release would not pose a danger and that he was not a flight risk. *Id.* In his memorandum explaining his decision, IJ Schultz found that Mr. He failed to satisfy this burden as to his potential danger and denied bond. *Id.* at 5.

41.    IJ Schultz acknowledged Mr. He's exemplary disciplinary record while incarcerated and his rehabilitation: "The Court commends Respondent for his model disciplinary record while incarcerated since 2011, and for his efforts to deal with the psychological issues that may have been at the root of the situation that led to the tragic death of his then-girlfriend in 2011."

*Id.* at 4. Nonetheless, IJ Schultz denied bond because of the possibility that Mr. He could once again find himself in abused by an intimate partner, reasoning that X.B.H's history "indicates a possible continued propensity to place himself in dangerous circumstances where he is victimized, and if released, he would not have the guardrails of incarceration to prevent him from acting on this victimization in an inappropriate, if not worse, manner." *Id.* at 4–5.

42.     IJ Schultz appeared to balance Mr. He's conduct in 2011 with his subsequent rehabilitation, rather than focusing on Mr. He's potential future conduct: "The Court thus finds that, based on this record, Respondent has failed to meet his burden to establish that he does not pose a risk of danger to the community, *as the weight of the underlying nature and facts of the criminal offense is not overcome by his rehabilitation efforts while incarcerated*." *Id.* at 5 (emphasis added).

43.     IJ Schultz did not appear to consider imposing conditions that could mitigate the risk of danger as a term of release. *Id.*

44.     However, IJ Schultz noted that, if he were to reach the issue of whether Mr. He also were a flight risk—even with the burden on Mr. He—IJ Schultz "would not be so concerned with risk of flight to deny bond on that basis, and would grant his release on an appropriate bond amount, given the strong community support and what appears to be a solid plan for reintegration into the community, as well as a promising future in a musical career." *Id.* at 5.

45.     Mr. He appealed IJ Schultz's decision to the BIA and filed his brief on December 5, 2024. Berger Decl., Exhibit 5 (BIA Brief). The BIA has not yet ruled on the appeal. *See* Berger Decl. ¶ 12.

***Removal Proceedings***

46.     On October 9, 2024, ICE charged Mr. He as removable under 8 U.S.C.

§ 1227(a)(1)(C)(i) because Mr. He entered the United States on an F-1 student visa in 2009 but, due to his girlfriend's abuse of him, did not enroll in classes in the spring of 2011. *See* Berger Decl., Exhibit 2 (Notice to Appear).

47.    Mr. He submitted applications for asylum, deferral of removal under the Convention against Torture, and withholding of removal. *See* Berger Decl., ¶ 13. He asserted two grounds for each of these three forms of relief: first, as a Roman Catholic, he would likely face persecution by the Chinese government if deported to China; and second, as a criminal deportee convicted of a crime against another Chinese citizen, he would likely be placed in a reeducation camp and tortured upon his return to China. *Id.*

48.    IJ Schultz began a hearing on Mr. He's applications on December 17, 2024, and continued the hearing to the following day. IJ Schultz scheduled a hearing for January 15, 2025, at which time he said he would issue an oral decision if he had not already issued a written decision. Mr. He's counsel submitted additional evidence on January 10, 2025, and IJ Schultz responded by cancelling the January 15 hearing and instead giving DHS until January 17, 2025 to respond. On February 7, 2025, IJ Schultz denied Mr. He's applications. *See Berger* Decl. ¶ 15. Mr. He intends to appeal this decision to the BIA promptly.

## APPLICABLE LAW

### I.    Statutory Basis for Detention

49.    Under the INA, "an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Pending such a decision, the government "may continue to detain the arrested alien." 8 U.S.C. § 1226(a)(1). Alternatively, the government "may release" an individual detained under § 1226(a) "on bond . . . or conditional parole." 8 U.S.C. § 1226(a)(2).

50.     Though the government has long had the power of discretionary detention pending removal, the Attorney General historically exercised this presumption in favor of liberty. *See Velasco Lopez*, 978 F.3d at 848. The BIA endorsed this presumption in *In re Patel*, stating that "[a]n alien generally is not and should not be detained or required to post bond except on a finding that he is a threat to the national security . . . or that he is a poor bail risk." 15 I. & N. Dec. 666, 666 (BIA 1976). The BIA reaffirmed the conclusion that the government bore the burden of proof in subsequent cases. *See*, *e.g.*, *In re Andrade*, 19 I. & N. Dec. 488, 489 (BIA 1987); *In re Shaw*, 17 I. & N. Dec. 177, 178 (BIA 1979); *In re Spiliopoulos*, 16 I. & N. Dec. 561, 563 (BIA 1978).

51.     When Congress passed the Illegal Immigration Reform and Immigration Responsibility Act ("IIRIRA") in 1996, it expanded the class of noncitizens subject to mandatory detention, but did not alter the general detention provision, which the government is using to detain XB.H. *See* 8 U.S.C. § 1226(a). Despite no change in the underlying statute, the Immigration and Naturalization Service ("INS") implemented new regulations soon after Congress passed IIRIRA, abandoning the longstanding presumption in favor of liberty. The new INS regulations only allowed arresting officers to release a noncitizen "provided that the alien must demonstrate to the satisfaction of the officer that such release would not pose a danger to property or persons, and that the alien is likely to appear for any future proceeding." 8 C.F.R. § 236.1(c)(8).

52.     Although this new INS regulation only applied to the initial custody determination made by arresting officers, the BIA later ruled that it was bound by the enforcement agency's regulation and held that noncitizens carried the burden of proof at bond hearings conducted by Immigration Judges under § 1226(a). *In re Adeniji*, 22 I. & N. Dec. 1102, 1113 (BIA 1999). The BIA reaffirmed that holding in *Matter of Guerra*, placing "[t]he burden . . . on the alien to show to the satisfaction of the Immigration Judge that he or she merits release on bond." 24 I. & N. Dec at

40. Under the BIA's precedents, its "to the satisfaction" standard is equivalent to a preponderance of the evidence standard. *Matter of Barrieros*, 10 I. & N. Dec. 536, 537 (BIA 1964).

53.    Here, IJ Schultz relied on this line of authority, especially *Guerra,* to conclude that a noncitizen detained under § 1226(a) bears the burden of establishing that he is not a danger and does not pose a risk of flight. Berger Decl., Exhibit 4, Memorandum Denying Bond. [23]

## II.    Mr. He is Entitled to the Protections of the Due Process Clause.

54.    Detention during removal proceedings is a constitutionally valid aspect of the deportation process. *Demore*, 538 U.S. at 523; *Velasco Lopez*, 978 F.3d at 848. But any statute that permits detention of a noncitizen must comport with the Constitution. *See Zadvydas*, 533 U.S. at 690. The Supreme Court has noted that "[a] statute permitting indefinite detention of an alien would raise a serious constitutional problem." *Id.*

55.    The Due Process Clause of the Fifth Amendment states that "No person shall be . . . deprived of . . . liberty . . . without due process of law." U.S. CONST. AMEND. V. "Freedom from imprisonment—from government custody, detention, or other forms of physical restraint—lies at the heart of the liberty that Clause protects." *Zadvydas*, 533 U.S. at 690. This freedom "has always been at the core of the liberty protected by the Due Process Clause from arbitrary governmental action." *Foucha v. Louisiana*, 504 U.S. 71, 80 (1992). The Due Process Clause "covers

---

[3] Neither the Respondents nor IJ Schultz has, at any point, suggested that Mr. He is subject to mandatory detention under 8 U.S.C. § 1226(c). Furthermore, the recent amendment to that provision under the Laken Riley Act, *see* Pub. L. 119-1 (2025); 8 U.S.C. § 1226(c)(1)(E), is irrelevant to Mr. He, as that amendment only applies to certain individuals who were never formally admitted to the United States. As stated above, Mr. He entered the United States on an F-1 student visa.

noncitizens, whether their presence here is lawful, unlawful, temporary, or permanent." *Velasco Lopez*, 978 F.3d at 850.

56.    The Supreme Court has recognized only two valid purposes for civil detention: protecting the community and preventing flight. *See Zadvydas*, 533 U.S. at 690. Even when the government invokes these reasons, due process requires "adequate procedural protections" to ensure that the government's asserted justification for physical confinement outweighs the individual's constitutionally protected interest in avoiding imprisonment. *Id.* And "[t]he Supreme Court has been unambiguous that executive detention orders, which occur without the procedural protections required in courts of law, call for the most searching review." *Velasco Lopez*, 978 F.3d at 850 (citing *Boumediene v. Bush*, 553 U.S. 723, 781–83 (2008); *I.N.S. v. St. Cyr*, 553 U.S. 289, 301–02 (2001)).

57.    To determine whether the procedural safeguards afforded to a detained noncitizen were sufficient under the Due Process Clause, the Second Circuit applied the three-factor balancing test laid out by the Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976). *See Velasco Lopez*, 978 F.3d at 851. The *Mathews* test requires consideration of (1) "the private interest that will be affected by the official action"; (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards"; and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335; *accord Velasco Lopez*, 978 F.3d at 851.

58.    Applying this framework in *Black*, which followed *Velasco Lopez*, the Second Circuit held that in immigration bond proceedings, "[w]here the government seeks to continue depriving a person of their liberty—especially when a district court has already found that

deprivation to be unconstitutionally prolonged—we must require the government to bear the burden of proving the need for continued detention." 103 F.4th at 155. This ruling accorded with the "consensus view that where . . . the government seeks to detain an alien pending removal proceedings, it bears the burden of proving that such detention is justified," *Rajesh*, 420 F.Supp.3d at 86 (quoting *Darko v. Sessions*, 342 F.Supp.3d 429, 434–36 (S.D.N.Y. 2018)), regardless of whether the detention has become prolonged.

59.     As the standard of proof, the Second Circuit further required that "that the government justify continued detention by clear and convincing evidence." *Black*, 103 F.4th at 157.

60.     Here, the government's continued detention of Mr. He violates the Due Process Clause for at least two reasons that fall within the ambit of the Second Circuit's decisions in *Velasco Lopez* and *Black*. First, the bond hearing that XB.H. received before IJ Schultz in October 2024 was not constitutionally adequate, as IJ Schultz forced Mr. He to bear the burden of showing why his release was not warranted. Second, regardless of the deficiencies of the October 2024 bond hearing, Mr. He is entitled to a new bond hearing with the enhanced procedural protections outlined by the *Velasco Lopez* and *Black* courts because Mr. He's detention has been prolonged and will likely continue for months or years unless this Court grants him relief.

61.     The proper remedy for an inadequate or unconstitutional bonding hearing, the Second Circuit has held, is a new bond hearing. *Velasco Lopez*, 978 F.3d at 855–56.

## III.     The Government violated the Due Process Clause by Placing the Burden of Proof on Mr. He

62.     IJ Schultz relied only on agency regulations and case law when placing the burden on Mr. He to establish that he merited release on bond. *See* Berger Decl., Exhibit 4, Memorandum

Denying Bond, at 3 (citing 8 C.F.R. § 1236.1(c)(8); *Matter of Fatahi*, 26 I&N Dec. 791, 793 (BIA 2016); *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006)).

63.    However, the Fifth Amendment entitles noncitizens to the protections of the Due Process Clause. *Velasco Lopez*, 978 F.3d at 850 (citing *Reno v. Flores*, 507 U.S. 292, 306 (1993)). "[T]he Due Process Clause applies to all 'persons' within the United States," including noncitizens, "whether their presence here is lawful, unlawful, temporary or permanent." *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001).

64.    Because of these due process protections, the Second Circuit has held that, in an immigration case, "[w]here the government seeks to continue depriving a person of their— especially when a district court has already found that deprivation to be unconstitutionally prolonged—we must require the government to bear the burden of proving the need for continued detention." *Black*, 103 F.4th at 156. Though *Black* presented consolidated cases involving prolonged detention, the grammar of Second Circuit's holding indicates that the ruling applies to all immigration bonding proceedings. *See id.*

65.    Additionally, to the extent there is any ambiguity as to whether the holdings of *Velasco Lopez* and *Black* apply to immigration detention that has not yet become prolonged, "a consensus" of district courts in this Circuit have held that, even in cases of less prolonged detention, the government must still bear the burden of proof. *Rajesh*, 420 F.Supp.3d at 86 (quoting *Darko*, 342 F.Supp.3d at 434–36); *see also Aparicio Jimenez v. Decker*, No. 21-cv-880 (VSB), 2021 WL 826752, at *8 (S.D.N.Y. Mar. 3, 2021) (rejecting the government's argument that *Velasco Lopez* suggests that the agency's burden allocation is unconstitutional *only* when detention has become prolonged); *J.C.G. v. Genalo*, 24-cv-08755 (JLR), 2025 WL 88831, at *9 (S.D.N.Y., Jan. 14, 2025) (same); *B.S. v. Joyce*, No. 22-cv-09738 (PKC), 2023 WL 1962808, at *4 (S.D.N.Y.

Feb. 13, 2023) (same); *Banegas v. Decker*, No. 21-cv-2359 (VEC), 2021 WL 1852000, at *3 (June 7, 2021) (same); *Quintanilla v. Decker*, No. 21-cv-417 (GBD), 2021 WL 707062, at *3 (S.D.N.Y. Feb. 22, 2021) (same); *Lopez Cano v. Decker*, No. 22-cv-7428 (AKH), 2022 WL 17584156, at *3 (S.D.N.Y. Dec. 12, 2022) (finding that the right to a "procedurally proper bond hearing does not depend on the length of a petitioner's detention").

66.    Moreover, in this line of cases, "[t]he Supreme Court has consistently held the Government to a standard of proof higher than a preponderance of the evidence where liberty is at stake, and has reaffirmed the clear and convincing standard for various types of civil detention." *Velasco Lopez*, 978 F.3d at 855 (collecting cases). Accordingly, after applying the *Matthew* factors to immigration bond proceedings, the Second Circuit has required "that the government justify continued detention by clear and convincing evidence." *Black*, 103 F.4th at 157.

67.    IJ Schultz further relied on an unnecessarily constrained reading of *Velasco Lopez* and failed to consider *Black* at all. *See* Berger Decl., Exhibit 4, Memorandum Denying Bond at 3. Specifically, IJ Schultz wrote: "While it is true that the Second Circuit found that, where a respondent is facing prolonged detention under INA §236(a), the Due Process clause requires that DHS bear the burden to establish by clear and convincing evidence that the respondent is a danger or a flight risk, it declined to create a bright-line rule for at what point in a detention this burden shift should occur." *Id.* (citing *Velasco Lopez*, 978 F.3d at 853). Yet the Second Circuit rejected this very argument in *Black*:

> The government suggests that our decision in *Velasco Lopez* means that the noncitizen, even when not subject to mandatory detention, has been allowed to shift the burden to the government only at second or third bond hearings—and not at the initial bond hearing. Accordingly, the government asserts, the noncitizen subject to mandatory detention must bear the burden at the first hearing. We find this argument unpersuasive. It is rooted neither in the text of section 1226 nor in our reasoning in *Velasco Lopez*.

*Black*, 103 F.4th at 157.

68.     Moreover, the individual circumstances of Mr. He's case overwhelmingly favor heightened procedural protections under *Matthews*.

69.     *First*, Mr. He's private interest affected by government action "is the most significant liberty interest there is—the interest in being free from imprisonment." *Velasco Lopez*, 978 F.3d at 851 (citing *Hamdi v. Rumsfeld*, 542 U.S. 507, 529 (2004)). As the *Velasco Lopez* court recognized, "commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Id.* (citing *Jones v. U.S.*, 463 U.S. 354, 361 (1984)). In fact, Mr. He is "not detained" at Buffalo Federal Detention Facility, but rather "incarcerated under conditions indistinguishable from those imposed on criminal defendants sent to prison following convictions for violent felonies and other serious crimes." *Id.* at 850 (internal quotations omitted); *see also Chavez-Alvarez v. Warden York Cty. Prison*, 783 F.3d 469, 478 (3d Cir. 2015) (citing *Hendricks*, 521 U.S. at 361) ("[M]erely calling a confinement 'civil detention' does not, of itself, meaningfully differentiate it from penal measures."), *overruled on other grounds by Jennings v. Rodriguez*, 138 S. Ct. 830 (2018).

70.     *Second*, "[r]equiring that detainees like [Mr. He] prove that they are *not* a danger and *not* a flight risk—after the government has enjoyed a presumption that detention is necessary—presents too great a risk of an erroneous deprivation of liberty . . . ." *Black*, 103 F.4th at 156 (emphasis in original). Due to the presumption that their detention is necessary, many noncitizens remain detained under § 1226(a) simply because they are unable to demonstrate their worthiness for release "to the satisfaction" of an IJ. *Matter of Guerra*, 24 I. & N. Dec. at 38. They are forced to prove negatives—that they are not dangerous or likely to flee—and even where they present evidence of good character and domestic stability, IJs are permitted to resolve competing evidence against their favor. *See Black*, 103 F.4th at 156 ("'[P]roving a negative (especially a lack

21

of danger) can often be more difficult than proving a cause for concern.'") (quoting *Hernandez-Lara*, 10 F.4th at 31); *Elkins v. United States*, 364 U.S. 206, 218 (1960) ("[A]s a practical matter it is never easy to prove a negative.").

71.    As in *Velasco Lopez*, the procedures afforded under BIA precedents "seriously impact[ed]" Mr. He's ability to obtain bond. *Velasco Lopez*, 978 F.3d at 852. Like Mr. Velasco Lopez, Mr. He was required to prove a negative—*i.e.*, that that he was neither a danger nor a flight risk. *Id.* Critically, in denying bond, IJ Schultz faulted Mr. He for his past victimization and improperly determined that Mr. He posed a present danger without considering the totality of the evidence. *See* Berger Decl., Exhibit 4, Memorandum Denying Bond at 3–5. Had the burden been on the government, they would have needed to provide affirmative evidence that Mr. He posed a *present* danger, instead of pointing to "temporally distant offenses . . . ." *Mathon v. Searls*, 623 F. Supp. 3d 203, 216 (W.D.N.Y. 2022).

72.    *Third*, the government would not suffer any undue fiscal or administrative hardship from bearing the burden of showing that Mr. He poses a danger or flight risk that cannot be mitigated by reasonable conditions of supervision. To the contrary, the government has no interest in detaining noncitizens who are neither dangerous nor a flight risk, but it does have an interest in "minimizing the enormous impact of incarceration in cases where it serves no purpose." *Velasco Lopez*, 978 F.3d at 852; *see also Aparicio-Villatoro v. Barr*, 2019 WL 3859013, at *6 (W.D.N.Y. Aug. 16, 2019) ("[T]he Court cannot discern any legitimate government interest, beyond administrative convenience, in detaining noncitizens generally while their immigration proceedings are pending and no final removal order has been issue[d]."). Indeed, should this Court order Mr. He's requested "due process hearing where the government b[ears] the burden of proof" then "the IJ [must] consider alternatives *before* resorting to detention." *Mathon v. Searls*, 623 F.

22

Supp. 3d 203, 217 (W.D.N.Y. 2022) (emphasis in original) (quoting *Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 242 (W.D.N.Y. 2019) ("[W]hether detention is necessary to serve a compelling regulatory purpose *requires* consideration of whether a less restrictive alternative to detention . . . would also address those purposes.") (emphasis in original) (internal citations and quotations omitted)).

73.    Consequently, Mr. He's due process rights were violated by IJ Schultz's failure to place the burden of proof on the government at his October 2024 bond hearing.

**IV.    Even if Mr. He's First Bond Hearing was Adequate, He Is Entitled to a New Bond Hearing Due to His Lengthy Detention.**

74.    Even if this Court finds that Mr. He's initial bond hearing comported with due process, *Velasco Lopez* and *Black* make clear that he nevertheless is entitled to a new hearing with heightened procedural protections as his detention has become prolonged and continues indefinitely. In *Velasco Lopez*, the Second Circuit used the *Mathews* factors to reach the conclusion that an individual who faced prolonged detention was entitled to a bond hearing where the government bore the burden of proof by clear and convincing evidence. 978 F. 3d at 856. Applying the same factors to the government's detention of Mr. He leads to the same result.

75.    *First*, "the private interest affected by the official action is the most significant liberty interest there is—the interest in being free from imprisonment." *Id.* at 851. The *Velasco Lopez* court stressed that civil immigration detention bears substantial similarity to criminal detention, saying that "it is clear that commitment for any purpose constitutes a significant deprivation of liberty that requires due process protection." *Id.* at 851–52 (quoting *Jones v. United States*, 463 U.S. 354, 361 (1983)).

76.     Mr. He is currently detained at the Buffalo Federal Detention Facility. Conditions of confinement at there are "indistinguishable from penal confinement." *Joseph v. Barr*, No. 19-CV-565, 2019 WL 3842359, at *5 (W.D.N.Y. Aug. 15, 2019) (citation omitted).

77.     Moreover, Mr. He's detention has already lasted nearly four months and is likely to continue for months or years, given his strong arguments on their merits of his claims, his willingness to continue litigating them, and China's unlikeness to accept his repatriation. As the Second Circuit observed in *Velasco Lopez*, "[t]here is no administrative mechanism by which [Mr. He] could have challenged his detention on the ground that it reached an unreasonable length." 978 F.3d at 852.

78.     Indeed, Mr. He is appealing the IJ's decision to the BIA—a process that typically takes several months and could extend for years if the BIA remands the case. ICE will continue to detain Mr. He during the pendency of any appeal and remanded proceedings, even if Mr. He is successful on remand to the immigration court. If the Board dismissed Mr. He's appeal, he plans to petition for review before the Second Circuit. If he succeeds in his appeal or petition for review, he would then likely be required to present his merits case once again to an IJ.

79.     Moreover, even if the government were to obtain a final order of removal against Mr. He after that process, China would likely decline to issue him a new passport, causing him to continue languishing in detention.

80.     *Second*, the current procedures used under BIA precedent are likely to lead to an erroneous deprivation of rights. Here, the "primary interest is not that of the Government but the interest of the detained individual." *Velasco Lopez*, 978 F.3d at 852. And as the Second Circuit recognized, the procedures underpinning the detention of noncitizens held under § 1226(a) "markedly increased the risk of error." *Id.*

81.     As a practical matter, noncitizens may be ill equipped to compile the evidence that they need for bond hearings. The current legal regime requires noncitizens to produce evidence on a range of issues, including criminal and immigration records, address history, length of residence, and family ties. *See Guerra*, 24 I&N Dec. at 40. The Supreme Court has noted that immigrant detainees "have little ability to collect evidence," *Moncrieffe v. Holder*, 569 U.S. 184, 201 (2013), and the Second Circuit recognized that these procedures "seriously impact" a noncitizen's ability to secure bail. *Velasco Lopez.* 978 F.3d at 852. Thus, the second factor also favors Mr. He.

82.     *Third*, the government would not suffer any undue fiscal or administrative burden from bearing the burden to show that a noncitizen poses a danger or flight risk that cannot be mitigated by reasonable conditions of supervision. And while the government may have an interest in detaining individuals where it advances a legitimate government purpose, it does not have an interest in prolonged detention of noncitizens like Mr. He who are neither dangerous nor a risk of flight. *See Velasco Lopez*, 978 F.3d at 854. To the contrary, the government itself has an interest in "minimizing the enormous impact of incarceration in cases where it serves no purpose." *Id.*

83.     Indeed, placing the burden on the government to show dangerousness or flight risk would allow the government to deploy its substantial resources and existing pathways for sharing information across government agencies: "ICE and DHS can access the records of other federal agencies and local law enforcement and routinely do so for purposes of the merits proceedings." *Velasco Lopez*, 978 F.3d at 855. Therefore, the third factor also weighs in favor of H.L.

## V.     Mr. He Is Entitled to a New Bond Hearing that Comports with Due Process

84.     As a result of the government's constitutional violation, Mr. He is entitled to a bond hearing that must comport with due process. In that hearing, the government must bear the burden of proving, by clear and convincing evidence, that Mr. He is a danger or flight risk. *See Velasco Lopez*, 978 F.3d at 855–56.

85.    Due process also requires consideration of alternatives to detention and a noncitizen's ability to pay bond. The Supreme Court has recognized that the primary purpose of immigration detention is to ensure a noncitizen's appearance during removal proceedings. *See Zadvydas*, 533 U.S. at 697. Detention, particularly prolonged detention, is not reasonably related to this purpose if there are alternative conditions of release that could mitigate risk of flight. *See Bell v. Wolfish*, 441 U.S. 520, 538 (1979); *see also Hernandez v. Sessions*, 872 F.3d 976, 991 (9th Cir. 2017) (observing that alternatives to detention "resulted in a 99% attendance rate at all EOIR hearings and a 95% attendance rate at final hearings"). It follows that—in determining the appropriate conditions of release for immigration detainees—due process requires "consideration of financial circumstances and alternative conditions of release" to prevent against detention based on indigence. *Id.*; *see also Hechavarria v. Whitaker*, 358 F. Supp. 3d 227, 242 (W.D.N.Y 2019) (holding that it was legal error to refuse to consider alternative conditions of release proposed by a detained noncitizen during his bond hearing).

## CLAIM FOR RELIEF

### MR. HE'S DETENTION VIOLATES THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT BY PLACING THE BURDEN OF PROOF ON MR. HE

86.    Mr. He realleges and incorporates by reference each and every allegation contained in the preceding paragraphs as if set forth fully herein.

87.    Under the Due Process Clause of the Fifth Amendment of the U.S. Constitution, the government must bear the burden of showing by clear and convincing evidence that a detained noncitizen is a danger or a flight risk. The adjudicator at the bond hearing must also consider the suitability of release on alternatives to detention and consider Mr. He's ability to pay when setting a monetary bond.

88.    The government has not proven by clear and convincing evidence that Mr. He is a danger or flight risk. Nor has the government shown by clear and convincing evidence that Mr. He poses a danger or flight risk that cannot be mitigated by reasonable conditions of supervision. At his bond hearing, IJ Schultz violated the Fifth Amendment by requiring Mr. He to bear the burden on issues of danger and flight risk.

89.    Alternatively, if IJ Schultz validly required Mr. He to bear the burden of proof at his initial bond hearing, Mr. He's detention has since become unconstitutionally prolonged, and the government must now bear the burden of proof.

90.    For these reasons, the government's actions violate Mr. He's Fifth Amendment right to due process.

## PRAYER FOR RELIEF

WHEREFORE, Mr. He respectfully requests that the Court:

1) Assume jurisdiction over this matter;

2) Enjoin the government from transferring him outside the jurisdiction of the Buffalo Field Office pending the resolution of this case;

3) Issue a writ of habeas corpus directing the government to:

a.    Immediately release Mr. He from custody on his own recognizance or on reasonable conditions of supervision; or

b.    Provide Mr. He with a bond hearing at which the government would carry the burden of proving by clear and convincing evidence that Mr. He is a danger to the community and where the Immigration Judge must consider Mr. He's ability to pay and alternatives to detention that would mitigate any danger or flight risk;

4) Award Mr. He costs and reasonable attorneys' fees in this action as provided for by the

Equal Access to Justice Act, 28 U.S.C. § 2412; and

5) Grant such further relief as the Court deems just and proper.

Respectfully submitted,

By:    */s/ Kyle Barron*

*Counsel for Petitioner*

LABATON KELLER SUCHAROW LLP
Woodworth B. Winmill (*pro hac vice* forthcoming)
Wesley A. Mann (*pro hac vice* forthcoming)
140 Broadway, 34th Floor
New York, NY 10005
212-907-0700
wwinmill@labaton.com

WEITZ & LUXENBERG, P.C.
Meredith D. Abrams (*pro hac vice* forthcoming)
700 Broadway
New York, NY 10003
212-558-5500
mabrams@weitzlux.com

THE LEGAL AID SOCIETY
IMMIGRATION LAW UNIT
Kyle Barron
Laura Berger (*pro hac vice* forthcoming)
49 Thomas Street
New York, NY 10013
646-574-2761
kebarron@legal-aid.org

Dated: February 08, 2025

**VERIFICATION PURSUANT TO 28 U.S.C. § 2242**

I submit this verification on behalf of Xiao Bao He because I am part of his legal team at The Legal Aid Society and have communicated with the other attorneys on his case. On information and belief, I hereby verify that the factual statements made in the attached Petition for Writ of Habeas Corpus are true and correct to the best of my knowledge.

Dated: February 08, 2025              _/s/ Kyle Barron_____
                                      Kyle Barron

## CERTIFICATE OF SERVICE

I hereby certify that on February 08, 2025, I filed this Petition for a Writ of Habeas Corpus with all supporting papers to the Clerk of the U.S. District Court for the Western District of New York using its CM/ECF system. By rule, habeas petitions filed with the Clerk of the District Court are electronically served through the Court's CM/ECF system on the following respondents on this case:

- Joseph Freden, in his official capacities, as Deputy Field Office Director, Buffalo Field Office and Administrator, Buffalo Federal Detention Facility, U.S. Customs & Immigration Enforcement;
- Thomas Brophy, in his official capacity as Field Office Director, Buffalo Field Office, U.S. Immigration & Customs Enforcement;
- Sirce E. Owen, in her official capacity as Acting Director, Executive Office of Immigration Review, U.S. Department of Justice;
- Kristi Noem, in her official capacity as Secretary, U.S. Department of Homeland Security; and
- Pamela Bondi, in her official capacity as Attorney General, U.S. Department of Justice.

Respectfully submitted,

*/s/ Kyle Barron*

Dated: February 08, 2025

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| Xiao Bao He | Joseph Freden, Thomas Brophy, Sirce E. Owen, Kristi Noem, and Pamela Bondi, all in their official capacities |

| **(b)**   County of Residence of First Listed Plaintiff   Genesee County, NY | County of Residence of First Listed Defendant |
|---|---|
| *(EXCEPT IN U.S. PLAINTIFF CASES)* | *(IN U.S. PLAINTIFF CASES ONLY)* |
|  | NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED. |

Kyle Barron & Laura Berger; Legal Aid Society, 49 Thomas Street, 5th Floor, New York, NY 10013 646-574-2761

Attorneys *(If Known)*

U.S. Attorney for the Western District of New York

## II.  BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
        Plaintiff

☐ 3   Federal Question
        *(U.S. Government Not a Party)*

☒ 2   U.S. Government
        Defendant

☐ 4   Diversity
        *(Indicate Citizenship of Parties in Item III)*

## III.  CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability |  |  |  | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & | ☐ 367 Health Care/ Pharmaceutical |  | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | Slander | Personal Injury Product Liability |  | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 330 Federal Employers' | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 151 Medicare Act | Liability | ☐ 368 Asbestos Personal Injury Product Liability |  | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 340 Marine |  |  | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer Protection Act |
| ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 862 Black Lung (923) |
| ☐ 160 Stockholders' Suits | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Management Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury |  | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 195 Contract Product Liability | ☐ 385 Property Damage Product Liability | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) |
| ☐ 196 Franchise | ☐ 362 Personal Injury - Medical Malpractice |  | ☐ 751 Family and Medical Leave Act |  | ☐ 890 Other Statutory Actions |
|  |  |  |  |  | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 895 Freedom of Information Act |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☒ 463 Alien Detainee |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence |  | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General |  |  | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** |
| ☐ 290 All Other Real Property |  | **Other:** | ☐ 462 Naturalization Application |  | ☐ 950 Constitutionality of State Statutes |
| ☐ 446 Amer. w/Disabilities - Other | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions |
| ☐ 448 Education | ☐ 550 Civil Rights |
|  |  | ☐ 555 Prison Condition |
|  |  | ☐ 560 Civil Detainee - Conditions of Confinement |

## V.  ORIGIN *(Place an "X" in One Box Only)*

☒ 1  Original
        Proceeding

☐ 2  Removed from
        State Court

☐ 3  Remanded from
        Appellate Court

☐ 4  Reinstated or
        Reopened

☐ 5  Transferred from
        Another District
        *(specify)*

☐ 6  Multidistrict
        Litigation -
        Transfer

☐ 8  Multidistrict
        Litigation -
        Direct File

## VI.  CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
22 U.S.C. Section 2241

Brief description of cause:
Prolonged detention violates the Fifth Amendment to the U.S. Constitution

## VII.  REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:      ☐ Yes     ☐ No

## VIII.  RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE                                                          DOCKET NUMBER

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 02/08/2025 | */s/ Kyle Barron* |

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT                APPLYING IFP               JUDGE                 MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)    Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

   **(b)    County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

   **(c)    Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.    Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.    Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.    Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.    Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statue.

**VI.    Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service

**VII.    Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.    Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

XIAO BAO HE,

*Petitioner,*

- against -

JOSEPH FREDEN, in his official capacities, as Deputy
Field Office Director, Buffalo Field Office and
Administrator, Buffalo Federal Detention Facility, U.S.
Customs & Immigration Enforcement; THOMAS
BROPHY, in his official capacity as Field Office
Director, Buffalo Field Office, U.S. Immigration &
Customs Enforcement; SIRCE E. OWEN, in her official
capacity as Acting Director, Executive Office of
Immigration Review, U.S. Department of Justice;
KRISTI NOEM, in her official capacity as Secretary,
U.S. Department of Homeland Security; and PAMELA
BONDI, in her official capacity as Attorney General,
U.S. Department of Justice.

*Respondents.*

**PETITION FOR WRIT OF
HABEAS CORPUS**

Case No. _____

## **TABLE OF CONTENTS**

| Exhibit | Page # | Name |
|---------|--------|------|
| A | 1 | Declaration of Xiao Bao He |
| B | 13 | Declaration of Laura Berger Esq. |
| B-1 | 18 | Exh. 1 – Criminal history documents |
| B-2 | 23 | Exh. 2 – Notice to Appear |
| B-3 | 28 | Exh. 3 – Excerpts of bond hearing evidence |
| B-4 | 146 | Exh. 4 – IJ bond decision |

| B-5 | 154 | Exh. 5 – BIA bond appeal brief |
|-----|-----|-------------------------------|

# EXHIBIT  A

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF NEW YORK**

---

XIAO BAO HE,

      *Petitioner*,

      - against -

JOSEPH FREDEN, in his official capacities, as
Deputy Field Office Director, Buffalo Field Office
and Administrator, Buffalo Federal Detention
Facility, U.S. Customs & Immigration
Enforcement; KENNETH GENALO, in his official
capacity as Field Office Director, New York Field
Office, U.S. Immigration & Customs Enforcement;
THOMAS BROPHY, in his official capacity as
Field Office Director, Buffalo Field Office, U.S.
Immigration & Customs Enforcement; SIRCE E.
OWEN, in her official capacity as Acting Director,
Executive Office of Immigration Review, U.S.
Department of Justice; KRISTI NOEM, in her
official capacity as Secretary, U.S. Department of
Homeland Security; and PAMELA BONDI, in her
official capacity as Attorney General, U.S.
Department of Justice.

      *Respondents*.

Civil Action No.

---

**DECLARATION OF X.B.H. UNDER PENALTY OF PERJURY**
**PURSUANT TO 28 USC § 1746**

I, X.B.H., declare under penalty of perjury, pursuant to 28 U.S. Code §1746 that what follows is

true and correct to the best of my knowledge:

1. My name is Xiao Bao He.

2. I was born in Tianjin, China in 1986. I was raised in a traditional CCP (Chinese Communist

   Party) family. My father worked for the government and my mother worked for a

1

government-owned company, until I was born. I was their only child due to the one-child policy in place at the time.

3. Throughout my childhood, my father was rigid and physically and psychologically abusive to me. I don't remember a time before he started beating me. I know even when I was a toddler, he would hit me for using chopsticks wrong. When I started school, he put intense pressure on me to succeed academically. If I disobeyed, there were violent consequences. He slapped me when I brought home a bad grade. If he was really angry, he would kick me and knock me to the ground, even if we were in public or at my grandparents' house. Sometimes my father threatened to break my legs so that I wouldn't be able to go anywhere. When I had braces, my father would pinch my mouth really hard and slap me so hard that it threw me sideways. My mother only intervened when the abuse became very serious..

4. My father would normalize the abuse by saying that they only did this because they cared about me. However, when my parents were really angry with me, they gave me the silent treatment for days. In Chinese we call this "cold violence." Cold violence meant my parents would not even look at me. It meant they stopped caring about me at all. I didn't always know what I had done to cause this.

5. Looking back on my childhood, the way I was treated conditioned me to be extremely obedient, not to share my feelings, and not to show anything that was happening inside me. I reacted to the abuse by becoming very quiet.

6. As I grew up, I was being led down a very traditional path for Chinese people. A traditional Chinese value is to always obey and give respect to one's elders. This was imprinted on me since I was young. However, I wanted to do something different. I told my parents that I needed to continue my studies in America.

2

7. I came to the United States in December 2009, on an F-1 Student visa, to attend Northeastern University's Global Pathway program to learn English and then to enroll full-time as a student in Northeastern. I came to study Financial Services as a master's student.

8. Northeastern's Global Pathways was a very competitive program, especially for foreign students. It was hard to make friends there because everyone was competing for the same jobs post-degree. Parents abroad are sending their children with a large amount of money and they see this as an investment, and they want to make money back.

9. In May, 2010, I met S.L., another Chinese exchange student at Northeastern. We began a relationship that unfortunately turned very unhealthy soon after. S.L. psychologically abused me relentlessly which over time escalated to physical abuse. I was completed isolated and financially exploited by S.L., leading to me dropping out of school. Despite my attempts to get away from S.L., she stalked me until I gave in to whatever she wanted. In the summer of 2011, she compelled me to work, taking all my earnings, taking away my legal documents, and depriving me of food and sleep. I became very unhealthy, physically and mentally. I started hearing voices and hallucinating from lack of sleep and food. I felt desperate, helpless and completely alone.

10. Everything came to a head on August 17, 2011. S.L. attacked me after I came home from work and broke my guitar. I was sleep deprived, starving and had a complete mental break and did something I deeply regret to this day – I killed S.L., and then tried to kill myself. I was psychiatrically hospitalized for months after my arrest. This was the first time I was told that what I suffered with S.L. was domestic violence. Still, I was horrified by what I had done. I spent the next 13 years incarcerated for this offense, during which time I found religion and music as a way to process the trauma of this nightmare and my deep remorse.

3

**LIFE AFTER ARREST**

11. I grew up in an atheist, CCP family. I only started attending Catholic services on a regular basis after I was convicted and sent to Green Haven correctional facility in New York. In 2014, Green Haven had a choir and a guitarist at their services. The guitarist offered to let me play the guitar for their service. This gave me a second chance at life, to play the guitar in this holy place. That was very meaningful and special to me. I became a member of the St. Paul Chapel Choir at Green Haven. In addition to becoming part of the choir, I also started studying to become a Catholic.

12. In late 2016, I applied to the New York Theological Seminary to study theology. It was an in-person class offered at Sing Sing Correctional Facility. I was accepted to the program and transferred to Sing Sing to attend in 2017. This program gave me a second chance to get a master's degree as I originally came to the United States to do, so it felt like a sign.

13. When I was transferred to Sing Sing, I got involved in the Our Lady of Hope chapel and ministry. Besides services, I also participated in Bible study. Every Wednesday night, we had short services with volunteers joining us. After the service, the congregation was divided into Bible study groups. That is where I met Sister Joanna Chan.

14. On Wednesdays, we would play music together for the services. After services, I would join Sister Joanna Chan's group for Bible study sessions where we could feel the love she had for us. She inspired me to deepen my spiritual journey with Catholicism and I wanted to become a person just like her. I attended this group from 2017 until 2024, except for at the height of Covid when there was a break.

15. At Sing Sing, I was baptized. Shortly after that, I was confirmed by Cardinal Timothy Dolan, Archbishop of New York.

16. When I first met Cardinal Dolan, I was just baptized at our church and I was still in the process of studying at New York Theological Seminary. When I learned that Cardinal Dolan would be the person doing my confirmation, it meant so much to me. It felt like this confirmation meant I was doing the right thing. On the day of my confirmation, we were all sitting in the Chapel waiting for him to come in. When he entered, the whole Chapel became quiet. He was such a holy figure. He walked fast, with a smile on his face. I felt so nervous and excited at the same time. This was the first time I had a close contact with a spiritual and religious leader like him. I considered this to be a very meaningful and unique experience. It was a great confirmation that I was making the right decision, and this was why I was here. He congratulated each candidate who received holy sacrament, taking time with each of us. When he shook my hand, he commented on my baptism name, Thomas. He said, "I wish that you will be doubting no more." It was a quick comment, but it stayed with me and was very meaningful.

17. I chose the Christian name Thomas for my confirmation because of the story of the resurrection of Jesus. One of Jesus's disciples was Thomas, but when Jesus appeared to his disciples after his death, Thomas wasn't there. A week later, Jesus appeared to Thomas, but Thomas did not recognize him as his Lord. Jesus asked him, "Do you see the wound I have on the side of my chest?" This was from when he was crucified, the Romans pierced him to prove that he was dead. Jesus asked Thomas to touch his wound, and then Thomas recognized him as his Lord. That's why he was called Doubting Thomas.

18. I chose this name because I grew up as an atheist but brainwashed by the Chinese Communist Party. I think having doubts ultimately gave me a stronger relationship with God. This gave me a second chance.

5

19. I graduated with master's degree from New York Theological Seminary in 2018. After that, I got a job as a Special Subjects Clerk at Sing Sing and became a member of the Carnegie Hall Musical Connections and Musicambia programs. This program was a new opportunity for me. Being able to play music in prison gave me a similar sense of emotional freedom and joy that I had only thus far felt in my Catholic religious practice.  Together my music and faith made me believe I could have a second chance in life and be in service to others.

20. At Sing Sing, I spent my days working as the Special Subjects Clerk, where we coordinated all events at Sing Sing, including religious events, rehabilitation programs, and cultural events. We dealt with paperwork, setting up and breaking down the stage, and planning every detail of events. This job gave me a lot of opportunities to work with people from different backgrounds. I also met many facility chaplains, outside volunteers, and program directors. It was very challenging for me as a minority, since I was Chinese, and English was my second language. But thanks to some of my NYTS courses, I felt prepared to handle it. One of the courses was pastoral counseling. Pastoral counseling helped equip me with certain skills to listen to others better and to have more effective communication. This also gave me more compassion and capacity to understand the issues others are experiencing. I could understand that and work with them better. A maximum-security facility can be a hostile environment but our work was always goal oriented and allowed me to work with others to achieve our shared goals.

21. Another course that impacted me was called Foundations of Ministry. This equipped me with the tools to practice my music ministry at Our Lady of Hope Chapel. I tried to make myself as available as possible to others, in my spare time at Church and in my music group. Prison

can be a hostile and stressful place. One encouraging conversation can be very important to someone.

22. I shared my time with the men in the gallery with me. Anyone who was interested in music or guitar, I would share my time with them. At church, I built up our church choir. We expanded our repertoire and catalogue of music. I worked with the current musicians on their musicality and cultivated potential choir candidates. I also built a trust group at church to share our personal issues, to maintain our physical and mental health. In my spare time, I volunteered to do music therapy in two different mental health units at Sing Sing. I did music therapy once a month for each unit.

23. Overall, my days at Sing Sing were very full. I worked full time as the Special Subjects Clerk. In the evenings, I attended Bible Study or practiced music. On the weekends, I attended Catholic services, ran events, participated in Musicambia and Carnegie Hall Musical Connections. Sometimes I was invited to do other programs and I had to turn them down because I needed a little time to myself to practice my music.

24. Another big event in my life while I was incarcerated was meeting my wife, Y.R. We met after I put a short bio and photo of myself in a paid program called Friends Beyond the Wall. Once my bio was published, I got letters from two people. One of them was Y.R., a woman who lived in New York City. She first wrote to me in December, 2016. Over the next several months, we exchanged many letters. In March, 2017, she told me that she wanted to have my child, and suggested that we get married so that we could take advantage of the Family Reunion Program.

25. Over the next few months, I grew to love Ms. R and we got married on July 22, 2017. Unfortunately, over the following months, our relationship grew toxic. Y.R. started sending

7

me letters where she threatened me and called me names. She became verbally abusive and aggressive over the phone as well. She took money from my parents that they sent for a marriage gift for the two of us and kept it. But after having been through a highly abusive relationship before, with S.L., I recognized these red flags for what they were. Instead of feeling like I was at fault and trying to fix the relationship, I sought advice from Father Matthew, the Catholic chaplain at Sing Sing, and the NYTS Director, Reverend Sabune. Ultimately, I decided to withdraw from Y.R. and we stopped communicating. I tried to get help from a "jailhouse lawyer" to prepare a divorce petition, but so far have been unable to finalize my divorce. But even without a formal end to our marriage, I have not been in regular contact with Y.R. for more than six years.

26. In 2017, my mother was diagnosed with cancer. I used my religious practice to cope with my negative thoughts and feelings towards not being able to be there for her. My mom had cancer four times in the next three years, and I hadn't seen her in almost 10 years at the time she passed, in early 2020. It felt extremely unfair for the disease to take her away from me. But it gave me the opportunity to think again about what I had done, taking someone away from their loved ones, the harm that I caused. It gave me a deeper understanding of that. I was in the middle of these thoughts, when Cardinal Dolan came back to Sing Sing.

27. The second time I met Cardinal Dolan was on Ash Wednesday in 2020. This meeting with the Cardinal has a very special meaning to me. My mom had passed away less than a month prior. I was still in the process of dealing with this extremely bad news. This time meeting him, I was already a Roman Catholic and I greeted him as the choir director of our Chapel where we played music for services with the volunteers and choir members. Seeing him was extremely healing and comforting. He already knew that my mom had passed away, and he

8

came to me, and asked my mother's name. He said, "we will pray for her," and he gave me a lot of comforting words.

28. Ash Wednesday is a very special day on the Catholic calendar. It means that we all came from ashes and will end as ashes. It's a day of renewal. The conversation with Cardinal Dolan gave me hope, to look forward, to do more work on myself and for others. I look at this meeting with Cardinal Dolan as God's will. He saw me going through a difficult time and sent a holy figure to give me words of encouragement to get me through it.

29. Throughout my time in prison, I was helped by these godly men and women. It was a blessing from God to put these good people in my life to help me along a difficult journey.

30. Even while I was incarcerated, I had the opportunity to have my musical compositions performed at Carnegie Hall, Lincoln Center, Trinity Church on Wall Street, the Peabody Institute, and many more prestigious venues. We won a grant from New York City to have all of my compositions performed at Carnegie Hall by a chamber music group called Decoda on May 28, 2024. The music was recorded in a studio and an album of my compositions will be released in 2025. This experience gave me hope that I can have a life in the future, using my guitar to share my feelings, my emotions, and my stories. This felt like God's grace to pick up the guitar again and also have all these good people around me to help me develop my skills. Through my music, I have been able to share my agonies, sorrows, regrets and my remorse with more people on a bigger stage. I am blessed with these people who help me believe in myself again. I want to be like them, to help others like they helped me. I want to bring hope to other people who have been incarcerated, or people dealing with trauma and domestic violence and mental health. This is what I was doing before leaving Sing Sing and I hope to continue that work.

9

31. With that in my heart, I started working on music therapy and that's a big part of my goal. If I can stay in America, I would love to work for an organization to help international students have a smooth transition, to help them succeed in their goals. I would like to provide caring programs to help them with their daily life needs and maintain their physical and mental health. That was my capstone project for my NYTS degree.

32. On October 8, 2024, my criminal appeal attorneys succeeded in getting me the opportunity to vacate my original conviction and re-plead to criminally negligent homicide. My 18 year sentence was also vacated, and instead I received a new sentence of one year and four months to four years. Since I had already served thirteen years, I was eligible to be released immediately, without any probation or restrictions. But the Department of Corrections and Community Supervision ("DOCCS") took me back to Ulster, where they held me for two more days. On October 10, 2024, I was transferred into ICE custody and brought to the Batavia Federal Detention Facility.

33. Since October 10, I have been held by ICE. On October 31, 2024, I had a bond hearing where my lawyers presented all of the evidence showing that I am not a flight risk or danger to society, and that my plans for release are to live in a Catholic reentry house called Abraham House, where I would be able to continue my education and be able to live in community with other Catholics.

34. Despite presenting evidence showing that my only conviction stemmed from a time that I was being abused and trafficked and in a very decompensated physical and mental state, and that ever since I have been a completely rule-following and law-abiding person, the Immigration Judge denied my bond application saying that I could be a danger to the community.

35. In the last four months since I was detained by ICE, I have experienced conditions that were much worse than at Sing Sing, a maximum-security prison. There is less food, and I have lost more than 10 pounds since being detained. Calls are also much more expensive in immigration detention than in prison, and so is food from the commissary. We are locked in our cells for 18 hours a day with a bunkmate, meaning we have no privacy. At Sing Sing, I had a full-time job, my guitar, and much more responsibility and autonomy even though I was incarcerated. At Batavia, they don't have regular Catholic services or programs that I can take part in. I spend the vast majority of my time in my cell.

36. If I am deported to China, I am afraid that my criminal record would come to the attention of Chinese authorities. My crime was publicized in Chinese-language newspapers and my friends from Northeastern saw it in the media. My parents learned about it from the news as well. S.L. was from Beijing, so her family was well-connected. I think this would put me at even higher risk of the government detaining me and punishing me further for the crime that I already served 13 years for. I am afraid that my deportation would end with me being taken and put in a re-education camp for an uncertain period of time. In those camps, there could be harsh tortures and brainwashing methods. My religion and my criminal history would both make me a target, especially because the victim of my crime was a Chinese citizen.

37. In China, I would also be cut off from the religious community in New York. I would not be able to worship and practice my ministry the way I am supposed to. If I point out the wrongs of the political suppression of Catholic practice, that would put my life in danger. In the US, I have had the luxury of freedom of religious practice, but that would end if I were in China.

38. If I'm allowed to stay in the United States, I hope to make a positive impact on others through my music, through my ministry, and through programs to help incarcerated people,

survivors of domestic violence, and international students specifically, because those are people going through what I have been through. I would love to work with the Church. If the tragedy that I experienced could be avoided for others, that would make it all worth it.


*/s/ Xiao Bao He*
Xiao Bao He

12

# EXHIBIT  B

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF NEW YORK

XIAO BAO HE,

       *Petitioner*,

       - against -

JOSEPH FREDEN, *et. al.*

       *Respondents*.

Civil Action No.

## DECLARATION OF LAURA BERGER, ESQ.

I, Laura Berger, declare as follows:

1. I am a staff attorney for the Exploitation Intervention Project ("EIP"), within the Legal Aid Society's Criminal Defense Practice, located at 49 Thomas Street, New York, NY 10013. I am the lead counsel for Petitioner Xiao Bao He in his removal proceedings. My knowledge of the facts set forth below is based on my personal knowledge, conversations with Mr. He, and/or my review of Mr. He's file.

2. Mr. He was born in Tianjin, China, in 1986. He came to the United States in December 2009 to attend graduate school at Northeastern University.

3. He was arrested in August 2011, and on October 16, 2014, he was sentenced to 18 years for manslaughter in the first degree for killing his abusive girlfriend Shuai Li. True and correct copies of documents from Mr. He's criminal case are attached as Exhibit 1 hereto.

4. In the years preceding his arrest, and in all of the time since, Mr. He has been exceptionally conscientious, sensitive, and peaceful. In his 13 years of incarceration, he never received a single disciplinary infraction. He became confirmed as a Catholic in a ceremony at Sing Sing, presided over by Cardinal Timothy Dolan, the Archbishop of New York. His fellow

inmates, the Catholic chaplains and volunteers he interacted with, and several corrections officers all the way up to the superintendent of Sing Sing were impressed by his ability to work with people of all backgrounds and how he was always a force for peace.

5. On October 8, 2024, Mr. He's conviction for manslaughter was vacated under NY C.P.L. 440.10(1)(h) due to a defect in his original conviction. The Brooklyn District Attorney's Office consented to this relief, conditioned upon his repleading to the lesser offense of criminally negligent homicide. Mr. He was given a sentence of 1 year and 4 months to 4 years, which meant he was immediately eligible for relief.

6. Instead of being released on the day of his repleading and sentencing, he was taken back into custody and brought to Ulster Correctional Facility. He was held an additional two days past the end of his sentence, at which time he was turned over to ICE custody on October 10, 2024, and brought to Batavia Federal Detention Facility.

7. Mr. He was issued a Notice to Appear dated October 9, 2024, which alleged that he had overstayed his F-1 student visa and was removable from the United States on that ground. A true and correct copy of this Notice to Appear is attached as Exhibit 2 hereto.

8. On October 31, 2024, Mr. He was given a bond hearing. The Department of Homeland Security did not contest that he was eligible for bond, but they alleged that based on the facts of his arrest in 2011, he would be a danger to society if released. The burden of proof was placed on Mr. He to show that he would *not* be a danger to society nor a flight risk. Mr. He presented extensive evidence of his rehabilitation and his perfect disciplinary record while in prison. He submitted letters into the record from the music programs he participated in, from Cardinal Dolan and many other Catholic clergy and volunteers, from various Corrections Officers and the Superintendent of Sing Sing, as well as many others whose lives he

14

impacted over the course of his incarceration. A true and correct copy of Mr. He's Request for Custody Redetermination, including its exhibits, is attached as Exhibit 3 hereto.

9. Mr. He also submitted extensive evidence into the record to show that, at the time of his arrest in 2011, he was experiencing mental health issues, he was in an abusive relationship with Ms. Shuai, he had been isolated from his friends and family, and he had tried to report the abuse but faced barriers due to his sex and societal prejudice against male victims of abuse.

10. At the hearing, Mr. He had three witnesses testify on his behalf. One was Professor Monit Cheung, who had done a psychological evaluation of Mr. He and found that he fit the profile of a victim of abuse, rather than a survivor, and was very unlikely to reoffend. Another witness was Father Zachariah Presutti, SJ, who offered Mr. He a place to live in his reentry program, Abraham House. The final witness was Brad Balliett, a musician and teacher who Mr. He met through the Musicambia program at Sing Sing. Mr. Balliett testified to Mr. He's musical ambitions and likelihood of success as well as his talent and character.

11. After this hearing, Immigration Judge Schultz issued a written decision on November 4, 2024, stating that Mr. He had failed to show that his release would not pose a danger to society and denied him bond. In this decision, he relied heavily on the evidence submitted by DHS, and ignored much of the evidence submitted by Mr. He. A true and correct copying of IJ Schultz's written decision is attached hereto as Exhibit 4.

12. Mr. He filed a Notice of Appeal of this decision the following week, and we submitted the legal brief to the Board of Immigration Appeals on December 5, 2024. A true and correct copy of Mr. He's brief is attached hereto as Exhibit 5. The appeal remains pending before the BIA at this time.

15

13. On November 13, 2024, Mr. He submitted his I-589 Application for Asylum, Withholding of Removal, and Deferral of Removal Under the Convention Against Torture. This application was based on his fear of returning to China both because of his Catholic faith, and because he feared being subjected to torture in "re-education" camps in China due to his criminal history.

14. On December 17, 2024, Mr. He had his first Individual Hearing before IJ Schultz, which continued on December 18. During these hearings Mr. He had two witnesses testify as well as giving testimony himself. At the end of the hearing, Mr. He was told that a decision would be made in writing shortly, but the Immigration Judge also scheduled a court date for January 15, 2025, to give an oral decision if a written decision had not yet been filed.

15. On January 10, 2025, Mr. He submitted additional evidence to include in the record, and IJ Schultz responded by allowing the evidence to be included but giving DHS until January 17, 2025 to respond. He also canceled the January 15, 2025 hearing. IJ Schultz also wrote in his decision that he would issue a written decision on or after January 17, 2025. On February 7, 2025, IJ Schultz denied Mr. He's applications.

16. Mr. He has lost at least 10 pounds if not more while being detained at Batavia, and his mental health has suffered. While he was in state custody, he had many more freedoms. At Batavia he is locked in his cell for 18 hours a day and has no privacy. He has told me that he feels very depressed, and that ICE has broken him down.

17. I intend to continue communicating with Mr. He regularly while he is detained. I am concerned about his declining mental health. Mr. He would benefit greatly from immediate release from detention while his immigration case is pending.

16

I declare under penalty of perjury that the foregoing is true and correct.

Executed on February 7, 2025, in New York, NY.

Laura Berger, Esq.

# EXHIBIT  B-1

EOIR — 15 of 382

HE, Xiao Bao    DOB: ▮▮▮▮

| Arrest date | Conviction Date | Location | Docket | Charges | Disposition | Sentence |
|---|---|---|---|---|---|---|
| 3/4/2011 | N/A | Brooklyn, NY | Arrest #: K11621473 | Assault in the 3rd Degree | N/A | N/A |
| 8/18/2011 | 10/8/2024 | Brooklyn, NY | IND-07153-11/001 | Murder in the 2d Degree, Criminal Possession of a Weapon in the 4th Degree, Criminal Contempt in the 2d Degree | Criminally Negligent Homicide | 1 year, 4 months-4 years |

# KINGS SUPREME CRIMINAL COURT

**NO FEE**

320 Jay Street, Brooklyn, NY 11201

Court ORI: NY023015J

| | |
|---|---|
| The People of the State of New York | **Certificate of Disposition** |
| vs. | Docket Number: **IND-07153-11/001** |
| **Xia B. He** | Legacy Docket Number: **07153-2011** |

NYSID: 05120601Y

Defendant DOB: **04/28/1986**    Arrest Date: **08/18/2011**    Arraignment Date: **09/22/2011**

THIS IS TO CERTIFY that the undersigned has examined the files of the **Kings Supreme Criminal Court** concerning the above entitled matter and finds the following:

| Number of Counts | Incident Date | Sentence Charge | Charge Description | Charge Weight | Conviction Type | Conviction/ Sentence Date | Sentence Highlight |
|---|---|---|---|---|---|---|---|
| 1 | 08/17/2011 | PL 125.10 | Criminally Negligent Homicide | EF | Pled Guilty | Conv: 10/08/2024 Sent: 10/08/2024 | • Imprisonment (1 years, 4 months - 4 years) |

**All fines, fees & surcharges imposed at sentence are paid in full.**

Charge Weight Key: I=Infraction; V=Violation; AM, BM=Class Misdemeanor; UM=Unclassified Misdemeanor; AF, BF, CF, DF, EF=Class Felony

Dated: **October 11, 2024**

*Nancy T. Sunshine*

Chief Clerk/Clerk of the Court

## CAUTION: THIS DOCUMENT IS NOT OFFICIAL UNLESS EMBOSSED WITH THE COURT SEAL

Pursuant to Judiciary Law § 212.2(z), a certificate of disposition for the public contains only records of convictions, if any, and information about pending cases. All marijuana convictions under PL 221.05, PL 221.10, PL 221.15, PL 221.20, PL 221.35 or PL 221.40 —including any appearing on this certificate of disposition— are vacated, dismissed, sealed, and expunged. It is an unlawful discriminatory practice for any entity to make any inquiry about such an expunged conviction or to use such an expunged conviction adversely against an individual in any form of application or otherwise—unless specifically required or permitted to do so by statute. It shall be an unlawful discriminatory practice, unless specifically required or permitted by statute, for any person, agency, bureau, corporation or association, including the state and any political subdivision thereof, to make any inquiry about, whether in any form of application or otherwise, or to act upon adversely to the individual involved, any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by an order adjourning the criminal action in contemplation of dismissal, pursuant to section 170.55, 170.56, 210.46, 210.47, or 215.10 of the criminal procedure law, or by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law or by a conviction which is sealed pursuant to section 160.59 or 160.58 of the criminal procedure law, in connection with the licensing, housing, employment, including volunteer positions, or providing of credit or insurance to such individual; provided, further, that no person shall be required to divulge information pertaining to any arrest or criminal accusation of such individual not then pending against that individual which was followed by a termination of that criminal action or proceeding in favor of such individual, as defined in subdivision two of section 160.50 of the criminal procedure law, or by an order adjourning the criminal action in contemplation of dismissal, pursuant to section 170.55 or 170.56, 210.46, 210.47 or 215.10 of the criminal procedure law, or by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law, or by a conviction which is sealed pursuant to section 160.59 or 160.58 of the criminal procedure law. An individual required or requested to provide information in violation of this subdivision may respond as if the arrest, criminal accusation, or disposition of such arrest or criminal accusation did not occur. The provisions of this subdivision shall not apply to the licensing activities of governmental bodies in relation to the regulation of guns, firearms and other deadly weapons or in relation to an application for employment as a police officer or peace officer as those terms are defined in subdivisions thirty-three and thirty-four of section 1.20 of the criminal procedure law; provided further that the provisions of this subdivision shall not apply to an application for employment or membership in any law enforcement agency with respect to any arrest or criminal accusation which was followed by a youthful offender adjudication, as defined in subdivision one of section 720.35 of the criminal procedure law, or by a conviction for a violation sealed pursuant to section 160.55 of the criminal procedure law, or by a conviction which is sealed pursuant to section 160.58 or 160.59 of the criminal procedure law. For purposes of this subdivision, an action which has been adjourned in contemplation of dismissal, pursuant to section 170.55 or 170.56, 210.46, 210.47 or 215.10 of the criminal procedure law, shall not be considered a pending action, unless the order to adjourn in contemplation of dismissal is revoked and the case is restored to the calendar for further prosecution. [Executive Law 296(16)]

Conviction charges may not be the same as the original arrest charges.

SUPREME COURT OF THE CITY OF NEW YORK
KINGS COUNTY—CRIMINAL TERM: PART 4
-----------------------------------------------------------------------X
                                                          :
THE PEOPLE OF THE STATE OF NEW YORK,                      :
                                                          :   **DECISION &**
             -against-                                    :   **ORDER**
                                                          :
XIA Q HE (correct name: Xiaobao He),                      :
                                                          :
                                   Defendant.             :   Ind. No. 7153-2011
-----------------------------------------------------------------------X

MATTHEW D'EMIC, J.

    Whereas the defendant has moved to vacate his October 16, 2014, judgment of conviction for first-degree manslaughter under Kings County indictment number 7153-2011 pursuant to Criminal Procedure Law § 440.10(1)(h), and

    Whereas, this Court finds that defendant has alleged a legal basis for relief due to a constitutional defect in the underlying proceeding supported by sworn allegations, which the People concede,

    IT IS HEREBY ORDERED that:

    The defendant's judgment of conviction for first-degree manslaughter under indictment number 7153-2100 is vacated.

    This constitutes the order of the Court.

Dated:    Brooklyn, New York
        October _8_, 2024

                          Hon. Matthew D'Emic
                          Justice of the Supreme Court

EOIR — 18 of 382

Case 6:25-cv-06080-EAW    Document 2    Filed 02/12/25

I N . C T M E N T

S U P R E M E   C O U R T   O F   T H E   S T A T E   O F   N E W   Y O R K
C O U N T Y   O F   K I N G S

-----------------------------------------------

THE PEOPLE OF THE STATE OF NEW YORK

AGAINST

X.    XIA BAO HE - VFO
        DEFENDANT

9D

INDICTMENT NO. 7153/2011
NON-ALIGNED
DOMESTIC VIOLENCE

-----------------------------------------------

COUNTS

MURDER IN THE SECOND DEGREE
CRIMINAL POSSESSION OF A WEAPON IN THE FOURTH DEGREE
CRIMINAL CONTEMPT IN THE SECOND DEGREE

CRIMINAL TERM ASR/MOT
SUPREME COURT KINGS

2011 AUG 25   AM 10: 58

CHARLES J. HYNES
DISTRICT ATTORNEY

### FIRST COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF THE CRIME OF MURDER IN THE SECOND DEGREE [PL 125.25(1)] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT AUGUST 17, 2011, IN THE COUNTY OF KINGS, WITH INTENT TO CAUSE THE DEATH OF SHUAI LI, CAUSED THE DEATH OF SHUAI LI, BY MEANS OF REPEATEDLY STABBING AND STRANGLING SHUAI LI, THEREBY INFLICTING VARIOUS WOUNDS AND INJURIES UPON  SHUAI LI, AND THEREAFTER AND ON OR ABOUT AUGUST 17, 2011, SHUAI LI DIED OF THE WOUNDS AND INJURIES.

### SECOND COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF THE CRIME OF CRIMINAL POSSESSION OF A WEAPON IN THE FOURTH DEGREE [PL 265.01(2)] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT AUGUST 17, 2011, IN THE COUNTY OF KINGS, KNOWINGLY AND UNLAWFULLY POSSESSED A DANGEROUS INSTRUMENT NAMELY: A KNIFE, WITH INTENT TO USE UNLAWFULLY AGAINST ANOTHER.

### THIRD COUNT

THE GRAND JURY OF THE COUNTY OF KINGS BY THIS INDICTMENT, ACCUSES THE DEFENDANT OF THE CRIME OF CRIMINAL CONTEMPT IN THE SECOND DEGREE [PL 215.50(3)] COMMITTED AS FOLLOWS:

THE DEFENDANT, ON OR ABOUT AUGUST 17, 2011, IN THE COUNTY OF KINGS, DID INTENTIONALLY DISOBEY A LAWFUL MANDATE OF A COURT, NAMELY: AN ORDER OF PROTECTION DATED JUNE 28, 2011 EFFECTIVE UNTIL SEPTEMBER 19, 2011, SUCH DISOBEDIENCE NOT INVOLVING OR GROWING OUT OF LABOR DISPUTES AS DEFINED BY SUBDIVISION TWO OF SECTION SEVEN HUNDRED FIFTY-THREE-A OF THE JUDICIARY LAW.

CHARLES J. HYNES
DISTRICT ATTORNEY

# EXHIBIT  B-2

DEPARTMENT OF HOMELAND SECURITY

**NOTICE TO APPEAR**

DOB:

Event No:

---

In removal proceedings under section 240 of the Immigration and Nationality Act:

Subject ID:

File No: 088 443 801

In the Matter of:

Respondent: XIAO BAO HE AKA: XIAO BAO, HE; HE, XIAOBAO     currently residing at:

4250 FEDERAL DRIVE BATAVIA,NEW YORK,14020     (585) 344-6500

           (Number, street, city, state and ZIP code)       (Area code and phone number)

☐ You are an arriving alien.

☐ You are an alien present in the United States who has not been admitted or paroled.

☒ You have been admitted to the United States, but are removable for the reasons stated below.

The Department of Homeland Security alleges that you:

1. You are not a citizen or national of the United States;

2. You are a native of China, Peoples Republic Of and a citizen of China, Peoples Republic Of;

3. You were admitted to the United States at or near San Francisco, CA on or about December 30, 2009, as an F1 visitor for the duration of status as a non-immigrant student;

4. Your status was terminated on February 18, 2011, for failure to enroll in a full course of study, and you remained in the United States without authorization from See Continuation Page Made a Part Hereof

On the basis of the foregoing, it is charged that you are subject to removal from the United States pursuant to the following provision(s) of law:

Section 237(a)(1)(C)(i) of the Immigration and Nationality Act (Act), as amended, in that after admission as a nonimmigrant under Section 101(a)(15) of the Act, you failed to maintain or comply with the conditions of the nonimmigrant status under which you were admitted.

☐ This notice is being issued after an asylum officer has found that the respondent has demonstrated a credible fear of persecution or torture.

☐ Section 235(b)(1) order was vacated pursuant to:    ☐ 8CFR 208.30    ☐ 8CFR 235.3(b)(5)(iv)

YOU ARE ORDERED to appear before an immigration judge of the United States Department of Justice at:

4250 FEDERAL DR RM F108 BATAVIA NY 14020. EOIR SPC Batavia, NY

       (Complete Address of Immigration Court, including Room Number, if any)

on November 13, 2024 at    9:00 AM    to show why you should not be removed from the United States based on the
    (Date)        (Time)

charge(s) set forth above.          TIMOTHY J NEVIN - SDDO
                  (Signature and Title of Issuing Officer)

Date:   October 9, 2024            Newburgh, NY
                        (City and State)

Uploaded on: Case 6:25-cv-06089-EAW Document 2 Case Filed 02/12/25 Page 62 of 210
Notice to Respondent

Warning: Any statement you make may be used against you in removal proceedings.

Alien Registration: This copy of the Notice to Appear served upon you is evidence of your alien registration while you are in removal proceedings. You are required to carry it with you at all times.

Representation: If you so choose, you may be represented in this proceeding, at no expense to the Government, by an attorney or other individual authorized and qualified to represent persons before the Executive Office for Immigration Review, pursuant to 8 CFR 1003.16. Unless you so request, no hearing will be scheduled earlier than ten days from the date of this notice, to allow you sufficient time to secure counsel. A list of qualified attorneys and organizations who may be available to represent you at no cost will be provided with this notice.

Conduct of the hearing: At the time of your hearing, you should bring with you any affidavits or other documents that you desire to have considered in connection with your case. If you wish to have the testimony of any witnesses considered, you should arrange to have such witnesses present at the hearing. At your hearing you will be given the opportunity to admit or deny any or all of the allegations in the Notice to Appear, including that you are inadmissible or removable. You will have an opportunity to present evidence on your own behalf, to examine any evidence presented by the Government, to object, on proper legal grounds, to the receipt of evidence and to cross examine any witnesses presented by the Government. At the conclusion of your hearing, you have a right to appeal an adverse decision by the immigration judge. You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of voluntary departure. You will be given a reasonable opportunity to make any such application to the immigration judge.

One-Year Asylum Application Deadline: If you believe you may be eligible for asylum, you must file a Form I-589, Application for Asylum and for Withholding of Removal. The Form I-589, Instructions, and information on where to file the Form can be found at www.uscis.gov/i-589. Failure to file the Form I-589 within one year of arrival may bar you from eligibility to apply for asylum pursuant to section 208(a)(2)(B) of the Immigration and Nationality Act.

Failure to appear: You are required to provide the Department of Homeland Security (DHS), in writing, with your full mailing address and telephone number. You must notify the Immigration Court and the DHS immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration judge in your absence, and you may be arrested and detained by the DHS.

Mandatory Duty to Surrender for Removal: If you become subject to a final order of removal, you must surrender for removal to your local DHS office, listed on the internet at http://www.ice.gov/contact/ero, as directed by the DHS and required by statute and regulation. Immigration regulations at 8 CFR 1241.1 define when the removal order becomes administratively final. If you are granted voluntary departure and fail to depart the United States as required, fail to post a bond in connection with voluntary departure, or fail to comply with any other condition or term in connection with voluntary departure, you must surrender for removal on the next business day thereafter. If you do not surrender for removal as required, you will be ineligible for all forms of discretionary relief for as long as you remain in the United States and for ten years after your departure or removal. This means you will be ineligible for asylum, cancellation of removal, voluntary departure, adjustment of status, change of nonimmigrant status, registry, and related waivers for this period. If you do not surrender for removal as required, you may also be criminally prosecuted under section 243 of the Immigration and Nationality Act.

U.S. Citizenship Claims: If you believe you are a United States citizen, please advise the DHS by calling the ICE Law Enforcement Support Center toll free at (855) 448-6903.

Sensitive locations: To the extent that an enforcement action leading to a removal proceeding was taken against Respondent at a location described in 8 U.S.C. § 1229(e)(1), such action complied with 8 U.S.C. § 1367.

## Request for Prompt Hearing

To expedite a determination in my case, I request this Notice to Appear be filed with the Executive Office for Immigration Review as soon as possible. I waive my right to a 10-day period prior to appearing before an immigration judge and request my hearing be scheduled.

Before:

_(Signature of Respondent)_

Deportation officer

Date: 10/10/2024

_(Signature and Title of Immigration Officer)_

## Certificate of Service

This Notice To Appear was served on the respondent by me on 10/10/2024, in the following manner and in compliance with section 239(a)(1) of the Act.

☒ in person ☐ by certified mail, returned receipt # _____ requested ☐ by regular mail

Attached is a credible fear worksheet.

Attached is a list of organization and attorneys which provide free legal services.

The alien was provided oral notice in the ENGLISH language of the time and place of his or her hearing and of the consequences of failure to appear as provided in section 240(b)(7) of the Act.

_(Signature of Respondent if Personally Served)_                Deportation officer

_(Signature and Title of officer)_

**Privacy Act Statement**

**Authority:**

The Department of Homeland Security through U.S. Immigration and Customs Enforcement (ICE), U.S Customs and Border Protection (CBP), and U.S. Citizenship and Immigration Services (USCIS) are authorized to collect the information requested on this form pursuant to Sections 103, 237, 239, 240, and 290 of the Immigration and Nationality Act (INA), as amended (8 U.S.C. 1103, 1229, 1229a, and 1360), and the regulations issued pursuant thereto.

**Purpose:**

You are being asked to sign and date this Notice to Appear (NTA) as an acknowledgement of personal receipt of this notice. This notice, when filed with the U.S. Department of Justice's (DOJ) Executive Office for Immigration Review (EOIR), initiates removal proceedings. The NTA contains information regarding the nature of the proceedings against you, the legal authority under which proceedings are conducted, the acts or conduct alleged against you to be in violation of law, the charges against you, and the statutory provisions alleged to have been violated. The NTA also includes information about the conduct of the removal hearing, your right to representation at no expense to the government, the requirement to inform EOIR of any change in address, the consequences for failing to appear, and that generally, if you wish to apply for asylum, you must do so within one year of your arrival in the United States. If you choose to sign and date the NTA, that information will be used to confirm that you received it, and for recordkeeping.

**Routine Uses:**

For United States Citizens, Lawful Permanent Residents, or individuals whose records are covered by the Judicial Redress Act of 2015 (5 U.S.C. § 552a note), your information may be disclosed in accordance with the Privacy Act of 1974, 5 U.S.C. § 552a(b), including pursuant to the routine uses published in the following DHS systems of records notices (SORN): DHS/USCIS/ICE/CBP-001 Alien File, Index, and National File Tracking System of Records, DHS/USCIS-007 Benefit Information System, DHS/ICE-011 Criminal Arrest Records and Immigration Enforcement Records (CARIER), and DHS/ICE-003 General Counsel Electronic Management System (GEMS), and DHS/CBP-023 Border Patrol Enforcement Records (BPER). These SORNs can be viewed at https://www.dhs.gov/system-records-notices-sorns. When disclosed to the DOJ's EOIR for immigration proceedings, this information that is maintained and used by DOJ is covered by the following DOJ SORN: EOIR-001, Records and Management Information System, or any updated or successor SORN, which can be viewed at https://www.justice.gov/opcl/doj-systems-records. Further, your information may be disclosed pursuant to routine uses described in the abovementioned DHS SORNs or DOJ EOIR SORN to federal, state, local, tribal, territorial, and foreign law enforcement agencies for enforcement, investigatory, litigation, or other similar purposes.

For all others, as appropriate under United States law and DHS policy, the information you provide may be shared internally within DHS, as well as with federal, state, local, tribal, territorial, and foreign law enforcement; other government agencies; and other parties for enforcement, investigatory, litigation, or other similar purposes.

**Disclosure:**

Providing your signature and the date of your signature is voluntary. There are no effects on you for not providing your signature and date; however, removal proceedings may continue notwithstanding the failure or refusal to provide this information.

**U.S. Department of Homeland Security**　　　　**Continuation Page for Form** I-862

| Alien's Name | | Date |
|---|---|---|
| HE, XIAO BAO | Event No: | 10/09/2024 |

THE SERVICE ALLEGES THAT YOU:
-------------------------------
the Department of Homeland Security.

| Signature | | Title | |
|---|---|---|---|
| TIMOTHY J NEVIN | | SDDO | |

<u>　　4　　</u> of <u>　　4　　</u> Pages

DEPARTMENT OF HOMELAND SECURITY
## NOTICE OF CUSTODY DETERMINATION

Alien's Name:  XIAO BAO  HE                                    A-File Number: [redacted]

                                                               Date: 10/10/2024

Event ID: [redacted]                          Subject ID: [redacted]

---

Pursuant to the authority contained in section 236 of the Immigration and Nationality Act and part 236 of title 8, Code of Federal Regulations, I have determined that, pending a final administrative determination in your case, you will be:

☒ Detained by the Department of Homeland Security.

☐ Released (check all that apply):

　　☐ Under bond in the amount of $ _____

　　☐ On your own recognizance.

　　☐ Under other conditions. [Additional document(s) will be provided.]

M 0568   BERMUDEZ                                              10/10/2024 10:02
Name and Signature of Authorized Officer                Date and Time of Custody Determination

SDDO                                                      BATAVIA NY 140200000
Title                                                    Office Location/Address

---

You may request a review of this custody determination by an immigration judge.

☑ I acknowledge receipt of this notification, and

　☑ I **do** request an immigration judge review of this custody determination.

　☐ I **do not** request an immigration judge review of this custody determination.

_____                                   10/10/2024
Signature of Alien                                        Date

---

The contents of this notice were read to        XIAO BAO  HE       in the      ENGLISH       language.
                                               (Name of Alien)              (Name of Language)

J  0622   RADLEY
Name and Signature of Officer                    Name or Number of Interpreter (if applicable)

DO
Title

---

DHS Form I-286 (1/14)                                                          Page 1 of 1

27

# EXHIBIT  B-3

**THE**
**LEGAL AID**
**SOCIETY**
**CRIMINAL**
**DEFENSE**

New York County Criminal Defense Office
49 Thomas Street
New York, NY 10013
(212) 732-5000
https://www.legalaidnyc.org/

Laura Berger
*Staff Attorney*
Direct Dial: (917) 921-4210
Email: LBERGER@legal-aid.org

Alan Levine
*President*

Twyla Carter
*Attorney-in-Chief*
*Chief Executive Officer*

Justine M. Luongo
*Chief Attorney*
*Criminal Practice*

Irwin Shaw
*Attorney-in-Charge*
New York County Office

October 28, 2024

The Honorable Judge Eric Schultz
Executive Office for Immigration Review
Office of the Immigration Judge
4250 Federal Drive, F108
Batavia, NY 14020

**RE:    REQUEST FOR CUSTODY REDETERMINATION**
Xiao Bao HE, A#██████████

Dear Judge Schultz:

The Legal Aid Society represents Xiao Bao He ("Mr. He" or "Respondent") (A# ██████████) in removal proceedings before this Court. Enclosed is an EOIR-28. Mr. He was detained on October 10, 2024. We are supporting this letter and supporting documents attached hereto in support of Mr. He's application for bond.

**Legal Standard**

Mr. He is eligible for bond under INA § 236(a). He has one criminal conviction for Criminally Negligent Homicide, a **non-violent felony**, under New York Penal Law 125.10, which is neither a crime involving moral turpitude nor an aggravated felony under the INA. As this crime requires only the mental state of negligence, it does not meet the federal definition of moral turpitude. *See Matter of Tavdidishvili*, 27 I&N Dec. 142, 145 (BIA 2017) ("Because section 125.10 of the New York Penal Law reaches offenses committed with criminal negligence—that is, offenses that do not require a sufficiently culpable mental state—the elements of this statute do not categorically fall within the definition of a crime involving moral turpitude."). Furthermore, the incident that led to Mr. He's conviction occurred in a context of him being severely abused and labor trafficked, and was completely out of character for him. He has no other convictions.

Under the BIA's framework, the standard of proof at a § 236(a) bond hearing is a preponderance of the evidence. *See Guerra*, 24 I&N at 40 (noting that an alien seeking release from custody must show "to the satisfaction of the Immigration Judge" that he or she merits release); *Matter of Locicero*, 11 I&N Dec. 805, 808 (BIA 1966) (interpreting the "to the satisfaction of the Attorney General" standard as equivalent to "a preponderance of evidence"). "When something is to be established by a preponderance of the evidence it is sufficient that the proof only establish that it is probably true." *Matter of E-M-*, 20 I&N Dec. 77, 80 (BIA 1989). Thus, the proper question before this Court when applying the BIA's framework for custody determination is whether Respondent has established that it is "probably true" that he does not present a danger to the community and is not a flight risk. Accordingly, the court may not rely exclusively on generalizations based on the

**Justice in Every Borough.**

28

individual's possession of generic characteristics.[1] In addition, just as, when predicting the likelihood of future harm in the context of claims for relief from removal, so in the bond context the court may not rely on a "series of suppositions" to determine future danger or flight risk. *Matter of J-F-F-*, 23 I. & N. Dec. 912, 917 (BIA 2006). Rather, a denial of bond or conditional parole "must be based upon some *specific fact* pointing to" the existence of flight risk or danger. *Mangaoang v. Boyd*, 186 F.2d 191, 196 (9th Cir. 1950) (emphasis added).

This BIA framework placing the burden on the respondent, although routinely applied in Immigration Court, is in fact unconstitutional, and the Respondent urges the Court to place the burden of proof on the Government to demonstrate that the Respondent is a danger or flight risk. *See Onosamba-Ohindo v. Barr*, 483 F. Supp. 3d 159 (W.D.N.Y. 2020) (agreeing with the "growing chorus of district courts have concluded that due process requires that the government bear the burden of proof at [§ 236(a)] bond hearings"), *judgment vacated in part on other grounds, appeal dismissed sub nom. Agustin v. Searls*, No. 20-3712, 2022 WL 15985214 (2d Cir. Aug. 26, 2022); *Arellano v. Sessions,* No. 18-cv -06625-MAT, 2019 WL 3387210, at *11 (W.D.N.Y. July 26, 2019); *Hernandez-Lara v. Lyons*, 10 F. 4th 19 (1st Cir. 2021); *see also Velasco Lopez v. Decker*, 978 F.3d 842 (2d Cir. 2020) (holding that the government must bear the burden by clear and convincing evidence when detention becomes prolonged, and not reaching question of whether this requirement applies when detention is not yet prolonged)., [2] Under either analysis, however, factors that are relevant to the determination include: length of residence, manner of entry, family ties, employment history, record of appearances in court, criminal history, fixed address in the U.S., and eligibility for relief. *See Guerra*, 24 I&N at 40; *Matter of Patel*, 15 I&N Dec. 666 (BIA 1976).

Always, an Immigration Judge's decision on custody must be based on a "reasonable foundation" and reliable evidence that is probative of factors relevant to flight risk and danger. *Carlson v. Landon*, 342 U.S. 524, 534 (1952). *See also Matter of Guerra*, 24 I&N Dec. 37, 40-41 (only evidence that is "probative and specific" may support a finding of dangerousness). When considering a respondent's criminal history, allegations alone do not constitute probative and specific evidence.

Detention based on public safety is permissible only if the decision-maker is "assess[ing] . . . danger to the community on a current basis." *Chi Thon Ngo v. I.N.S.*, 192 F.3d 390, 398 (3d Cir. 1999), as amended (Dec. 30, 1999) (emphasis added); *see United States v. Salerno*, 481 U.S. 739, 751 (1987) (approving bail procedures that assessed "likelihood of future dangerousness" (emphasis added)). Thus, the appropriate inquiry focuses on whether Mr. He currently "presents an identified

---

[1] *See, e.g., Cruz-Taveras v. McElroy*, 1996 WL 455012, at *6 (S.D.N.Y. August 13, 1996) (reversing denial of bond where IJ "lumped [the petitioner] together with all drug offenders and refused to consider the special circumstances of the case").

[2] To that end, the Respondent preserves the argument that the documents attached hereto should only be considered if the Government first meets its burden by clear and convincing evidence.

and articulable threat to an individual or the community" such that detention is necessary to "disable [Mr. He] from executing that threat." *Salerno*, 481 U.S. at 751 (emphasis added).

Several BIA decisions hold that very old criminal convictions – even serious ones – cannot on their own establish current dangerousness. *See K-R-N-,* AXXX XXX 430 (BIA Dec. 14, 2020) (holding that DHS did not demonstrate that Respondent was a danger to the community where his last conviction was in 2002 and he had been engaged in anger management courses since 2015 and addiction support since 2016); *M-D-*, AXXX XXX 982 (BIA Feb. 8, 2018) (reversing determination that Respondent was a danger to the community where sole convictions all stemmed from a single incident occurring more than 11 years prior); *C-G-C-,* AXXX XXX 735 (BIA Dec. 8, 2018) (reversing determination that Respondent was a danger to the community where last criminal conviction occurred in 1991); *S-V-,* AXXX XXX 037 (BIA May 1, 2014) (reversing finding that Respondent was a danger to the community where his crimes were committed 20 years prior).

Where an Immigration Judge finds that a respondent is entitled to a bond, the IJ must set a bond amount that is no higher than what is "necessary to ensure the respondent's presence at [removal] proceedings." *Matter of Urena*, 25 I&N Dec. 140, 142 (BIA 2009). *See also Black v. Decker,* 103 F. 4th 133 (2d Cir. 2024), at 158 (holding that the court must consider ability to pay and alternatives to detention when setting a bond amount); *Hernandez v. Sessions*, 872 F.3d 976, 991 (9th Cir. 2017) (holding that "setting a bond amount without considering financial circumstances or alternative conditions of release undermines the connection between the bond and the legitimate purpose of ensuring the non-citizen's presence at future hearings"). Respondent is also entitled to consideration of conditional parole. *See* INA § 236(a)(2)(B) (the Attorney General may release the alien on conditional parole); *see also Rivera v. Holder*, 307 F.R.D. 539, 553 (W.D. Wash. 2015) (holding that the plain language of the statute requires immigration judges to "consider conditions for release beyond a monetary bond," such as conditional parole, and ordering immigration judges in Washington to do so).[3]

## Mr. He is not a danger to the community or flight risk

---

[3] To the extent the statute is in any way ambiguous, the canon of constitutional avoidance also compels consideration of conditional parole to ensure that individuals are not impermissibly detained based solely on their lack of financial resources. *See Zadvydas v. Davis*, 533 U.S. 678, 699 (2001) (construing 8 U.S.C. 1231(a)(6) to avoid the serious constitutional concern of prolonged detention). Courts have held in the pre-trial criminal bail context that the Fifth and Fourteenth Amendments require courts to find that there are no alternative forms of release, such as a lower bond and/or non-monetary conditions of supervision, that would be sufficient to mitigate flight risk and danger before continuing an individual's detention. *See Pugh v. Rainwater*, 572 F.2d 1053, 1057-58 (5th Cir. 1978) (en banc) (upholding Florida criminal bail scheme against a constitutional challenge by construing it to require consideration of alternatives to money bond). Here, an interpretation of the statute that does not require an inquiry into the immigrant's ability to pay bond or suitability for release on alternative conditions would raise serious constitutional doubts under the Due Process, Excessive Bail, and Equal Protection clauses. *See Hernandez*, 872 F.3d at 991 ("Detention of an indigent 'for inability to post money bail' is impermissible if the individual's 'appearance at trial could reasonably be assured by one of the alternate forms of release.'") (quoting *Pugh v. Rainwater*, 572 F.2d 1053, 1058 (5th Cir. 1978) (en banc)).

As clearly demonstrated in the attached evidence, Mr. He is neither a danger nor a flight risk and merits release on his own recognizance or bond. His sole criminal conviction is a result of him being labor trafficked and physically, emotionally, and psychologically abused by his girlfriend. He has a pending T Nonimmigrant Status application based on the experience of having being forced and coerced into involuntary servitude in the months prior to the incident which led to his arrest. His abuser/trafficker girlfriend had completely isolated him, relentlessly abused him psychologically, and deprived him of food and sleep for months until Mr. He began hallucinating and hearing voices. It was a confluence of factors - intense abuse, sleep and food deprivation, and trauma - that led to Xiao Bao's offense and attempted suicide. He was so mentally decompensated and suffered such intense guilt and contrition, that he attempted suicide several more times in the months after his arrest. In her evaluation, Dr. Monit Cheung found that the abuse that Mr. He suffered at the hands of Shuai Li psychologically impacted him "to the point that he was irrational in his killing as an action to end suffering." "The killing was not contemplated but linked to DV victimization inflicted by Shuai, including emotional, psychological, financial, and physical abuse, sexual manipulation, and stalking behaviors. Before the fatal incident, he had exhibited symptoms of extreme emotional disturbances, hearing his own voice questioning himself and feeling intense loneliness, helplessness, and hopelessness. Dr. Cheung also evaluated Mr. He's likelihood of reoffending, and found that he has a very low likelihood to reoffend. She compared his characteristics with those of DV perpetrators and found that he does not fit the prototype of an offender. Rather, he was a DV victim, both in his relationship with Shuai Li, and in his childhood.[4]

Mr. He's record while incarcerated was nothing short of remarkable. Mr. He never received a single disciplinary ticket while in DOCCS custody for thirteen years.[5] He dedicated his time behind bars to the service of others, working in a highly regarded position at Sing Sing. He developed a rare talent for music performance and composition while incarcerated, and has composed classical pieces that have been performed at Carnegie Hall and Lincoln Center. He was seen as a force of peace among other incarcerated individuals by corrections officers and prison staff—several of whom have submitted personal support letters on his behalf. He also dedicated himself to religion. He obtained a master's degree in theology and was confirmed by Archbishop of New York, Cardinal Dolan. The Cardinal has written a rare letter of personal support for Mr. He's case.

Mr. He has an astounding level of support in New York City among both the Catholic church and the music community. If released, he has a stable and supportive place to live, an offer of gainful employment, educational prospects, and reentry therapy lined up. Mr. He's reentry plan, prepared by his criminal appeals attorney, is included in the attached evidence.

---

[4] Exhibit D, Expert Report of Dr. Monit Cheung, PhD, LCSW.

[5] Exhibit E, Print-out from the DOCCS showing that Mr. He has no disciplinary record from 2011 until present.

Mr. He's post-sentencing achievements are equally exemplary. He never received less than the highest possible marks on every job and educational review while in DOCCS custody. In 2018, Mr. He obtained his Master's degree from New York Theology Seminary after completing a 36-credit advanced degree program. He also enrolled in college courses for non-credit since he already received his undergraduate and master's degrees. He worked as the Special Subjects Clerk at Sing Sing where he assisted the Prison Superintendent with coordinating special events at the prison. In this role, he was given outstanding evaluations in addition to several raises.

Most notably, Mr. He used his time in custody to pursue his extraordinary talent as a jazz musician and classical music composer.[6] Through these prison music programs, Mr. He connected with professional musicians from prominent institutions including Carnegie Hall and Julliard, who believe his talent is so great that they have taken measures to ensure his compositions are brought outside prison walls and onto professional stages. To date, Mr. He's original compositions have been performed at Carnegie Hall, Lincoln Center, and Trinity Church.[7]

Mr. He has excellent prospects for re-entry because—despite not knowing anyone when he first came to the United States—Mr. He has managed to establish a large support system for himself both inside and outside prison walls while incarcerated. In prison, he gained accolades from other incarcerated individuals, correctional officers, chaplains, leaders of prison programming—many of whom have written support letters on his behalf. He is almost guaranteed to have a lawful, peaceful, and successful life as a professional musician, composer or music teacher upon his release given the breadth of support he has in the professional music community. In fact, he has already been offered a place to live by a re-entry organization sponsored by the Catholic Church, Carnegie Hall has offered him a job if he is released, and several institutions have offered to pay for him to attend music school if he so desires.

The numerous letters of support from prison officials, chaplains, music professionals, and Catholic leaders demonstrate that Mr. He is well known as a peaceful, respectful, religious, talented individual with a lot of support behind him and an incredibly bright future. He is clearly neither a danger nor a flight risk, and should be granted a reasonable bond so he can move forward from the domestic violence and trafficking he experienced that resulted in his current incarceration.

## Conclusion

Mr. He is requesting release from detention on bond or his own recognizance pending resolution of his removal proceedings. He is not a danger to the community: his criminal history is

---

[6] Mr. He has been a participant in Carnegie Hall's Musical Connections Program for the past 5-6 years, in addition to being a program-participant at Musicambia, which is another music program at Sing Sing run by outside professional musicians.

[7] A recording of the October 2023 concert at Trinity Church can be found here. Mr. He's music is introduced around the 9:00 mark: https://trinitywallstreet.org/events/novus-ny-renewal-2023-10-15

Field

Page 6

limited to one conviction which is a direct result of the domestic violence and trafficking he suffered at the hands of his ex-girlfriend. He also does not represent a flight risk since he has extensive support and opportunities in New York City, as well as professional goals that keep him there. Finally, he has already filed an application for T Nonimmigrant Status, which has been pending for more than a year, and has a strong motivation to pursue his case and obtain legal status in the United States.

Accordingly, we respectfully request that Respondent be granted a reasonable bond, taking into consideration his lack of employment for the past 13 years.

Date: October 28, 2024

Respectfully Submitted,

Laura Berger, Esq.
The Legal Aid Society
49 Thomas Street
New York, NY 10013
(917) 921-4210

**Justice in Every Borough.**

33

## INDEX OF DOCUMENTS IN SUPPORT OF MR. HE'S BOND REQUEST
A#

| EXHIBIT | DOCUMENT DESCRIPTION | PAGES |
|---|---|---|
| A | **Form I-797C Receipt Notice for Pending I-914 Application for T Nonimmigrant Status,** filed August 14, 2023 | 1 |
| B | **Mr. He's Affidavit Submitted with His I-914 Application for T Nonimmigrant Status** | 3 |
| C | **New York State Notice of Confirmation of Human Trafficking from Office of Temporary and Disability Assistance** dated June 16, 2023 | 15 |
| D | **Psychological Evaluation from Dr. Cheung** | 16 |
| E | **Printout from DCCS Showing that Mr. He has no disciplinary record from his time in custody 2011-2023** | 36 |
| F | **Medical Records from Bellevue Hospital, showing that Mr. He was suicidal, had lost weight, hallucinating, depressed, and experiencing domestic violence at the time of his arrest.** | 37 |
| G | **Letter of Support from Cardinal Timothy Dolan** | 47 |
| H | **Affidavit of Yushi Liu, recalling Mr. He's history of childhood physical and psychological abuse by his father, and treatment by his girlfriend, Shuai Li** | 49 |
| I | **Affidavit of Qin Chen, recalling Mr. He telling him about his experience of being physically beaten by Shuai Li, but not being taken seriously.** | 57 |
| J | **Affidavit of Chenling Lu, recalling Mr. He and Shuai Li's relationship while they were in grad school.** | 64 |
| K | **Letter of Support from Sister Joanna Chan** | 71 |
| L | **Letter of Support from Manuel Bagorro at Carnegie Hall** | 76 |
| M | **Letter of Support from Ayanna M. Cole, Director of Social Impact Programs at Carnegie Hall** | 77 |
| N | **Letter of Support from Sebastian Budinich, Supportive Services Coordinator at Thrive for Life** | 78 |
| O | **Letter of Support from Father Zachariah Presutti, SJ, Executive Director at Thrive for Life** | 80 |
| P | **Letter of Support from Matt Moran, lead teaching artist for the Carnegie Hall Musical Connections Program, and other Teaching Artists of the Carnegie Hall Musical Connections Program** | 82 |
| Q | **Letter of Support from Brad Balliet at Musicambia** | 84 |
| R | **Letter of Support from Laura Weiner at Musicambia** | 85 |
| S | **Letter of Support from Charles Moore from Rehabilitation Through the Arts** | 87 |
| T | **Letter of Support from Christopher Estberg from Sing Sing Correctional Facility** | 89 |
| U | **Letter of Support from John Mahoney, RPL II, NY DCCS** | 90 |
| V | **Letter of Support from Craig Littrell, RPL I, NY DCCS** | 91 |

| W | Letter of Support from Father Matthew Ugwoji, Catholic Chaplain | 92 |
|---|---|---|
| X | Letter of Support from Dr. W. Francois III, New York Theological Seminary | 93 |
| Y | Letter of Support from Sean Pica, Executive Director of Hudson Link | 94 |
| Z | Letter of Support from Dr. Melissa Baker, Director of Artistic Planning of Trinity Church Wall Street | 96 |
| AA | Letter of Support from Dr. Elliot Cole, Program Director for Musicambia | 97 |
| BB | Letter of Support from C.O. James, Corrections Officer at Sing Sing Correctional Facility | 99 |
| CC | Letter of Support from C.O. G. Knowlden, Corrections Officer at Sing Sing Correctional Facility | 100 |
| DD | Letters of Support from Friends / Fellow Musicians:<br>• **Kenyatta Emmanuel, Artist-in-Residence, Initiative for a Just Society, Colombia Law School**<br>• **Anthony Perez**<br>• **Jean Rohe**<br>• **Jamey Aebersold** | 101 |

# EXHIBIT  C

EXHIBIT  C



**NEW YORK** STATE OF OPPORTUNITY.

**Office of Temporary and Disability Assistance**

| | | |
|---|---|---|
| **KATHY HOCHUL** | **DANIEL W. TIETZ** | **BARBARA C. GUINN** |
| Governor | Commissioner | Executive Deputy Commissioner |

## NEW YORK STATE NOTICE OF CONFIRMATION OF HUMAN TRAFFICKING

June 16, 2023

Xiaobao He
c/o Laura Berger
The Legal Aid Society
49 Thomas Street
New York, NY 10013

OTDA Tracking Number: 2█████

Dear Xiaobao He,

The New York State Division of Criminal Justice Services, in consultation with the New York State Office of Temporary and Disability Assistance has reviewed the information that The Legal Aid Society supplied on 6/13/23 regarding your circumstances and have determined that you **MEET THE CRITERIA FOR CONFIRMATION** as a human trafficked person in New York State.

Under New York State law, you may be qualified for assistance under New York State Response to Human Trafficking Program. We encourage you to seek assistance at Restore NYC at 20 W 46th Street, Suite 2B, New York, NY 10036: 212-840-8484. We also encourage you to continue working with The Legal Aid Society. Should you require further information, please visit Restore NYC website at: https://restorenyc.org/services/

You may also be eligible for assistance from the New York State Office of Victim Services at Alfred E. Smith State Office Building, 80 South Swan Street, 2nd Floor, Albany, New York 12210; 1-800-247-8035; www.ovs.ny.gov.

Under Section 483-DD of New York State Social Services Law, you or your representative may request that a law enforcement agency provide you with United States Citizenship and Immigration Services Form I-914, Supplement B – Declaration of Law Enforcement Officer for Person of Trafficking in Persons. This document may assist you to obtain immigration status in the United States, if necessary, as well as assistance from the United States government.

Best wishes,

*Noelia Santillana*
Noelia Santillana
Program Aide, Response to Human Trafficking Program

cc:  Julina Guo, Division of Criminal Justice Services

# EXHIBIT F

```
Printed:27 Feb 23  1041:38          ----------------------------------------
                                    |MRN:3457903                           |
Bellevue Hospital Center            |Patient:He,Xiao Bao                   |
462 First Avenue                    |DOB:           █████   Sex:M  Type:IP |
New York, NY 10016                  |                                      |
                                    |Visit Date:08/18/11 Visit# 3457903-1  |
                                    |Location:inpatient                    |
                                    ----------------------------------------
```

                                                      Page  1 of 736

                        Outpatient Chart Print

==============================================================================

                              All Events

------------------------------------------------------------------------------
0200 Admission Assessment Record (Psychiatry) Ad          Status: complete
```
        BP                     : 124/89  mmHg
        Pulse                  : 68  bpm
        Resp                   : 18  breaths/min
        Resp Description       : regular, unlabored
        O2 Sat                 : n/a
        Temp                   : 97.0 F (36.1 C)
        Temp Method            : tympanic membrane
        Pain                   : no
        Pain (Trend)           : 0
        Weight in Kg or Lbs    : pounds (lbs)
        Weight (Pounds)        : 81.6 kg (180 lbs)
        Calc Weight            : 81.6 kg (180 lbs)
        Height in Inches,Feet or
        Cms?                   : centimeters
        Height                 : 180 cm (71 in, 5'11")
        BMI                    :  25.19
        Allergies - Med        : no known drug allergies
        Allergies - Other      : no known allergens
        Bld Trans              : no previous blood transfusion
        Pain Assessment        : no pain issues at this time
        Does Patient Have
        Advance Directives?    : No and does not wish to complete one.
```

39

Printed:27 Feb 23  1041:38

Bellevue Hospital Center
462 First Avenue
New York, NY 10016

```
-----------------------------------------
|MRN:3457903                             |
|Patient:He,Xiao Bao                     |
|DOB:              Sex:M  Type:IP        |
|                                        |
|Visit Date:08/18/11 Visit# 3457903-1    |
|Location:inpatient                      |
-----------------------------------------
```

Page  2 of 736

Outpatient Chart Print

===========================================================================

All Events - continued

0200 Admission Assessment Record (Psychiatry) Ad -- cont'd
```
        Arrival Date/Time         : 18 Aug 11  2225
        Admitted From             : CPEP
        Transport Mode            : transported via ambulation
        Wristband                 : Yes
        Wristband Types           : White ID Wristband,
        Sources                   : Patient
        Personal Contacts         : none known
        Preferred Language(s)     : English
        Communication Ability     : Able to communicate
        Language Used             : English
        Possessions               : not applicable
        Unit Orientation          : oriented to:
        Legal Status              : 9.39
        HIPAA                     : yes, pt received HIPAA Privacy Form
        Bill of Rights            : yes, patient received Bill of Rights
        Adm Reason                : Adm Reason: suicidal ideations Signs
                                        Symptoms: attempted suicide Hx of
                                        Problem: yes
        Prior Hospitalizations    : no
        Abuse History             : physical abuse historical As: victim
                                        Specifics/Action Taken: Pt says once
                                        around January his girlfriend
                                        scratched his face and bit his
                                        finger. There was a court proceeding
                                        but pt says no charges pending.
        Mood                      : Calm,
        Behavior                  : Cooperative,
        Thoughts                  : Organized,
```

40

```
Printed:27 Feb 23  1041:38          -------------------------------------
                                    |MRN:3457903                          |
Bellevue Hospital Center            |Patient:He,Xiao Bao                  |
462 First Avenue                    |DOB:0          Sex:M  Type:IP        |
New York, NY 10016                  |                                     |
                                    |Visit Date:08/18/11 Visit# 3457903-1 |
                                    |Location:inpatient                   |
                                    -------------------------------------
```

Page  3 of 736

Outpatient Chart Print

=======================================================================

All Events - continued

0200 Admission Assessment Record (Psychiatry) Ad -- cont'd
         Risk Assessment          : Score: 15 Risk Level: Moderate Risk
                                    Presence/influence of hopelessness:
                                    Yes Recent Stressful life event,ex
                                    job loss, financial worries, pending
                                    court action: Yes Evidence of
                                    persecutory voices/beliefs/and/or
                                    command Auditory hallucinations: No
                                    Evidence of depression/loss of
                                    interest or loss of pleasure: Yes
                                    Presence of anxiety or panic: No
                                    Presence of restlessness or
                                    agitation: No Evidence of
                                    withdrawal-history of substance
                                    abuse: No Warning/verbalization of
                                    suicidal intent: No  Evidence of
                                    verbalization of plan to commit to
                                    suicide : No Family History of
                                    serious psychiatric problems or
                                    suicide: No Recent bereavement or
                                    relationship breakdown (R) None (N):
                                    Yes History or current psychosis: Yes
                                    Widow/Widower: No Prior Suicide
                                    Attempt: Yes History of
                                    socio-economic deprivation: Yes
                                    History of alcohol and/or alcohol
                                    abuse: No Presence of terminal
                                    illness: No
         Medical History          : Disease: None
         Surgical History         : no previous surgeries
         History of Seizures      : No
         Immunization History     : None,
         Self Reported Status     : offered and declines HIV testing
```

41                                 Page 39

```
Printed:27 Feb 23  1041:38          ----------------------------------------
                                    |MRN:3457903                           |
Bellevue Hospital Center            |Patient:He,Xiao Bao                   |
462 First Avenue                    |DOB:(          )      Sex:M  Type:IP   |
New York, NY 10016                  |                                      |
                                    |Visit Date:08/18/11 Visit# 3457903-1  |
                                    |Location:inpatient                    |
                                    ----------------------------------------
```

Outpatient Chart Print

================================================================================

All Events - continued

0200 Admission Assessment Record (Psychiatry) Ad -- cont'd
        Neurological Assessment  : ORIENTATION/RESPONSE: alert & oriented to
                                   person; alert & oriented to place;
                                   alert & oriented to time; alert &
                                   oriented to situation;
                                   SPEECH/APHASIA: normal speech;
                                   HEADACHES: no BLURRED VISION: no
                                   TINGLING: No
        Vision                   : No Vision Deficits
        Hearing                  : No Hearing Deficits
        Oral                     : No Oral Deficits
        Cough                    : None
        Cardiovascular Assessment: CHEST PAIN: no chest pain PERIPHERAL
                                   EDEMA: no peripheral edema; Protocol
                                   Weight: All other admissions (Weekly
                                   Weight)
        GU/GI/GYN Assessment     : GU: non-distended; DIALYSIS PT: No
                                   PATTERN/Last BM: regular;

42                    |    Page 40
```

```
Printed:27 Feb 23   1041:38
                                    ----------------------------------------
                                    |MRN:3457903                            |
Bellevue Hospital Center            |Patient:He,Xiao Bao                    |
462 First Avenue                    |DOB:▮           Sex:M  Type:IP         |
New York, NY 10016                  |                                       |
                                    |Visit Date:08/18/11 Visit# 3457903-1   |
                                    |Location:inpatient                     |
                                    ----------------------------------------
```

Outpatient Chart Print

=============================================================================

**All Events - continued**

1330 Psychiatric Assessment ED                          Status: complete
     You may select "Help with Psychiatric Assessment," by clicking the downward
     triangle by "Psychiatric Assessment."  This will provide a full help file, and
     access to a list of all fields in the assessment.
     Please make sure you accept your assessment fully with "(A) Accept" after you
     complete all required fields.  You may save part-way through with
     "(P) Accept Partial," but you will need to use "Complete/Correct Previous
     Notes" to complete the assessment.  Be VERY CAREFUL to not back out of the
     assessment without saving it.
     The benefits from understanding basic Misys functions and having an efficient
     navigation strategy are SUBSTANTIAL in allowing rapid completion of this form.
     Version                   : retention documentation
     Start Time of Evaluation  : 18 Aug 11  1215
     Source of Referral        : Law enforcement
     Sources of Information     : Patient,Referral letter
     Barriers to Assessment    : Psychosis or confusion
     Consenting Party          : patient consents or involuntary treatment
     Preferred Language(s)     : English
     Language Used             : Pt initially requested interview to be in
                                 Mandarin. Mandarin phone interpreter #7103
                                 used. Pt then said he would prefer English.
                                 Interpreter stayed on the line and helped
                                 translate when pt or I felt that there was an
                                 issue which needed translation.
     Interpreter Name/Modality: James / # 7103



Printed:27 Feb 23  1041:38

Bellevue Hospital Center
462 First Avenue
New York, NY 10016

```
-----------------------------------------
|MRN:3457903                              |
|Patient:He,Xiao Bao                      |
|DOB:(             )     Sex:M  Type:IP   |
|                                         |
|Visit Date:08/18/11 Visit# 3457903-1     |
|Location:inpatient                       |
-----------------------------------------
```

Page 11 of 736

Outpatient Chart Print

================================================================================

All Events - continued

1330 Psychiatric Assessment ED  -- cont'd
        Chief Complaint         : "This morning, I was talking to a doctor who
                                  said I had suicidal thoughts."

        History of Present
        Illness (WP)            : 25 y/o domiciled AM with no prior psychiatric
                                  or drug / alcohol history, BIB NYPD
                                  pre-arraignment on murder charge. Patient
                                  reportedly stabbed and killed his girlfriend
                                  this morning, and was then found by police
                                  with a knife in his had after self-inflicting
                                  several injuries in a suicide attempt. Pt was
                                  taken to Lutheran Hospital, medically
                                  cleared, put on a 9.27 psychiatric hold, then
                                  transported here.

                                  Here, pt is calm and cooperative with a
                                  significantly blunted affect and significant
                                  psychomotor slowing. Pt says that he has been
                                  depressed most days since January, when he
                                  began to have significant conflicts with his
                                  girlfriend. He endorses insomnia (problems
                                  going to sleep due to racing thoughts and
                                  early morning awakening), guilt feelings "for
                                  myself" which he says is because he made "the
                                  worst choice", decreased energy (says he
                                  feels tired "all day"), decreased appetite
                                  (eating one meal a day, has lost weight but
                                  doesn't know how much), psychomotor slowing,
                                  and suicidal thoughts.

                                  Pt says one month ago, he went to a subway
                                  station with thoughts of wanting to kill
                                  himself by jumping in front of a train. He
                                  says that he "couldn't do it." He again had
                                  suicidal thoughts today. Pt states that after
                                  the alleged incident with his girlfriend, he

44

```
Printed:27 Feb 23  1041:38          ----------------------------------------
                                    |MRN:3457903                            |
Bellevue Hospital Center            |Patient:He,Xiao Bao                    |
462 First Avenue                    |DOB:▮              Sex:M  Type:IP       |
New York, NY 10016                  |                                       |
                                    |Visit Date:08/18/11 Visit# 3457903-1   |
                                    |Location:inpatient                     |
                                    ----------------------------------------
```

Outpatient Chart Print

======================================================================================

**All Events - continued**

1330 Psychiatric Assessment ED  -- cont'd

> told his roommate to call 911 and not let anyone into his room. He went into his room with the intention of killing himself. He stabbed himself in the stomach and made lacerations to his wrists and his neck. (Medically cleared at Lutheran; see Medical history for details.) Pt says that right now, he continues to be suicidal and is contemplating starving himself to death.

> Pt also endorsed some psychotic symptoms. He says that since January, he has been intermittently hearing his own voice intermittently. Using the interpreter, I made sure that pt understood the distinction between "hearing" his own thoughts and in actually having the perceptual experience of hearing voices. He says he has the experience of hearing his own voice. He denies any commands from the voices. The voice does ask him questions such as "Is this the life you want?" and "Do you want to be controlled by her?" Seeing his girlfriend made this voice better.

> He also experiences a hallucination / delusion that he is in a movie. He says that frequently the movie has been "I go back home [to China] and get away from her [his girlfriend]. I live alone. Then we argue. I kill her, then I kill myself." I again used the interpreter to distinguish between fantasies and hallucinations. Pt says that these are not fantasies, but that he actually experiences this movie as though it is real.

45

```
Printed:27 Feb 23   1041:38          --------------------------------------
                                     |MRN:3457903                          |
Bellevue Hospital Center             |Patient:He,Xiao Bao                  |
462 First Avenue                     |DOB:(           )      Sex:M  Type:IP |
New York, NY 10016                   |                                     |
                                     |Visit Date:08/18/11 Visit# 3457903-1 |
                                     |Location:inpatient                   |
                                     --------------------------------------
```

Page 13 of 736

Outpatient Chart Print

========================================================================

**All Events - continued**

1330 Psychiatric Assessment ED  -- cont'd

This happens maybe once every other day. He says that when he experiences this movie, he has the experience of "being alone in the world." One example of this is that he was on a subway platform with many people around, but when he started to hallucinate about this "movie", he felt like he was alone on the platform.

He had some vague paranoia, saying that he is "always afraid" and "never feels safe." He had no specific target of this paranoia. Pt denies any manic symptoms, any grandiosity, any ideas of reference, any PTSD symptoms and any religious experiences. He was not internally preoccupied. There was a previous note from Lutheran that pt said that he was not alive and had committed suicide. Pt denies this to me, and says he is alive and knows he didn't commit suicide.

Prior Mental Health Srvcs: None
AOT Status                 : no aot involvement
High Risk Psychiatric Hx : Self-harm or suicide attempts,Arrest or
                           incarceration
Psychopharm History        : no history of psychopharmacological agents
Past Psychiatric History
(WP)                       : Pt denies any past psychiatric
                           hospitalizations, contact with psychologists
                           / psychiatrists, or psychiatric medications.
                           Pt says he took steps towards suicide 1 month
                           ago, when he went to a subway station and
                           wanted to jump in front of a train. Pt says,
                           "I just couldn't do it." This was his only
                           prior suicide attempt prior to today (see HPI
                           for details).

46                      Page 44

```
Printed:27 Feb 23  1041:38          ---------------------------------------
                                    |MRN:3457903                          |
Bellevue Hospital Center            |Patient:He,Xiao Bao                  |
462 First Avenue                    |DOB:(          ]     Sex:M  Type:IP   |
New York, NY 10016                  |                                     |
                                    |Visit Date:08/18/11 Visit# 3457903-1 |
                                    |Location:inpatient                   |
                                    ---------------------------------------
```

Outpatient Chart Print

================================================================================

All Events - continued

1445 SW Psychosocial Assessment* -- cont'd

[to China] and get away from her [his girlfriend]. I live alone. Then we argue. I kill her, then I kill myself." I again used the interpreter to distinguish between fantasies and hallucinations. Pt says that these are not fantasies, but that he actually experiences this movie as though it is real. This happens maybe once every other day. He says that when he experiences this movie, he has the experience of "being alone in the world." One example of this is that he was on a subway platform with many people around, but when he started to hallucinate about this "movie", he felt like he was alone on the platform. He had some vague paranoia, saying that he is "always afraid" and "never feels safe." He had no specific target of this paranoia. Pt denies any manic symptoms, any grandiosity, any ideas of reference, any PTSD symptoms and any religious experiences. He was not internally preoccupied. There was a previous note from Lutheran that pt said that he was not alive and had committed suicide. Pt denies this to me, and says he is alive and knows he didn't commit suicide"

ON REASSESSMENT ON 19 WEST (18/19/11): Chart reviewed.  Patient was identified by wristband/name.  19 West treatment team met with patient today in interview room. Patient is a 25 y.o. single, domiciled Asian male BIB NYPD with no previous history of psychiatric hospitalizations, treatment or medications.  He is pre-arraiged on a murder charge and is alleged to have stabbed his

47

Printed:27 Feb 23  1041:38

Bellevue Hospital Center
462 First Avenue
New York, NY 10016

```
----------------------------------------
|MRN:3457903                           |
|Patient:He,Xiao Bao                   |
|DOB:(          )        Sex:M  Type:IP |
|                                      |
|Visit Date:08/18/11 Visit# 3457903-1  |
|Location:inpatient                    |
----------------------------------------
```

Page 66 of 736

Outpatient Chart Print

================================================================================

All Events - continued

1445 SW Psychosocial Assessment* -- cont'd

girlfriend.  When asked what brought him to
BHC, patient stated "I tried to kill myself
and that is why I'm here".  Patient reported
that around January of this year, after he
broke up with his girlfriend who went back to
China, he started feeling depressed, was
having difficulty sleeping, poor appetite,
weight loss, poor concentration.  He stated
that in February, he felt better when she
came back to the US and they reconciled.
Around June of this year, they started having
physical and verbal altercations again and
his depression came back.  He stated that his
girlfriend was very jealous and controlling
and told him that he could not have a cell
phone.  He stated that they eventually
obtained restraining orders against each
other.  Around this time, he also started
hearing voices. He stated that the voice is
his own voice and would makes statements such
as "What are you doing with your life?!" or
"You have to get away from your girlfriend".
He stated that he started seeing things as if
they he was watching a movie, and would see
images of him killing his girlfriend and
eventually killing himself.  He also started
to have suicidal ideation while he was on the
subway platform and thought of throwing
himself on the tracks but could not get
himself to do it.  Patient denied any
symptoms (current or history) of mania,
paranoid/grandiose/persecutory delusions,
thought insertion/withdrawal/broadcasting.
Patient was calm and cooperative during
interview.  He presented with depressed mood,

# EXHIBIT  G



OFFICE OF THE CARDINAL
1011 FIRST AVENUE
NEW YORK, NY 10022

October 22, 2024
Feast of Pope St. John Paul II
Month of the Holy Rosary

U.S. Immigration and Customs Enforcement
Office of the Principal Legal Advisor, New York
26 Federal Plaza, Room 1130
New York, NY 10278

Dear ICE,

I am writing in support of Xiao Bao He, a victim of human trafficking and domestic violence, and to urge ICE not to detain Xiao Bao He while he is resolving his immigration visa status. I have had the privilege of getting to know Xiao Bao during the religious services offered at Sing Sing Correctional Facility, particularly when I celebrated the sacrament of confirmation, welcoming him into the Catholic Church in March 2018 and during Lent 2020. I am deeply impressed by Xiao Bao's exceptional character and his unwavering commitment to spiritual development throughout his years of incarceration.

Xiao Bao, once an international student pursuing a master's degree at Northeastern University, experienced immense hardship due to depression and domestic violence, which tragically culminated in a terrible crime. However, it is crucial to consider the context in which these events occurred. Prior to this unfortunate situation, Xiao Bao was a high-achieving student driven by a strong desire to excel in his studies and pursue academic excellence.

Since his incarceration, Xiao Bao has dedicated himself to personal growth in various areas of his life: personally, academically, and spiritually. He has actively participated in Catholic services at each facility to which he has been transferred. Notably, he applied for a Master's Degree in Theology from the New York Theological Seminary, which he successfully completed, leading to his reception of the sacraments of baptism and confirmation. Xiao Bao's commitment to learn about and follow Christ has been transformative, reshaping his way of life. Additionally, he has immersed himself in music and composition. As a member of *Musical Connections* from Carnegie Hall and *Musicambia*, he has composed several original songs, with one even performed by a chamber music group at Carnegie Hall.

Upon release, and with the possibility of legally remaining in the United States, Xiao Bao has the opportunity to join *Thrive for Life*, an organization overseen by Jesuit priest Father Zachariah Presutti. *Thrive for Life* provides a community where individuals actively work on their reentry process and contribute to society. Through its houses of studies, Abraham House and Ignacio House, *Thrive for Life* offers a continuity of care that includes job training, assistance with academic goals (such as Xiao Bao's aspiration to pursue Music School), and well-being progress. The organization is dedicated to accompanying Xiao Bao through his reentry process until he secures permanent affordable housing, working closely with community partners and parole.

I humbly request your careful consideration and support for Xiao Bao's case. Xiao Bao's demonstrated commitment to personal growth, deep spirituality, and artistic talents make him a valuable asset to society. Xiao Bao is not a danger to the public or a flight risk. We strongly urge you to release him while his immigration matters are being resolved. He has a strong and wide support network and is prepared to contribute to his community. He has supportive housing at our *Thrive for Life* Abraham House, and many opportunities to develop professional and personally which would be significantly hindered if he were detained.

Thank you for your time and attention to this matter. I remain hopeful that, with your support, Xiao Bao will have the chance to rebuild his life and utilize his unique talents to inspire others and foster positive change. Should you require any additional information or documentation, please do not hesitate to contact me.

With prayerful best wishes, I am,

Faithfully in Christ,

†Timothy Michael Cardinal Dolan
Archbishop of New York

TMD:cw

51

# EXHIBIT H

SUPREME COURT OF THE STATE OF NEW YORK
CRIMINAL TERM – KINGS COUNTY

THE PEOPLE OF THE STATE OF NEW YORK,

– against –

XIAOBAO HE,

Defendant

Ind. No ███████1

**AFFIDAVIT OF YUSHI LIU**

YUSHI LIU, being duly sworn, deposes and says:

1.     My name is Yushi Liu. I submit this affidavit in support of Xiaobao He's motion for resentencing under Criminal Procedure Law § 440.47.

2.     I am a friend of Xiaobao He. I live in Vancouver, BC, Canada. I work for the City of Vancouver as a traffic assistant. I have a wife and we have a young child.

3.     I grew up with Xiaobao in Tianjin, China. We met in elementary school. Xiaobao is one year older than me. We went to school together from the age of 6 through college. Xiaobao is the closest thing I ever had to a sibling because we were both born under China's "One Child" policy and we're the only children our parents had. We became best friends, like family. Because he is one year older, I think of him like a big brother.

4.     Xiaobao's father was an officer for the Chinese Communist Party (CCP). His mother stayed at home while Xiaobao was growing up. When Xiaobao was born, his mother gave up her job, and her entire existence became dedicated to making Xiaobao into a perfect child and student. I would describe Xiaobao's mom as a dictatorial parent: she controlled everything about him from what he ate, what he wore, and even how long his hair could grow.

5.     I remember Xiaobao's parents being very strict with him when he was a kid. His parents were stricter than most other parents. Even at a very young age he was forced to be very intense about his schoolwork. His parents would always forbid us from doing things when I went there and Xiaobao was very good at following the rules when we were at his house. Because of how strict his parents were, Xiaobao spent a lot of time at my home whenever he could.

1

6.    Disciplining children physically is more common in China than in the United States, but Xiaobao would tell me that both his parents used physical discipline with him that was unusually harsh. Both his parents spanked him, and he told me that his father would often beat him with a belt with metal buckle and did not stop until Xiaobao was a teenager.

7.    At our school, Xiaobao was a star student. Everyone liked Xiaobao, even our teachers. He played sports, played music, and had lots of friends. Chinese schools have a position called class monitor: one student would get chosen to help lead and essentially help run the classes alongside the teacher. It was a big deal to be class monitor because the student that was selected needed to have the best grades and be seen as the best leader. Xiaobao was the class monitor for all 12 years from elementary through secondary school.

8.    Xiaobao and I also went to the same college, Tianjin Normal University, and we were roommates there. We were both good students and got good grades. In 2008, Xiaobao was selected out of thousands of people to volunteer at the Beijing Olympics, which was a big honor. He also had several girlfriends in college, and from what I knew and observed, those relationships were very normal and happy.

9.    In 2009, Xiaobao graduated from college. Before we had gone to university, Xiaobao's father wanted Xiaobao to skip the college entrance exam and become a CCP officer like him. Xiaobao did not want to do that. After college, Xiaobao's father again tried to pressure Xiaobao into becoming a Party officer, but Xiaobao convinced his parents to agree to let him attend Northeastern University in Boston to attend a graduate program in  Human Resources. His plan was to improve his English, get a degree in Human Resources, then get a job as an HR Business Partner.

10.    When Xiaobao moved to Boston for school in December 2009, I started my career in an American freight forwarding company called Apex Maritime Inc. as an export specialist in Tianjin. But even after he moved, Xiaobao and I talked to each other almost every day by phone and on Skype. We would Skype with our video cameras on, sometimes for hours, so we could see each other and be comforted. Also, Xiaobao and I would often play videogames together online, him in Boston, me in China. When we played, our headphones would be plugged in so we could see and speak to each other while playing.

2

11.    I remember Xiaobao being so excited when he first got to Boston. He was so eager to be free of his parents' control. However, I think he was a bit naïve to the challenges he would face as an international student in an American city. In his first few months in America, Xiaobao had very few friends. He was not fluent in English, and because of the language barrier, he had trouble figuring out how to do things for himself for the first time in his life. He also told me that he felt very out of place in his program at Northeastern, which was almost all Chinese students from very wealthy families. His family was financially stable, but not rich by any means. I think he also felt a lot of pressure from his parents to succeed and get a good-paying job in the business sector since they had allowed him to come to America in the first place.

12.    I first learned about Shuai Li from Xiaobao in May of 2010. Xiaobao told me that he had met a female student a week prior who was also from China, and that they had just begun to date each other.

13.    I remember playing video games with Shuai when Xiaobao was in the same room with her(this was in August 2010—I remember because that was the time that the sequel to my favorite video game, StarCraft, was released). I spoke to Shuai directly during the times when the three of us played video games together. Right away, I felt that Shuai was difficult. I could tell she was not easy to get along with. She would use a harsh tone with Xiaobao, used some nasty words, and called him names.

14.    Through our Skype conversations and on social media, I heard and saw a lot of disturbing things about Shuai. Shuai was always playing little tricks on Xiaobao and was very manipulative and authoritative. She would not call Xiaobao for three days and then would spend two full days with him. It was always a back-and-forth game with her. She would give him something but then take something away. Also, Shuai's name on the internet was Dinosaur. So, in conversations between Xiaobao and myself, I would refer to her as the "Dinosaur." I remember saying, "you know, the Dinosaur is dangerous, the Dinosaur will hurt you if you get back with her," and he said something like, "It is what it is."

15.    While Xiaobao seemed very glad to be going out with Shuai, I felt that he was in a relationship that seemed very controlling. It reminded me of his mother's dynamic with him when he was a child because his mother also controlled every aspect of his life.

3

16.     Shuai was so different from his previous girlfriends. Xiaobao's other girlfriends had usually been nice girls, and his relationships had been calm and polite. Shuai had an air of being mischievous or naughty. I think this is what attracted Xiaobao to her. He had always played by the rules, and I think it was exciting for him to be with someone who did whatever she wanted.

17.     During the summer of 2010, Xiaobao became more secretive with me. He and I had always shared everything with each other, but after he met Shuai, he started to hide how he was feeling, and would not talk to me how he was feeling or what was happening in his life. It was out of character for him to hide things from me. I was his best friend for so long, so I could tell that he was hiding things. I think it was because he was ashamed that he was struggling and didn't know how to ask for help.

18.     Before Xiaobao met Shuai, he was very careful with his money. He never spent his money on luxury items. But, because Xiaobao saw how the rich Chinese students at Northeastern bought expensive gifts for their girlfriends, Shuai convinced him that he needed to buy luxury items for her too. I saw Shuai as someone who was very spoiled by her family because Shuai told me herself that her father owned a factory, and her family was rich. She was careless with her own spending habits, which was one thing. But I noticed that she made Xiaobao spend a lot of money on her, which he could not afford. She would order the most expensive food when they would go out to eat and pressured him to buy extravagant gifts for her.

19.     Later that summer, Xiaobao told me he realized that there was not a healthy dynamic with Shuai. He told me that he tried to break up with her several times, but it always failed. He told me she would track him down by showing up at his apartment and outside his classes or calling him hundreds of times until he agreed to get back together with her.

20.     Xiaobao had a social media account on a site called XIAONEI (this was a Chinese equivalent of Facebook, and today it is called Renren) where he would post updates on his life in Boston. I would check his profile almost every day. One day, his profile was gone. I called him up and he told me Shuai forced him to delete his entire profile. I asked him what happened, and he said that she didn't want him to socialize with any of his other friends, male or female. His social media account had been filled with articles and old diaries from college all the way back

4

from 2005, and now suddenly they were all gone. I was really sad. He didn't say much else about it. He just seemed to accept the fact that he had to do this for Shuai.

21.    Xiaobao also told me Shuai had all the passwords to all his accounts, including his bank account, phone, and social media, which he used to communicate with his friends back home. She looked through all his messages, deleted them, and then shut down the account entirely.

22.    At one point, Xiaobao told me not to send him text messages because Shuai would read everything that I, or anyone else, sent to him. He told me that I should not write anything down because Shuai would notice and be upset with him—even if we were talking about something good. He seemed really upset, or like this problem was very intense and important to him. I felt concerned because first Shuai deleted all his previous memories from his college experience and secondary school and now she was cutting Xiaobao off from all his connections to his previous life.

23.    I started directly receiving calls from Shuai Li in January of 2011. Shuai found my phone number in Xiaobao's phone and would call me screaming whenever Xiaobao would try to leave the relationship. When she called, she would say things like she was going to fly to China and apologize to Xiaobao's parents (who she had never met) just so that Xiaobao would forgive her and get back together with her. She would desperately ask for Xiaobao's parents' home address and contact information, but I never gave her any information because I didn't trust her. It was extremely confusing and dramatic. If she had a problem with her boyfriend of less than a year, I didn't understand why her first thought was to fly to China to do such an extreme gesture. But Shuai was obsessive and kept calling me over and over again no matter what I said.

24.    During this time, I became very concerned for Xiaobao's wellbeing. I was nervous when I found out they had gotten back together because Xiaobao said she would always track him down and it made him feel like there was no escaping her, so he had to just accept her as part of his life. I started to be very frank with Xiaobao that he should not have let this person into his world, but he was convinced that no matter how troublesome she was, he had to be with Shuai because it was his fault that he had initially let her into his life.

5

25.    After January of 2011, I found out that Xiaobao left school and moved to New York a few months earlier without telling me. It became very hard for me to get in touch with Xiaobao. He would have moments where he knew he was not in a safe relationship and would force himself to get away from Shuai. Sometimes he lived in a neighborhood called Dyker Heights, sometimes he lived in Chinatown. I asked him why he was moving so frequently, and his responses were usually about trying to run away from Shuai.

26.    By early 2011, I could barely even get in touch with Xiaobao anymore. I didn't even know where Xiaobao was, or when he was in Boston or New York. I was confused and concerned about what was going on in his life, but I was still in China and trying to focus on my own life and future as well. This was a stark change compared to when he first moved to Boston when we spoke almost every day for hours.

27.    On one of the few occasions when we were able to speak, Xiaobao described to me an incident of Shuai tracking him down. He had been sitting in a library in New York. Suddenly Shuai appeared and tapped him on the shoulder. He did not know how she found him. He told me that he thought this was a sign that they were fated to be together, whether he liked it or not. Despite trying to escape Shuai and having moments of realization of how dangerous the relationship was, I noticed that Xiaobao began to feel more and more resigned every time Shuai would track him down. Shuai knew where Xiaobao was all the time and Xiaobao couldn't understand how she could find him.

28.    By June 2011, we rarely used Skype at all because he was not allowed to use his computer to talk because Shuai had moved in again. We tried to use mobile apps to communicate, but it was very little compared to before. By that point, he was always under the control of Shuai. As his best friend, I didn't even have his phone number. This was the first time in our whole lives I was unable to be in touch with him. Around this time, I remember Xiaobao told me he was forced to sleep in a park because Shuai kicked him out of the apartment they were living in together.

29.    In August 2011, Xiaobao and I had lost touch entirely for at least a week. Then I saw on social media that he had been arrested for killing Shuai. One of our mutual friends posted a news story about it on social media. I began looking back through our messages for clues or some sign that things had gotten so bad between him and Shuai.

6

30.     I was totally shocked that Xiaobao had engaged in an act of violence. I don't think he realized how abusive his relationship with Shuai would become, and once it was too late, I know that he felt trapped, ashamed, and scared.

31.     After I heard the news about what happened, I didn't know if Xiaobao was alive or dead. I didn't hear from him for 2 years. I had no idea how to find him or get in touch with him after the news of his arrest. In August 2013, I came to the United States to attend a master's program in New Jersey. Xiaobao finally called me. That was the first time we talked in 2 years.

32.     The first time I visited Xiaobao while he was incarcerated was in the fall of 2013. I then went on to visit him 9 more times in 2 years.

33.     In 2014, I went back to our hometown during my summer vacation. I visited Xiaobao's parents. His father said that he had been very harsh with Xiaobao, and perhaps this was why Xiaobao developed a "rebellion inside of his heart" and dated someone like Shuai.

34.     When I visited with Xiaobao's parents, they were living in a small apartment outside of the city. I did not dare to ask them what had happened to them financially. I thought they might have had to give most of their money to Shuai's family, but I now understand that they probably spent their life savings on their son's legal case. They were desperate about the whole situation because it was so unbelievable.

35.     In 2015, I finished my master's degree and moved to Beijing, China for a job. Then, in 2020, my wife and I obtained permanent residence in Canada, so we moved to Vancouver, BC. I live and work here with my wife and newborn son. I still speak to Xiaobao on the phone regularly, often more than once a week. He is still my best friend after 30 years.

36.     I will do everything in my power to help Xiaobao when he is released from prison. I know that he may be deported back to China, which would be very difficult for him. If he can stay in the United States or move to Canada, I will help him with getting housing and employment. I am certain we will remain close friends as we have been our entire lives.

**PROVINCE OF BRITISH COLUMBIA** )

CITY OF ___Vancouver___ } SS:

Dated: ___August___ _8_ , 2023

SIGNED: _____
Yushi Liu

Sworn to before me this _8_ day of _August_ 2023

Menachem Freedman
Barrister and Solicitor
1918-1030 W. Georgia Street
Vancouver, BC V6E 2Y3
604-639-1481

_____
NOTARY PUBLIC

8

# EXHIBIT I

EXHIBIT I

SUPREME COURT OF THE STATE OF NEW YORK
CRIMINAL TERM – KINGS COUNTY

THE PEOPLE OF THE STATE OF NEW YORK,

– against –

XIAOBAO HE,

*Defendant*

### AFFIDAVIT OF QIN CHEN

QIN CHEN, being duly sworn, deposes and says:

 1. My name is Qin Chen. I submit this affidavit in support of Xiaobao He's motion

for resentencing under Criminal Procedure Law § 440.47.

 2. I am a friend of Xiaobao He.

 3. I live in Munfordville, Kentucky with my fiancée Trina Lin. Ms. Lin is a better

English speaker than I am. She helped translate an interview I had with Mr. He's legal team,

and she helped me draft this affidavit.

 4. I used to own a restaurant in Sunset Park, Brooklyn named Mr. Q's Grill.

Xiaobao was a regular customer at my restaurant in the winter of 2010 and 2011. When Xiaobao

first started coming into my restaurant, he would come in several times a week, always by

himself. One day I struck up a conversation with Xiaobao. Once we got to talking, we learned

that we had a lot in common and we quickly became friends.

1

5.      When I first met Xiaobao, he appeared to be a very happy guy. He was always calm and nice, and he seemed hopeful. Most importantly, the more I got to know him, I remember feeling like Xiaobao was a very good person.

6.      Xiaobao and I would share details about our personal lives whenever he came into the restaurant, and he would talk excitedly about his future. He told me that he used to live in Boston and that he was a university student there before he moved to New York to find work. Over time, we talked about a lot of different topics, but especially our futures and the goals we had for our lives. I remember Xiaobao talking a lot about wanting to have his own career, and I could tell that he was ambitious, goal-oriented and very intelligent.

7.      I did not know who Shuai Li was at the time Xiaobao and I first became friends.

8.      I remember learning about Xiaobao's relationship with Shuai Li a couple months later when I met Shuai in person when she showed up unexpectedly to my restaurant.

9.      In April of 2011, one of Xiaobao's friends threw Xiaobao a small birthday party at another restaurant in Brooklyn. I stopped by briefly at the beginning of the birthday party to say hi and wish him a happy birthday. Then I left to start work at my restaurant.

10.     Not long after I got to my restaurant and began work, I remember a woman showed up outside my restaurant with a suitcase. She seemed to know who I was, or at least that my restaurant was a place that Xiaobao would come to frequently. The woman began questioning me and demanded that I tell her where Xiaobao was. I told her that I didn't know where he was, even though I did, because something seemed off about her. The woman seemed very anxious. She was smoking a lot and pacing outside my restaurant doors. She wouldn't

2

leave the restaurant. She kept saying she wanted to know where Xiaobao was. She was there for 45 minutes to an hour at least.

11. I finally called Xiaobao and said there was a woman at my restaurant who was looking for him and that she wouldn't leave the restaurant unless I told her where he was. Xiaobao told me he would take care of it, but even then, the woman wouldn't leave the front of my restaurant and continued smoking cigarettes outside the door. She kept saying, over and over again, that she "wanted to find him," referring to Xiaobao. She was very upset. She kept insisting on me telling her where Xiaobao was. She kept going back and forth, pacing, smoking. Eventually, I think Xiaobao called the woman and told her where the birthday party was, and she finally left my restaurant.

12. A day or two later, I heard from other people after that the woman was Xiaobao's girlfriend, that her name was Shuai Li, and that she had showed up at Xiaobao's birthday party after she left my restaurant and they had gotten into a big fight. I remember being concerned for Xiaobao's wellbeing because that situation seemed very weird, and I was worried about what was happening to Xiaobao in his relationship.

13. After the day that Shuai showed up outside my restaurant, Xiaobao only came into my restaurant two or three more times.

14. On one of these occasions, he told me about his relationship with Shuai. He told me that when he lived in Boston, he was in a relationship with Shuai, and that he had tried to break up with Shuai on multiple occasions, but Shuai did not "accept" the end of the relationship and followed him to New York to pressure him to get back together with her.

3

15.    Xiaobao also told me that Shuai was very controlling and would need to know what he was doing 24/7. He said that Shuai would not let him do any of the things he would normally do, like see any of his friends, and that she controlled every aspect of his life. I wanted to ask him more about what was going on, but I did not want to pry into his personal life too much because Xiaobao seemed like he was a private person, and I could tell that it was hard for him to talk about his relationship.

16.    One of the other times that Xiaobao came into the restaurant after the party, I saw that his face was swollen, and he had bruises all over different parts of his face. He looked like he had been beaten up. His demeanor was heavy, and he seemed like he wanted to talk to me about something serious. At first, he only told me that he had a fight with a girlfriend. I think he may have tried to make a joke of it, saying in a light-hearted way that his girlfriend had beaten him up and that's why he was injured.

17.    I was not sure what to think. Domestic violence is usually the other way around—a man beating up a woman. It didn't really occur to me that Xiaobao had actually been really beaten up by Shuai. I later realized that he was not joking but was ashamed of what was happening and looking for help. When he said that Shuai hurt him, it was sort of in a joking way, I think, to test what my reaction would be. Since I reacted as though he was joking, he pretended that he was also joking and played along. Even though I saw bruises on different parts of his face, I did not realize how bad the relationship was.

18.    One of the last times I saw him in person, Xiaobao really opened up to me and told me more about the extent of control Shuai had over his life. He told me that Shuai took everything from him, like his wallet, for instance. He said he felt like he did not have any

4

freedom and was restricted. I still thought he was kidding when he told me all of this because it seemed so extreme. I now realize he was trying to get help.

19.    During this conversation, Xiaobao looked very disappointed and down. It seemed to me like he wanted to leave Shuai. After the day Shuai showed up to my restaurant, Xiaobao seemed so different compared to the happy, ambitious person I had become friends with. It seemed like Xiaobao lost his purpose in life and looked so unhappy and down all the time.

20.    After Xiaobao stopped coming to the restaurant, I tried to call him, but he did not answer the phone or return my calls.

21.    Before Shuai showed up to my restaurant in April, Xiaobao and I would text each other regularly and we would call each other occasionally. After that day, I basically had no phone contact with Xiaobao. It was like he disappeared. I had no idea where he went.

22.    I was shocked when I learned about Xiaobao's arrest in 2011 from a Chinese newspaper called the Sing Tao Daily News. I was surprised because I didn't think that Xiaobao would ever do something like this unless he was being tortured or manipulated. I believed he was being controlled and was in a situation that he couldn't get out of. I even started looking for a lawyer to try to help him, but I could not find anyone who would take his case.

23.    After Xiaobao went to prison, I have stayed in touch with him over the past 12 years. We speak often by phone now, usually every other week. We stayed in touch after Xiaobao's incarceration because I believe Xiaobao is a good person who was forced into this situation.

5

24.    If Xiaobao was to return to China upon his release from prison, I am fairly certain he would be discriminated against and would not be able to get a job because the offense was big news in China.

25.    In my opinion, Xiaobao will contribute positively to society if he is released from prison. I will support him however I can. He has been a great friend to me over the years, and I want to maintain that friendship if Xiaobao is released.

6

STATE OF KENTUCKY                    )

                                     ) SS:

CITY OF _Munfordville_    )

Dated: ___8___ ___7___, 2023

                              SIGNED: _____

                                          Qin Chen


Sworn to before me this _7_ day of _Aug_ 2023


_____

NOTARY PUBLIC

Ryan Thomas Furkin
Notary Public, ID KYNP47342
State at Large, Kentucky
My Commission Expires on April 17, 2026

7

# EXHIBIT J

SUPREME COURT OF THE STATE OF NEW YORK
CRIMINAL TERM – KINGS COUNTY

THE PEOPLE OF THE STATE OF NEW YORK,

– against –

XIAOBAO HE,

*Defendant*

Ind. No. ███████

## AFFIDAVIT OF CHENLING LU

CHENLING LU, being duly sworn, deposes and says:

1.     My name is Chenling Lu. I submit this affidavit in support of Xiao-Bao He's

motion for resentencing under Criminal Procedure Law § 440.47.

2.     Xiaobao is a friend of mine. I currently live in Vancouver, British Columbia,

Canada.

3.     In 2009 and 2010, I was a student at Northeastern University in Boston,

Massachusetts.

4.     I was first introduced to Xiaobao in late 2009 by a mutual friend who connected

us via QQ, an application for chatting online. I arrived in Boston earlier than him. Xiaobao had

recently been accepted into the same master's degree program at Northeastern that I enrolled in

at the time, and he wanted to connect with other international students in the program

beforehand to help him prepare for his studies in America. We messaged each other a lot before

he moved to Boston from China. I remember that he was very friendly and excited to begin his

studies, and since we were both from not too far away from each other in China (I'm from

Shaanxi, and he is from Tianjin, which are different provinces in China). We both looked

forward to meeting in person eventually when he moved to Boston.

1

5.     I was the first person that Xiaobao knew when he moved to Boston in December 2009, and we quickly became close friends. We had most of the same classes and we would eat most of our meals together in the student center between classes, so we spent most of our time with each other. We also ran errands and went to the mall together in our free time. There were so many huge cultural differences in America compared to life in Mainland China, so we were also figuring out how life worked in a different country together.

6.     At the beginning of our friendship, Xiaobao was very outgoing and friendly. He always had a smile on his face. He played a lot of music, especially guitar, and he would write his own music. I remember being impressed when I learned that he had volunteered for the Beijing Olympics in 2008 because that role is a huge honor and takes a certain kind of engaging and respectful personality that Xiaobao had. Xiaobao really valued his friends, and he spent most of his time with us often during these first few months of school. He also always wanted to do well in his studies and studied very hard in his first semester. Overall, he was a great friend.

7.     In May of 2009, Xiaobao began spending time with another student named Shuai Li. Shuai was a classmate of both of ours. While we were never close, I knew a lot about her because a lot of the international students from China who attended Northeastern would hang out together. Shuai was very pretty, and I knew that she was from a very rich family in China (Xiaobao wasn't poor necessarily, but I do remember visiting the apartment he shared with other students, and it wasn't fancy at all).

8.     Shuai had tons of luxury clothes: expensive bags, shoes, and designer brands, and she always wore lots of makeup. Shuai also had a strong, mean, and spoiled attitude. One time, when I was in the library, I remember seeing Shuai sitting nearby, and another student offered her some of his lunch. I remember Shuai looked at his food with disgust and told him to take it away, basically saying that it sucked. I also heard through mutual friends that Shuai would drink a lot and that she loved to play mind games with different guys, but I didn't pay that much attention to her at the time.

2

9.    Shuai seemed very confident, but also secretive and private. Most of us students at Northeastern would talk to each other before and after class about things that were going on in our lives, or just things we were interested in, like concerts, music, TV, and jokes. As classmates, we all knew a little bit about each other, but no one really knew much about Shuai.

10.    I could tell that Xiaobao was so thrilled when he met Shuai because Shuai was so different from the other quiet and good girls in his life. However, the excitement that Xiaobao had when he first met Shuai changed very quickly when they began dating. I saw them a few times walking around in the first few months of their relationship. I had a sense that their relationship was not very healthy almost immediately. Soon after Xiaobao and Shuai started dating, Xiaobao started to disappear from my life and the lives of others. Xiaobao also started missing a lot of classes and I stopped seeing him around much.

11.    I wanted to respect Xiaobao's new relationship, so I tried to keep my distance, but I noticed Xiaobao missing more and more classes and then disappearing entirely. I would try to say hi to Xiaobao when I saw the couple, but they looked very serious so I would walk away. Neither of them looked happy.

12.    Xiaobao was a different person when Shuai was around. Before Shuai he was always around campus, in the student center, in class, asking me for recommendations and for ideas of fun things to do in Boston. He wanted to go to parties, meet new friends, and learn new information. After he met Shuai, this all stopped.

13.    Xiaobao clearly really cared about Shuai and because of this he would do what she said. I could tell he had changed given how unhappy he looked when I saw him and the way he retreated from not just me, but the entire school, his classes, and community.

14.    After Shuai and Xiaobao's relationship started, Shuai didn't allow Xiaobao to have friends like he did before. The other Chinese Northeastern students and I had lots of gatherings. But I never saw Xiaobao and Shuai attend any group gatherings once they were together, even though Xiaobao used to often come before this relationship.

3

15.    When I tried to stay friends with Xiaobao, he stopped replying to me. Shuai would have control over his phone and Xiaobao could only reply to me during specific times when Shuai wasn't around. He would sometimes reply to my messages a couple of days later, other times it would be a couple of weeks before I got a response. It seemed like he didn't even have his phone with him almost ever unless Shuai wasn't around. I knew it was a toxic and controlling relationship. When Xiaobao would reply, his mood was often weird. He would seem not happy at all. He would say things like, "Sorry I was with Shuai, and we were arguing. It's fine now, but don't be angry with me." It seemed like he would only respond to me when he was away from her. He seemed fearful.

16.    I remember having a phone call with Xiaobao where we planned to have dinner together. We were supposed to meet at a train station in Boston before we went to dinner. I was with my other friend Tina, and we waited almost an hour for Xiaobao to show up. I was concerned because Xiaobao was an extremely punctual person and was always on time. I kept calling and texting him, but he didn't answer me, so eventually I left. A few hours later he texted me and called me saying that he and Shuai were having arguments and that Shuai had not been happy at the time we were supposed to meet. He said she wouldn't let him leave the house. He wasn't allowed to leave her alone. He said he was sorry for standing me up. I laughed about it and said I understand and that I hoped he was happy and satisfied with whatever he was doing. He didn't say much, but sounded different, not as calm, or joyful as before. The sound of his voice was different. Shuai controlled Xiaobao's life and made sure people knew that he belonged to her and that his schedule was dominated by her. She was very much a "you will do whatever I say and belong to me" type of partner.

17.    I knew that the relationship seemed odd, but I didn't say anything. I had done that before with other friends: I had seen one cheating on the other, so I told my friend. Then they broke up and got back together and made me out to be a bad person. I learned my lesson

4

not to meddle in people's relationships, and kept my mouth shut no matter how weird the relationship looked.

18.    Eventually Xiaobao disappeared entirely. I thought maybe he had transferred to a different university. I had no idea where he went. He stopped replying to me on social media and he changed his phone number.

19.    I remember asking a classmate if he knew where Xiaobao was after Xiaobao disappeared. He began to give me some information. He told me that Xiaobao had moved to New York with Shuai. He was still in close touch with Shuai even though it seemed Xiaobao wasn't allowed to be in touch with me. He told me that Shuai told him that she and Xiaobao argued a lot in New York.

20.    A few months later, the same student said to me: "Do you know your friend Xiaobao is a killer? He deserves to die." The very next thing I knew, I saw on the news that Xiaobao had killed Shuai and was arrested. I was completely shocked. Xiaobao was not the type of person to harass or fight girls or anyone for that matter. Students were saying that my friend was a murderer, but I didn't feel scared of Xiaobao. I felt incredibly sad. Shuai was my classmate too. But I didn't feel that Xiaobao was a murderer. He had never tried to hurt someone. I knew there must be more to the story and that we should try to see the whole picture.

21.    I knew that Xiaobao and Shuai's relationship was not healthy. I knew something was off from the start. But I didn't specifically ask Xiaobao about what he was going through, and I regret that. Maybe if I had called him or messaged him specifically about what I noticed, or his safety, I could have helped him get out of the relationship.

22.    Xiaobao changed entirely after he met Shuai. He was disconnected from the world when he was with Shuai. I didn't see him often on campus, and when I did see him, he didn't look well. The times that we tried to hang out, he stood me up because of Shuai, and then he eventually disappeared entirely. I never blamed him for this, or thought he was a bad friend, because I tried to avoid getting involved with something that wasn't my business. But I regret

5

not getting involved. XiaoXiao's entire personality became distant, scared, and lost himself. He was unlike the person I had known before. I also wish that Shuai rest in peace, no matter what she did or who she was. Even though I am a friend of XiaoXiao, I try to be as neutral as I can

6

CITY OF _S JABEV_ } SS:

Dated _AUGUST_ _9_ 2023

SIGNED _Chen Lu_
Chenling **Lu**

Sworn to before me this _9_ day of _Aug_ 2023



NOTARY PUBLIC

ATTESTED TO BUT NOT **DRAWN BY**
NO LEGAL ADVICE SOUGHT **OR GIVEN.**

7

# EXHIBIT K



**—MARYKNOLL—SISTERS—**

P.O. Box 311
Maryknoll, New York  10545-0311
Tel. (914)-941-7575

Immigration and Customs Enforcement,
26 Federal Plaza #500, New York, NY 10278

Oct. 27, 2024

Dear Sir/Madam:

I am writing on behalf of Mr. Xiaobao HE for his release from detention.

I am a member of the religious congregation of Maryknoll Sisters of St. Dominic. For 44 years, I was an active playwright and stage director in New York City and in Hong Kong.

I was the Co-founder and Artistic Director (1992-2014) of Yangtze Repertory Theatre of America in New York City, a company created to produce works for and by Asian artists. During my tenure as Artistic Director, I had presented over 110 cultural events, including full-length dramatic productions, art exhibitions, productions of new dance works and musical concerts, making possible the New York debuts of many outstanding Asian talents, including Dr. Wang XiaoYing, Deputy Director of China's National Theater, and Dr. Gao XingJian, the 2000 Nobel laureate in literature. In 2005, Yangtze co-presented Beijing People's Art Theater, China's most prestigious and historic theater company, in its signature masterpiece, *The Teahouse*, in its New York debut as the final stop of the company's first U.S. tour.

I received my doctoral degree in Theatre/Communications from Teachers College, Columbia University, where I was honored with a Distinguished Alumni Award in 1994. In July 1993, I was honored at *An All-Star Salute to Chinese American Cultural Pioneers* at City Hall, New York City, with July 9, 1993, named *Joanna Chan Day* in the city of New York. I was honored again in 2017 by the New York State Senate with Nov. 11, 2017, named Dr. Joanna Chan Day. Most recently, the collection of documents and records from my 52 years career was accepted by Columbia University library for permanent preservation

In 2016, in the newly opened permanent exhibition, *New York at Its Core*, at the Museum of the City of New York, as cited by the Museum as "an artist and a pioneer community and spiritual leader", my life story was featured among those of 74 others prominent citizens chosen from the city's 400-years history.

Since 2002, I have been working as a volunteer in Sing Sing Correctional Facility in upstate New York in three different programs: Rehabilitation Through the Arts (RTA 2002- 2011); the Catholic program (2006 till the present) and the Chinese Language and Culture program (2009 -2020).

It was at the Catholic program when I first met Mr. HE seven years ago. He had been transferred from another correctional facility. Since I am also from China, there was immediate affinity between us. I learned a little more about him than from other inmates. The only son of an educator and a civil servent in Northeastern China near Beijing, HE had come to the United States for his Masters degree. He is well-mannered and self-confident, obviously brought up well by devoted parents who would not have been endowed with abundant means. They must have made tremendous sacrifices to enable their only son to come to this country for advanced studies.

Like many students coming alone from China, Mr. HE would not have the immediate support that an immigrant family provided. Many of such lone foreign students would immediately be drawn to relationships which many times became volatile. That turned out to be the tragic case for Mr. HE. His idyllic world fell apart, and after admitting his part in the horrible turn of event, he has been paying dearly for it since.

By the time I met Mr. HE, he had become a convert to Catholicism. He had made a tentative recovery from his nervous breakdown and took his religious commitment seriously. Our Wednesday night gathering contains a community worship followed by a brief spiritual talk from me and reflections by the inmates. We could always count on intelligent and insightful sharing from Mr. HE. In the meantime, he had applied himself seriously to his studies, and obtained a Masters degree which his parents had wanted for him in the first place. The death of his mother in Tienjin, China, from cancer a few years ago must have been a tremendous blow to him.

Mr. HE is a superb classical guitarist. No one fails to be in awe of the music he creates on the guitar and be mesmerized in his presence when he plays. He worked joyously with other guitarists and a lead singer at the Catholic community worship each Wednesday in Sing Sing, of which I was a part. Because of his musical talents, he was allowed to enroll in Sing Sing in the advance program run by musicians from Carnegie Hall and trained in composition with world class professionals from DECODA MUSIC. He was so outstanding that DECODA got a grant to present his compositions for chamber music at Carnegie Hall on May 28th this year. Before and after the event, his music had been presented in various venerable institutions including Trinity Church in New York City by his mentor from the Peabody Institute at John Hopkins University and the Juilliard School and Musicambia. Those events had won him recognition and a following especially in New York City, which will be his support circle once he is released from detention. He will find lodging at Abraham House founded by Catholic Prison Chaplains in the Bronx, New York City.

The most astounding fact about Mr. He is that, as a Chinese newcomer in a maximum security correctional facility peopled mostly by black and Hispanic inmates, he was broadly liked and highly respected. Despite the tragic circumstance that led to his

79

incarceration, this affable young man has worked hard to amend his wrong doing, and has led fruitful years behind bars, purposefully and continuously striving for excellence. I know for sure that he will not be a menace to society, but will be an upright citizen in wherever he finds himself in the future.

If further information is needed, I can be reached at jchan@mksisters.org.

Sincerely,

Sister Joanna Wan-Ying Chan

80

**28 U.S. Code § 1746 - Unsworn declarations under penalty of perjury**

2.  If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (Oct. 27, 2024).
(Joanna Wan-Ying Chan)

Joanna Wan-Ying Chan



P<USACHAN<<JOANNA<WAN<YING<<<<<<<<<<<<<<<<<<<<
5769955312USA3908141F2706096337618618<014448

# EXHIBIT L

EXHIBIT L

# CARNEGIE HALL

**Manuel Bagorro**
**Creative Advisor**
**Social Impact Programs**

mbagorro@carnegiehall.org

881 Seventh Avenue
New York NY 10019
carnegiehall.org

October 17, 2024

**ATTN: Immigration and Customs Enforcement**

**Letter of support for Xiao Bao He**

I am writing this letter in support of Mr. Xiao Bao He. He has been involved in Carnegie Hall's Musical Connections program for 9 years. Observing Mr.Xiao Bao He's participation over the years, I believe he has acquired significant skills that will be beneficial in his future endeavors.

Mr. Xiao Bao He was an advanced workshop participant and mentor in our program. He was a very committed student, leading rehearsal sessions and encouraging perseverance. His collaboration and support of other workshop participants demonstrated his interpersonal skills and have been of enormous value to the program. He has a gentle and accommodating disposition, which have made him an admired collaborator and friend of Musical Connections. I sincerely cannot imagine him being a danger to anyone; he is one of the kindest and most generous program participants with whom I have had the pleasure of working over a long career of programs in diverse community settings.

Mr. Xiao Bao He is a composer, and guitarist. His work ethic has enabled astonishing progress over the years, particularly in his performance skills. Multiple concerts at Sing Sing have prominently featured Mr. Xiao Bao He. His performances consistently draw praise for their honesty and impressive quality. He has been part of Sing Sing workshops involving high profile visiting artists including Metropolitan Opera star, Joyce DiDonato and Emmy, Grammy, Oscar winning artist, Common. He has exhibited ambition and determination in workshops, rehearsals and performances.

We plan to invite Mr. Xiao Bao He to join Carnegie Hall's Musical Connections Advisory Committee who meet monthly, continue to develop musical skills, and brainstorm objectives and implementation of Carnegie Hall's Social Impact Programs. Mr. Xiao Bao He is eligible to be a Carnegie Hall volunteer, as other members of the Advisory Committee have been. We confirm that we will support Mr. Xiao Bao He's efforts to find employment and will interview him for appropriate roles at Carnegie Hall that are available. There are a number of further education/musical training opportunities that we also have in mind for Xiao Bao He.

I look forward to continuing to work with Mr. He. I believe he has the capacity to take positive steps in his life and career.

Yours faithfully,

Manuel Bagorro

**Manuel Bagorro**
**Creative Advisor, Social Impact Programs – Carnegie Hall**
**mbagorro@carnegiehall.org**

84

# EXHIBIT M

# CARNEGIE HALL
## Weill Music Institute

881 Seventh Avenue
New York, NY 10019

(+1) 212-903-0748
carnegiehall.org

**January 16, 2024**

Letter of support for Xiao Bao He

My name is Ayanna Cole and I serve as the Director of Social Impact Programs at Carnegie Hall's Weill Music Institute. In my role I oversee, advise, and support our Musical Connections Program at Sing Sing Correctional Facility. Musical Connections, a program launched at Sing Sing over a decade ago engages in workshops led by our teaching artists where the Sing Sing participants create and perform original music, work side by side with visiting artists and build community through the sharing of perspectives and music.
I am writing this letter with enthusiastic support of Mr. Xiao Bao He's resentencing motion and resolution of his immigration status. I met Mr. He a little more than 5 years ago during my site visits, following up on program engagement, structure, challenges, and opportunities with Musical Connections. My role requires that I spend time understanding the program's needs, success, and the program's participants.

Mr. He is not only a talented composer, introspective thinker, community builder, leader, and guitarist but he's also incredibly committed to being a part of this community of men as he uplifts, encourages, and partners with participants, facility staff, Carnegie Hall staff and visiting artists to make the experience impactful for everyone involved.
Mr. He has been featured in multiple Sing Sing concerts and he is one of the leaders in our bi-weekly Sing Sing workshops leading up to concerts. In this role, I have directly observed him support the learning of other men in the program, connect facility and Carnegie Hall staff in ways that support the logistical process of running the program, and earn the praise of audience members and prominent musicians alike for his warm, friendly demeanor and impressive musical quality.

Once he is released, we will invite Mr. He to join Carnegie Hall's Musical Connections Advisory Committee who meet monthly at Carnegie Hall, developing their musical skills, and partnering with Carnegie Hall staff in brainstorming and implementing Carnegie Hall's Social Impact programming. We fully intend to support Mr. Xiao Bao's employment efforts and interview him for appropriate roles at Carnegie Hall, which we have done for other members, some of whom have been hired and continue to be employed by Carnegie Hall. I and my entire team look forward to continuing to work with Mr. He in the future. I have seen firsthand his caring character, and the significant steps he's taken to become the person we have come to depend on in the group as a leader, motivator, and artist. Please contact me if you have any questions.

Sincerely,

Ayanna M. Cole
Director, Social Impact Programs
acole@carnegiehall.org

86                        Page 77

# EXHIBIT  N



**Thrive For Life**    30 West 16th St, New York, NY 10011 |
(212) 337-7544 | www.thriveforlife.org

Re: Xiaobao He
Din#███████

To whom it may concern,

This letter is regarding the housing at Abraham House for Xiaobao He (#14A4742). We are pleased to confirm that Mr. He has been accepted as a resident with the Thrive For Life Prison Project Program at our Abraham House supportive program-based transitional homes located at 340 Willis Ave. Bronx, NY, 10454.

We are particularly excited to welcome Mr. He to our program given his demonstrated commitment to personal growth and his impressive achievements during his time of incarceration. Mr. He's journey of spiritual and academic development aligns perfectly with our mission and values at Thrive For Life.

Xiaobao's accomplishments are truly remarkable. He has successfully completed a Master's Degree in Theology from the New York Theological Seminary, demonstrating his dedication to learning and spiritual growth. His commitment to music and composition as a member of Musical Connections from Carnegie Hall and Musicambia has resulted in several original compositions, with one even being performed by a chamber music group at Carnegie Hall. This artistic talent and dedication to personal development exemplify the kind of positive transformation we aim to support at Thrive For Life.

As a resident, Mr. He will be expected to fulfill the requirements of our programming and abide by all rules and regulations established to ensure a safe and secure living environment. This includes adhering to all requirements mandated by his parole. Additionally, he will receive mentorship and support in his scholarly work and participate in wellness workshops designed to foster personal and professional development. We are particularly excited to support his aspiration to pursue Music School as part of his reentry goals.

Our housing program is designed to provide a stable foundation for our residents as they transition back into the community. While there is no set time limit for residency, we work closely with each individual to help them achieve their goals and eventually transition to independent living. We provide ongoing support and referrals to help residents find alternative housing when they are ready, ensuring that no one leaves our program without a secure housing plan in place.



30 West 16th St, New York, NY 10011 |
(212) 337-7544 | www.thriveforlife.org

We have every confidence that Mr. He will be a valuable contributor to our community, and we are very much looking forward to welcoming him to Abraham House. His presence, with his unique blend of spiritual depth and artistic talent, will undoubtedly enrich our program and inspire fellow residents.

Thank you for your attention to this letter. Please contact me should you need any further information.

Sincerely yours,

Sebastian Budinich
Supportive Services Coordinator
Thrive For Life
sbudinich@thriveforlife.org

89

# EXHIBIT O



**Thrive For Life**

30 West 16th St, New York, NY 10011 |
(212) 337-7544 | www.thriveforlife.org

U.S. Immigration and Customs Enforcement

Office of the Principal Legal Advisor, New York

26 Federal Plaza, Room 1130

New York, NY 10278

Dear ICE,

I am writing in support of Xiao Bao He to urge against his detention while he resolves his immigration visa status. As a Jesuit priest overseeing Thrive for Life and having worked closely with Xiao Bao, I can speak directly to his character and strong ties to our New York community.

Xiao Bao has established significant connections in New York City that make him extremely likely to remain local and attend all required proceedings. Most notably, he has secured supportive housing at our Thrive for Life Abraham House, where we provide comprehensive reentry support services. Our organization has committed to working closely with him, offering job training and supporting his aspirations to pursue Music School. Through Musical Connections from Carnegie Hall and Musicambia, he has already built meaningful relationships within New York's musical community, even having his original composition performed at Carnegie Hall.

I want to emphasize strongly that Xiao Bao poses no danger to public safety. Throughout his time in various correctional facilities, he has demonstrated exemplary behavior and a genuine commitment to personal growth. His dedication to education is evident in his completion of a Master's Degree in Theology from the New York Theological Seminary. His involvement in our religious community, including his baptism and confirmation in the Catholic Church, reflects his deep commitment to spiritual development and positive change.

Xiao Bao's good character is evident in multiple aspects of his life. As a former international student at Northeastern University pursuing a master's degree, he showed strong academic potential before facing personal challenges. Since then, he has transformed his life through dedication to education, spiritual growth, and artistic development. His composition work and involvement with prestigious musical organizations demonstrate both his talent and his potential to contribute positively to society.

91



**Thrive For Life**

30 West 16th St, New York, NY 10011 |
(212) 337-7544 | www.thriveforlife.org

Our organization, Thrive for Life, is fully prepared to provide Xiao Bao with a comprehensive support system. Through our houses of studies, Abraham House and Ignacio House, we will ensure he has access to:

- Stable housing
- Job training opportunities
- Academic support for his musical studies
- Mental health and well-being services
- Community integration support

We are committed to working closely with community partners and parole to support his successful reintegration into society. This established support network makes detention unnecessary and potentially counterproductive to his positive trajectory.

Should you require any additional information about our support services or Xiao Bao's character, please do not hesitate to contact me directly.

Sincerely,

*F. Presutti SJ*

Father Zachariah Presutti, SJ

Executive Director, Thrive for Life

# EXHIBIT P

**Matt Moran**                              composer, educator, vibraphonist, percussionist

matt@mattmoran.com                          Carnegie Hall, Musical Connections
45 Van Buren St
Brooklyn, NY 11221
(917) 373-4349

October 16, 2024

To whom it may concern:

I'm writing a request for release from detention for Mr. Xiao Bao He. I am a lead teaching artist for the Carnegie Hall Musical Connections program, which has been active in Sing Sing Correctional Facility since 2012; I have worked closely with Mr. He for the past 8 years both as his teacher and also as a fellow performer at our concerts.

I can say that Mr. He has distinguished himself as one of the most diligent students we've ever had in our program, but this is only half of the picture: equally important is the care and attention he brought to supporting our community of learners and performers. We relied on him to help everyone's needs and provide scaffolded learning and a trusting community; he is trusted and admired by his peers. His vision of community extends far beyond what will benefit him personally: for example he helped to select and mentor new students to prepare for a leadership role in our program. Mr. He's thoughtfulness, kindness, attention to detail, and diligence are inspiring to everyone around him, as we know from talking to other volunteers who worked with him at Sing Sing in religious and academic programs. I am 100% confident that Mr. He is not a danger to anyone; I know from listening to Mr. He that he is deeply remorseful, both emotionally and intellectually, for his past actions.

Mr. He is deeply appreciated by our 12 teaching artists and Carnegie Hall administrative staff in the New York City area, all of whom are eager to support him in the next phase of his life in NYC. We are already having conversations with graduate school administrators and other people in our community about how we can help Mr. He get an advanced degree and start a professional career.

Mr. He is already an accomplished composer and performer, and while Carnegie Hall has opportunities and resources for him if he is released, I can also affirm that as a professional musician I would look for every opportunity to collaborate with and support him.

Please feel free to contact me if I may be of further assistance.

Sincerely,

Matt Moran

94

October 16, 2024

To whom it may concern:

We're writing in support of the release of Mr. Xiao Bao He. We are Teaching Artists for the Carnegie Hall Musical Connections program (active at Sing Sing Correctional Facility since 2012) and have worked closely with Mr. Xiao Bao He for the past 8 years as teachers and also as colleagues during performances. We believe Mr. Xiao Bao He is an exceptional candidate for graduate studies in jazz, and we believe that institutions would benefit from welcoming him if he applied.

New York institutions such as Manhattan School of Music, the Juilliard School, NYU, and the Mannes School of Music offer full scholarships to a select few graduate students. We believe that given Mr. Xiao Bao He's instrumental ability, compositional ability, and astonishing professional credentials accumulated while incarcerated (for example, having an entire evening of his chamber music performed at Carnegie Hall by the ensemble Decoda in the Spring of 2024) he is well-positioned to receive such support. Furthermore, we have a group of 12 teaching artists that know him well and who are prepared to advocate for him in his applications; many of us also have professional and personal connections with faculty and administrators in these institutions.

In the past Mr. Xiao Bao He was accepted for graduate studies at Northeastern University; we therefore know that his previous academic record is no obstacle. As a new applicant he would bring a wealth of knowledge, diversity (in age, ethnicity, and background), ability, and dedication to a graduate program in jazz studies; we would strongly and actively support and encourage his application process.

Sincerely,

*Matt Moran*
Carnegie Hall Teaching Artist
M.M. in Jazz Composition, New England Conservatory
B.M. in Jazz Composition, Berklee College of Music

*Sarah Elizabeth Charles*
Adjunct Professor, The New School (Jazz/COPA); Carnegie Hall Teaching Artist
B.M. in Jazz Vocal Performance, The School of Jazz at The New School
B.L.A. in Sociology/Urban Studies, Eugene Lang at The New School

*Willerm Delisfort*
Educator, Jazz at Lincoln Center; Carnegie Hall Teaching Artist
B.M in Jazz Studies, Florida A&M University
M.M in Jazz Studies, Northern Illinois University

*Leo Traversa*
Associate Professor of Music, Columbia University; Carnegie Hall Teaching Artist
A.A.S. in Music Performance, Five Towns College
B.M. in Music Performance, Berklee College of Music

*Jay Sawyer*
Carnegie Hall Teaching Artist
B.M. in Jazz Studies, Western Michigan University
M.M. in Jazz Studies. University of Illinois at Champaign-Urbana

*Jason Marshall*
Adjunct Prof., The New School (Jazz/COPA); Educator, Jazz House Kids; Carnegie Hall Teaching Artist
B.M. in Jazz Performance, The School of Jazz at The New School
M.M. in Jazz Studies, Aaron Copland School of Music, CUNY

# EXHIBIT Q



Brad Balliett
▮▮▮▮, New York, NY 10034
bballiett@gmail.com

Professor of Bassoon, The Peabody Institute, Johns Hopkins University
Faculty, The Juilliard School Evening Division
Artistic Director, Decoda
Faculty, Musicambia

To whom it may concern:

I am a teacher and program director for Musicambia, through whom I have worked closely with Xiaobao He on musical projects for the past ten years. I also teach at Johns Hopkins University, The Juilliard School, and have given masterclasses at many universities, and I can honestly say that Xiaobao He ranks among the most inquisitive, kind, and talented students with whom I have ever worked.

In addition to being an extremely talented member of the musical community at Sing Sing, Xiaobao He is unflaggingly positive and encouraging to other students in the program, and goes to great lengths to help others improve. He is universally admired in the program and many of the other students speak of him as an inspiration. I, personally, have been inspired by both his generous spirit and hard work and dedication.

Xiaobao He is an outstandingly talented musician, and it has been a great pleasure to perform many of his works in the past few years with a number of different ensembles, including Decoda, the Affiliate Ensemble of Carnegie Hall. Decoda performed one of Xiaobao He's compositions at Carnegie Hall in 2022 to great acclaim, and I have since performed his music in concerts in New Jersey, Connecticut, and California. In 2023, students from Montclair State University (Montclair, NJ) and the Special Music School (Manhattan) made new arrangements of his compositions for inclusion on a special concert at Merkin Concert Hall in Lincoln Center.

Xiaobao He will be a very valuable member of any musical community he joins upon release. Musicambia supports re-entry for our alumni, and all of the artists in our organization that have worked with him believe in the role that he could play here in America. Our alumni program will keep him engaged with music and provide many performance opportunities. I have no doubt he will continue to compose beautiful music that will be performed across the country.

Ours is an organization that believes strongly in the power of rehabilitation, and we as a society stand to benefit from that rehabilitation. I believe America deserves the benefits that would result from his release.

Thank you,

Brad Balliett

# EXHIBIT R

EXHIBIT R

98



Laura Weiner

▪▪▪▪▪▪

New York, NY 10034

▪▪▪▪▪▪▪

▪▪▪▪▪

April 1, 2023
Re: Xiao Bao He

To whom it may concern:

I am on faculty for Musicambia at Sing Sing Correctional Facility. I am also a professional musician working in New York City. I perform classical French horn with orchestras like the New York Philharmonic, in Broadway musicals, and onstage with artists like Adele. However, one of my most satisfying artistic endeavors has been teaching music inside prisons. Over the past decade of teaching hundreds of incarcerated individuals across multiple correctional facilities in both New York and South Carolina, I have met a handful of remarkably talented musicians- chief among them is Xiao Bao He.

I first met Xiao Bao He about five years ago when he joined the roster of Musicambia students. The very first time I heard him play guitar in a classroom at Sing Sing, I stopped in my tracks to listen. He plays at a very high technical level, but he also imbues every musical performance with sincere emotion. The musical expression that he displays at every concert and casual Saturday workshop takes effort and integrity. He undoubtedly possesses the skill set and talent to be a professional guitarist performing at jazz clubs and concert halls across New York City.

Xiao Bao He has also come into his own as a composer. I have performed many of his original musical compositions both inside Sing Sing at our concerts and at concert halls throughout New York City, including onstage at Carnegie Hall. He has grown by leaps and bounds as a jazz and classical composer because he listens attentively to feedback and treats each new composition as a chance to grow and learn. Because of this courageously humble attitude, Xiao Bao He has progressed rapidly in just a few short years of composing. I hope you take the opportunity to listen to some of his music contained in his advocacy packet- its beauty and tenderness speaks for itself.

In light of these extraordinary musical talents, one might expect Xiao Bao He to be eager to display and flaunt his gifts. What is most remarkable about Xiao Bao He is his ability to lead with actions and quiet humility. Xiao Bao He is one of the most polite and gracious students I have ever worked with. He greets us every Saturday with a smile and a thank you, having arrived early to set up the music classroom for others. He is always willing to cede his music lesson time to another student in need of instruction, and is constantly helping other beginning students master the basics of guitar. He has the soul of a teacher, and it is this giving spirit that most stands out when I think of Xiao Bao He as a member of the Musicambia community inside Sing Sing CF.

Everyone at Musicambia, myself included, is eager to help Xiao Bao He upon his release with job opportunities as a professional musician and networking connections in New York City, where most of the Musicambia faculty work in busy musical careers. Musicambia already supports a network of



released alumni who are thriving in a variety of jobs and roles in society. I have no doubt that Xiao Bao He will succeed in whatever he does with his work ethic, reflective intellect, and generosity of spirit.

Xiao Bao He is a unique musical voice- his compositions display nuance and profundity. Nobody else writes music quite like him. The United States has already invested much into Xiao Bao He's rehabilitation—I sincerely hope that we will also be able to reap the artistic rewards of these efforts upon his release.

Thank you in advance for your consideration of Xiao Bao He, a remarkable musical voice whom I am honored to know.

Sincerely,

Laura Weiner

# EXHIBIT S



**735 Anderson Hill Road**
**Purchase, NY 10577**
**914-251-7540**
**info@rta-arts.org**
**www.rta-arts.org**

June 12, 2023

Re: Xiaobao He's 14A4742

To whom is may concern,

For the past five years, Xiaobao He's, has been a dedicated, loyal and active participant in many components of the Rehabilitation Through The Arts (RTA)* program. In any activity Mr. He's presents himself well, is a solid and responsive participant, and completes all assignments in a timely manner.

At all times, we have found Mr. He's to conduct himself with a positive attitude and with integrity. He is a respected and stabilizing factor in our program and works well with our workshop leaders and with his peers. I hope he will be considered favorably for his pending resentencing hearing.

Sincerely,

*Charles Moore –*

Charles Moore, MPS
Director of Programs & Operations

Copy: Mr. He's

* Rehabilitation Through The Arts (RTA) is an arts-based, rehabilitative program that assists incarcerated men and women in building life-skills. We operate in six New York State Correctional Facilities. Former NYS Commissioner, Brian Fischer once said from the stage at Sing Sing..."What you will see tonight is entertainment, what I see is rehabilitation".

Page 87

*RTA is a program of Prison Communities International Inc.*

# Rehabilitation Through the Arts (RTA)

## Proudly Presents This

## Certificate of Achievement

*to*

# BAO HE, IAO

*for your participation in*

## RTA's Production of "12 Angry Men"

*For your leadership, dedication, and team building in the production.*

Sing Sing Correctional Facility – This 12th. Day of May 2023

**Charlie Scatamacchia**
**Director**

**Margret Ables,**
**Associate Director**

**Charles Moore**
**Executive Producer**

103

# EXHIBIT T



**Central New York**
**Psychiatric Center**

| ANDREW M. CUOMO | ANN MARIE T. SULLIVAN, M.D. | DEBORAH J. MCCULLOCH |
|---|---|---|
| Governor | Commissioner | Executive Director |

June 6, 2023

To Whom it may concern,

The following is a letter of support for Mr. Xiao Bao He (1████████) whom this writer got to know over the past 3 years. I worked with Mr. He in his capacity as a very gifted and talented musician who volunteered to help facilitate the Jeptha music program where he functioned as a program assistant. The Jeptha program is an extension of Carnegie Halls Music Cambia program but is geared towards incarcerated individuals who are here on the OMH mental health unit. This group is facilitated by this writer and conducted by a civilian teaching musician every month. To say that Mr. He is a very enthusiastic, dedicated volunteer is an understatement. He clearly believes in using his music gift not only to help himself grow as a person, but also to share and teach others about the beauty and therapeutic potential of music. His ability to connect and work with our patients using his talents is remarkable. He has been an amazing role model for our men as someone who has practiced and worked very hard at something and sees tangible success. In his interactions with staff, OMH patients, officers, and I/I's, Mr. He is always respectful, compassionate, insightful, and humble. It has been amazing to see his talent develop from a novice into an accomplished jazz musician, who has studied guitar and music theory extensively. I have seen him perform here at Carnegie hall's Music Cambia concerts in front of a full auditorium and give poised, inspiring, virtuoso performances. Since I have met him he has been a consistently kind, authentic, optimistic, pleasant, humble, motivated, hardworking and grounded individual and a very responsible IPA for our program. Based on my experience working for NYS OMH for the past 41 years and here at Sing Sing for 31 years I believe Mr. He would flourish and contribute greatly to the outside community whether as a musician, teacher or above all as a responsible citizen if given the chance.

Sincerely,

Christopher Estberg , Senior Recreation Therapist (OMH)
Intermediate Care Program
Sing Sing Correctional Facility
Ossining , NY 10562

# EXHIBIT U



**Corrections and Community Supervision**

KATHY HOCHUL
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

TO:     Whom it may concern

FROM:   John Mahoney – RPL II

SUBJECT:   SUPPORTING LETTER FOR RESENTENCING MOTION FOR XIAO BAO HE 14-A-4742

DATE:   May 23, 2023

I am writing this letter to show support for resentencing for Incarcerated Individual Xiao Bao He 1█████. Mr. He has worked for me for the over 5 years as a Special Subjects clerk. Mr. He helps coordinate all special events for Special Subjects from religious, musical, plays and family graduations and celebrations. Yearly Special Subjects runs over 150 events and Mr. He helps coordinate, set up and run all these events.

Mr. He has become the Incarcerated Individual coordinator in charge of all Carnegie Hall/Musicambia events. Carnegie Hall/Musicambia run weekly music lessons for the most skilled musicians in the facility. Mr. He has coordinated this activity for the past few years and has taken it upon himself to take on teaching responsibilities within the program.

From all my observation of Mr. He, has proven to be a reliable and diligent worker. All assignments given to him are done in a timely manner and are well done. I hope this letter is taken into consideration when looking into his resentencing motion.

# EXHIBIT V

EXHIBIT V

108



NEW YORK STATE | Corrections and Community Supervision

KATHY HOCHUL
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

To:        Celia Givens, ESQ

From:      Craig Littrell, RPL I

Subject:   Letter of Support for Xiaobao He    Din: 1█████

Date:      May 4, 2023

I am the Recreational Leader at Sing Sing Correctional Facility. I work in the Special Subjects department which means that I am responsible for all special events, recreational areas and activities at Sing Sing. I have been one of Mr. He's supervisors for approximately five years. It is in that capacity that I write this letter in support for Xiaobao He's resentencing motion.

Mr. He was hired in the Special Subject office after he graduated from the NYTS Master's of Professional Studies program. In order to work in Special Subject, an incarcerated individual must come highly recommended by other incarcerated individuals and other correctional staff. The reason for this is because the people we hire have to work well with security, volunteers, other staff and civilians. The other reason is because we need people who are dependable.

In a given month Sing Sing Correctional Facility can have several special events. From religious observances to population events, to concerts that host celebrities like Common and to graduations where several hundred guests are in attendance. Special Subjects is responsible for generating all of the paperwork and setting up and breaking down the equipment before and after the event. In order to do this, I rely on Mr. He to not only follow orders, but to demonstrate integrity. Mr. He is entrusted by Special Subjects to carry out these duties because he has proven himself to be reliable, honest, and dependable.

In order for Mr. He to carry out his responsibilities he is sometimes required to be on an outcount and is transported to different work areas where only Special Subject workers have access to. In fact, Special Subjects only employs three clerks to work in the office. As a clerk, Mr. He is expected to operate in a way that allows us to carry out our numerous responsibilities for the smooth running of events at Sing Sing. Because of Mr. He's hard work, Sing Sing continues its reputation as a correctional facility that highlights programs and rehabilitative opportunities more so than any other correctional facility in the state of New York.

I have witness Mr. He's respectful and intelligent actions on several occasions. Never has there been a grievance about Mr. He's work ethic or him as a person. To my knowledge, Mr. He is considered a trustworthy and responsible person by me, his other supervisors and his peers.

# EXHIBIT W

From: Fr. Matthew Ugwoji, Catholic Chaplain

Date: May 7, 2023

Re: Recommendation for Resentencing Application for Xiao Bao He, #1▮▮▮▮▮

To whom it may concern,

    My name is Father Matthew Ugwoji and I am the Catholic Chaplain at Sing Sing Correctional Facility. I have worked at Sing Sing for nearly thirteen years and during that time I have known Xiao Bao He as one of the members of the Catholic Community. He has been an active member of the Catholic community attending worship, education, and overseeing the music program since his arrival in 2017. He has always been willing to assist his fellow community members in the chapel and for several years has volunteered his time to organize the music and choir for our weekly services and special event. His efforts have helped to ensure that all participants enjoy their time in prayer and spent with their families, In addition, Mr. He has served as a great Catholic example for the men as well as acting as a mentor for the younger community members.

    I know Mr. He as a fellow man of faith who has come a long way on his personal journey. I also recognized that he has taken ownership for his past actions and realizes that his prior life choices put him behind bars for nearly twelve years. His dedication to his faith, along with the personal and spiritual growth of his peers, stand as testaments to the man that he has become. No longer is the young man that made those earlier life choices being presented to you. Instead, he is a man who believers that his choices have and will continue to dictate his circumstances.

    He has express remorse for the choices that brought him to this point and wishes that he could ease the pain of those whom he has hurt. While this is not possible, he has expressed his desire to live out his remaining years being of service to the outside community and by spending as much time as possible with his family and friends.

    As his priest, I find his sentiments moving, honest and sincere. The Xiao Bao He I have come to know over the past six years would be an asset to the community with his presence, experience, and resourcefulness. Because of this transformation into an asset which the community can benefit from, I write this letter in support of his application for resentencing.

Respectfully,

Father Matthew Ugwoji

111

Page 92

# EXHIBIT X

EXHIBIT X

112

23 June 2022



**Dr. W. Francois III,
Director**
New York Theological Seminary

Dear Mr. He:

On behalf of the New York Theological Seminary (NYTS) faculty, executive team, its trustees and board members, the class of 2020 and 2021, and NYTS Alumni I want to thank you for your efforts during our June 22, 2022 graduation. Your service and skills are truly appreciated.

I am proud to say that the 39th NYTS commencement at Sing Sing was an absolute success. We presented 8 seminary students with Master Professional Studies degrees at an event attended by over 50 guests, which included family members, NYTS faculty, and facility staff. Your contribution as a Coordinator was crucial to the success of this event.

Specifically, your ability to take direction, problem solve in the moment, prosocial attitude towards your peers and staff, and commitment to achieving a successful commencement reflected the professional standards expected from NYTS I would therefore like to express my most sincere gratitude to you for your selfless service. Please continue to exemplify the qualities that I am sure would benefit society upon your release.
God Bless.

Respectfully,

Dr. W. Francois III, NYTS Dir.

**Sing Sing Correctional Facility**
354 Hunter Street
Ossining, New York 10562-5442
914-941-0108 Ext. 4860

cc:    Mr. Xiaobao He 14-A-4742
        ORC Unit.

*But seek the welfare of the city where I have sent you into exile, and pray to the LORD on its behalf, for in its welfare you will find your welfare. Jeremiah 29:7*

113                                    Page 93

# EXHIBIT Y



www.hudsonlink.org

December 7, 2023

Re: Letter of Recommendation for Xiaobao He

To Whom It May Concern,

My name is Sean Pica and I am the Executive Director of Hudson Link, an organization that provides higher education opportunities to incarcerated people in New York State, as well as reentry resources and support upon their release. I am writing this letter of support on behalf of Xiaobao He, who I consider one of my closest friends, as he prepares for the next steps in his long-awaited journey to return to our community.

I myself lived at Sing Sing for nearly two decades, and then came back to work at Sing Sing after I returned home. I have known Xiaobao for 6 years. Throughout these years, I have personally witnessed Xiaobao's growth, development, and incredible leadership among the population at Sing Sing, as well as Xiaobao's willingness to assist the administration in building and cultivating a stronger education program.

In the past 25 years, Hudson Link has awarded over 800 degrees to incarcerated individuals in five New York State correctional facilities. Our holistic program structure follows each student from pre- to post-release, providing alumni with a variety of reentry supports to reduce recidivism, obtain meaningful employment, and support people as they transition home. In fact, less than 2% of Hudson Link graduates who are released return to prison for a new crime.

Xiaobao has been working directly with the Hudson Link College Program, in addition to working on his own studies in music for as long as I can remember. Xiaobao has been an invaluable help to Hudson Link, helping us coordinate many important events including college graduations, a TEDx talk, and our 25-year anniversary event. Xiaobao's assistance ensures that each one of these events runs smoothly and without issue.

Xiaobao has done the work while incarcerated that will prepare him to rejoin society. I know that he is committed to making a positive contribution to the community if he is resentenced. He has always been a strong member of the Sing Sing community and is always willing to help those in need. Xiaobao is a man of integrity and honor. In my opinion, is Xiaobao a model of rehabilitation and I have no doubt that he will succeed at reentering society if permitted.

Lastly, Hudon Link also coordinates transitional housing for reentering citizens and we would like to offer Xiaobao a placement in our housing program, in addition to employment at the Hudson Link office upon his release. Our "Finish Line" program will provide financial

115

assistance to Xiaobao so that he can afford to pay for any further studies, such as music school.

For these reasons, it is without hesitation that I respectfully request that you approve Xiaobao's resentencing motion and resolution of his immigration status. We at Hudson Link are proud to stand in Xiaobao's corner, and we are ready to assist him in any way we can to make sure his reentry is a successful one.

If there is any additional information that I can provide, please do not hesitate to contact me directly at spica@hudsonlink.org.

Sincerely,

Sean Pica
Executive Director, Hudson Link

116

# EXHIBIT Z

EXHIBIT Z



**TRINITY**
**CHURCH**
WALL
STREET

An Episcopal Parish in
the City of New York

76 Trinity Place
New York, NY 10006

December 15, 2023

Dr. Melissa Baker
Director of Artistic Planning
Trinity Church Wall Street
(646) 430-1291

Re:     Xiaobao He's Musical Gift

Ladies and Gentlemen:

I am writing with gratitude for the work and art that has come out of Xiaobao's rehabilitation at Sing Sing Correctional Facility, particularly his work with Musicambia.

As the Director of Artistic Planning at Trinity, I program concerts of works that grapple with social issues, with a focus on creating a community that feels connected in our human experience. This season, the series was focused on "Renewal" or how we actively participate in a new way of being. I have never met Xiaobao, but his efforts in creating art for a community and audience that he is not a part of, speaks volumes about the person I believe he is and he is a perfect example of what we hope Renewal can be. It was a blessing to present and perform the world premiere of Mr. He's five movement work *Suite* on October 15 of this year.

Mr. He's composition was stunning. The orchestration was impressive and the music was written so accessibly that our diverse audience - that varies from classical music experts to people just walking in from the street – were all equally captivated. Mr. He brought so much joy to not only our audience in the space, but the hundreds of viewers that watched the performance online. From the inside, he has made a great impact to many people in our community and I am grateful.

I am hopeful that you will take letter into your consideration for Mr. He's resentencing. I think that his art can heal others and I highly support any opportunity for Mr. He to continue his incredible work in becoming a musician who I know will continue to impact many.

Thank you for your time,

Mel Baker

# EXHIBIT AA

EXHIBIT AA



# musicambia

Dr. Elliot Cole

Ridgewood, NY 11385
512-

I'm the Program Director for Musicambia, where I regularly work first-hand with musicians at
Sing Sing. In this capacity I've known Xiao Bao He for six years. I have also taught at Juilliard,
The New School, Princeton, and the Manhattan School of Music, and have had many excellent
students — but Xiao Bao He still stands out as one of the most remarkable students I have
ever encountered.

Musicambia is a non-profit organization that provides direct education, materials, and other
support to musical communities in prisons. We have run programs in New York, South
Carolina, Missouri, California, and Indiana, and I have participated in many of them. I am a
composer and performer with a PhD from Princeton and my music is frequently performed
around the world.

Xiao Bao He has used his time incarcerated to pursue one of the most difficult musical studies,
jazz, and he has attained a remarkable level of skill on the guitar. I have no doubt that he could
work as a professional musician and make a meaningful contribution to his community and to
the field. He astonishes me every time I hear him. I wish I could play like him.

It's also revealed some important qualities about his character. Watching him far outpace all of
his peers, it's clear he *could* be using his prowess as power to dominate the stage and the
community. But instead he is extremely humble, kind, and supportive of the other students. He
teaches; he mentors and cheers on the beginners; he makes sure he doesn't take too much
time and attention. These positive personal qualities extend beyond the musical sphere. A
remarkable thing about him is that he has never received a disciplinary infraction from DOCCS.
This doesn't surprise me. He is one of the most positive, generous, and beloved members of
our community.

Our organization can help support his re-entry. We are a group of well-connected professional
musicians who care about him, and who believe in the role he can play here in America. Our

musicambia.org / 712A Monroe Street, Brooklyn NY 11221 / 817.980.7463



alumni program will keep him engaged, and provide performance opportunities and other professional support.

Our country has already invested so much into his rehabilitation, and we stand to benefit from that rehabilitation. I believe America deserves to enjoy the benefits of his presence and his talents once he is released. If he was deported, after working so hard for his rehabilitation, we'd be the losers.

Thank you,

Dr. Elliot Cole

# EXHIBIT BB

To:        C. Givens, ESQ

From:    Officer H. James

Subject:  Letter of Support for Xiaobao He's Resentencing Motion

Date:     May 16, 2023

I am writing to you to share information, I have learnt about I/I Mr. Xiaobao He.

Mr. He has been productive in the prison community for over 5 years. I have noticed he himself has completed all mandatory educational requirements and moved onto higher education. I've noticed he's a great example to other I/Is. And he exceeds in helping other I/Is in academics, also, his clerk position in school building. He has shown to have a mild nature as he avoids problematic people and situations. NOTE: This ability in prison community is not easy to balance. Mr. He does very well in this.

Also, he follows directions well, shows good self-control. He holds above average attitude toward authority figures.

In difficult times, I've seen Mr. He with a pleasant attitude still willing to work hard.

Mr. He is employable. He will be a great asset to any organization. In my opinion, giving a chance Mr. He will succeed in society.

*James*
*C O H. JAMES*

123

# EXHIBIT CC

EXHIBIT CC

TO: Celia Givens, ESQ

FR: C.O. G. KNOWLDEN

DT: 3 May 2023

RE: <u>LETTER OF SUPPORT FOR CPL§440.47 MOTION FOR Xiaobao He 1▮▮▮▮▮</u>

Dear Attorneys:

I am G. Knowlden, a Correctional Officer with over 25 years of experience working at Sing Sing Correctional Facility as the Officer In Charge in the Chaplain/auditorium. As the OIC I am able to consistently observe incarcerated individuals for years. With that experience in mind I am writing this letter of support for Xiaobao He's (DIN: 14-A-4742) CPL§440.47 application.

I have known Mr. He for approximately 6 years.

Mr. He first came to my attention because of his enrollment in the New York Theological Seminary Master's of Professional Studies program. This is an intensive course where Master candidate's attend school in the chapel's basement. Over the course of nearly a year Mr. He consistently attended his courses. I never registered or heard of a complaint about Mr. He. Mr. He interacted with volunteers, professors, and security staff in a professional and courteous manner. Mr. He was uncommonly courteous and I witnessed Mr. He's positive influence on his peers and his dedication to positive programming firsthand.

During his time as a Master's candidate and since graduating, Mr. He has acted in a similar fashion towards the Catholic community that he is a part of. Mr. He regularly attends services throughout the week. Mr. He plays a prominent role in the Catholic community. Mr. He plays guitar for the Catholic choir. Mr. He is extremely talented and is counted on by the Catholic Chaplain, Father Matthew to provide music and to work with other musicians. Mr. He shows up weekly for rehearsals to perform for Mass and other celebrations and observances of the church.

I have also witnessed Mr. He's musical talent during Carnegie Hall Musical Connections concerts in the auditorium. Mr. He not only performs in the concerts, but is also entrusted to set up and break down the concerts. One of his responsibilities is to ensure that all of the equipment is accounted for. There has never been a complaint about Mr. He's performance as a musician or in his carrying out his responsibilities. In fact, Mr. He's presence ensures integrity and a smooth running.

Finally, Mr. He has played a positive role amongst his peers. Mr. He is known as a force for peace and for influencing those around him to get involved in positive activities. All in all Mr. He is known by security staff, volunteers, civilians and his peers as a person who is consistently doing positive things for himself and his communities.

C.O. G. Knowlden

# EXHIBIT DD

## In support of Xiaobao He Din: 1

Kenyatta Emmanuel <kenyatta ███████████m>
Thu 8/10/2023 10:54 PM
To:Celia Givens <cgivens@legal-aid.org>

> You don't often get email from kenyatta.e.hughes@gmail.com. Learn why this is important

To whom it may concern,

I hope this letter finds you well. My name is Kenyatta Emmanuel Hughes, I am writing in support of Xiaobao He,In support of DIN# █████, in support of his character, and recognition of his value to his friends, family, and community.

I am the artist in residence for the Initiative for a Just Society at Columbia School of Law, and a Teaching Artist with Carnegie Hall. I have known Xiaobao for over 10 years. We met while we were both incarcerated at Sing Sing correctional facility in New York State. I was finishing a 25 year sentence, and Xiaobao was serving his own sentence of many years. We worked together in the Special Subjects office of the facility. Many of the lessons that I learned with and from Xiaobao have helped me successfully navigate this world and society to which I have returned after so long.

In prison, you learn who the people around you truly are, because there is such forced proximity. Everywhere humans live together, community is formed—including in prisons. I watched Xiaobao as a member of our community. I have gone to meals with him, gone to the chapel and the school with him, have watched him interact with his peers, and with officers and civilian staff. Xiaobao maintains an integrity of character regardless of the environment or the people involved. Xiaobao He is a kind and loving man, a faithful and diligent person. His words and actions are consistent. In that place, which was often chaotic, Xiaobao was even tempered and thoughtful, a dependable and consistent friend.

Besides working together, Xiaobao and I spent much time together making music, both being part of a Carnegie Hall program designed to provide musical expression and experience to incarcerated people. Already a skilled guitarist, I watched Xiaobao apply himself consistently, with determination and dedication, to help others realize their own artistic visions. As we worked for months on some compositions and performances, Xiaobao and I had the opportunity to learn about each other's lives and families. We discussed our hardships, and shared our joys and trials. Xiaobao is a thoughtful and introspective man, measured in his consideration of even the difficult circumstances. He was steady in an often chaotic environment, always mindful of the effects our actions had on others.

It is not an overstatement to say New York State and society in general would benefit so much from Xiaobao's release. He is thoughtful, introspective, helpful, sensitive, and humble. Knowing him as I do, I expect you will receive several letters in support of his release, detailing his character, rehabilitation, and academic accomplishments. I speak of his spirit and heart—something perhaps not often stated in matters such as these. I pray you will consider all of the effects that keeping Xiaobao in prison would bring—and to whom. Similarly, I implore you to consider the blessing that he would be if he were free to touch the community out here as he has touched the community inside. Xiaobao is a benefit to everyone around him, because he has a servant's heart—and he will bring that same mind and heart home with him; it is who he is. It is why he is such a steady friend, a bedrock for his family, and an asset to his community. It will serve no one for him to be incarcerated any longer. In fact, it will harm us, in that we are deprived of him.

Thank you for your consideration,

Kenyatta Emmanuel Hughes

https://outlook.office.com/mail/inbox/id/AAQkAGNlODk4YmZhLTBmZTQtNGU5MS1hNGYwLWU0MDg0ODViOWIwMwAQABIuk3uGI59DnjE%2FVAiNHIw…    1/2

Kenyatta Emmanuel, (he/him)
Artist-In-Residence
Initiative for a Just Society
Columbia University Law School
2022 Galaxy Leaders Fellow
Website: https://kenyattaemmanuel.com

October 16, 2024

**Subject: Character and Impact of He Xiao Bao**

To Whom It May Concern,

I am writing to express my unwavering support for my close friend, He Xiao Bao. I have known Mr. He for over seven years, six of which we spent together at the same correctional facility. During this time, I have come to deeply respect his character and integrity.

Mr. He and I first met in June 2017 while pursuing our MPS Degrees at New York Theological Seminary. Through our shared academic journey, I witnessed firsthand his commitment to learning, his ability to connect with people from diverse backgrounds, and his unwavering dedication to serving others. Our friendship extended past our graduation, which occurred in June 2018.

Throughout our time together, Mr. He has always been a peaceful and considerate individual. I have never observed any behavior that would suggest he poses any threat to anyone. In fact, his strength lies in his ability to use communication and conflict resolution to address challenges.

I was particularly struck by the remorse that Mr. He exhibited. It is clear that any type of violent incident would be completely out of character for the person I have come to know and respect. He deeply regrets his actions and has learned from this experience. His daily actions and acts of service reflect this growth and commitment to change.

Personally, Mr. He became a safe space for me in an environment where safety was rare. I trusted him because of his authenticity, accountability for his past, and his daily efforts to become better and plan for a future where he could help others.

Mr. He has the potential to become a valuable member of our community if given a chance. He has already made a positive impact on the lives of many people. I am confident that if given the opportunity to remain in the United States, he will continue to contribute to our society in meaningful ways.

Thank you for your time and consideration.

Sincerely,
Anthony Perez
E: anthony.perez101417@gmail.com P: (347) 646 9011

## 28 U.S. Code § 1746 - Unsworn declarations under penalty of perjury

(2) If executed within the United States, its territories, possessions, or
commonwealths: "I declare (or certify, verify, or state) under penalty of perjury
that the foregoing is true and correct. Executed on  10/21/2024.

Anthony Perez

130





132

# Jean Rohe

### songwriter ○ musician ○ educator

██████    BROOKLYN, NY 11225  (862██████    INFO@.███████

January 9, 2024

**Letter of Recommendation for Xiaobao He**

To Whom It May Concern,

My name is Jean Rohe and I have been a teaching artist for the past ten years with Carnegie Hall's Musical Connections program at Sing Sing Correctional Facility. In my capacity as a teaching artist I work regularly with a small group of incarcerated individuals to write songs, learn musicianship skills, collaborate with other musicians, and perform their songs. I write today in support of Xiaobao He, a guitarist, composer, and participant in our program for the past eight years.

During his time in our program, Mr. Xiaobao has made remarkable strides in his musicianship and performance skills. An eager, diligent student of the guitar, he has grown tremendously as a sight-reader, improviser, and performer, through consistent practice and dedication. I have been struck by the sensitivity, enthusiasm, and authenticity that he brings to his performance. Mr. Xiaobao has performed in concerts at Sing Sing featuring high-profile performers like the artist Common and singers from the Metropolitan Opera, during which he exhibited the utmost professionalism and determination under pressure.

Besides his talent, his love of music, and his work ethic, I've been impressed by his humility and willingness to share his skills with newer participants, proofreading their writing, collaborating with them, and offering encouragement and support. Mr. Xiaobao brings positive energy, leadership, and a community spirit to the group. He is an inspiration to his fellow participants and a joy to teach.

I look forward to Xiaobao He's continued progress in music. I believe that the skills he is cultivating in the Musical Connections program will serve him throughout his life.

Sincerely yours,

Jean Rohe

Jean Rohe

Songwriter, teaching artist – Carnegie Hall Musical Connections

info@jeanrohe.com

133

www.jazzbooks.com    **JAMEY AEBERSOLD**    ████████s.com

████████ **Drive**    New Albany, IN  47151-1244    Ph. (812) 9█████

January 2, 2024

To Whom it may concern:

I, Jamey Aebersold, am writing to you to support Xiaobao (████2) 440.47 resentencing motion.

I got to know Xiaobao through correspondence beginning in 2021.

Through our correspondence and love of music/jazz and his curious mind, he asked me many questions which I answered, and our relationship blossomed through jazz theory and application on his guitar. I've heard him play and he is VERY good and has written some amazing compositions. His songs have been played at Lincoln Center

where I received my NEA Jazz Masters award in 2014. His songs have been played at Carnegie Hall and Trinity Church Wall Street.

He uses his music and music skills to serve his community and he plays guitar for his church. He also volunteers his time to run two music therapy programs at two different mental health units at Sing Sing.

I believe Xiaobao's passion for jazz music could lead him on a successful path upon his release.

I've corresponded with dozens of inmates over the past 56 years since 1967, I first released my series of Jazz Play-A-Longs: *Play with the jazz giants'* books and audio sets. I've traveled to many places around the world doing week-long jazz workshops and clinics and am known as a leader in Jazz Education.

Xiaobao is near the top of students I've had contact with, and I honestly feel he will be very successful in the current musical environment. He is multi- talented.



Therefore, I am asking you to give fair consideration for resentencing motion and resolution of his immigration status.

I am enclosing several pieces of information to let you know what I've been doing with my life. I'm 84, and a teacher, player, publisher, and composer. I have helped many prison programs and inmates who are learning to play music and jazz all over America. I call it my music ministry.

You can Google me and visit my site: www.jazzbooks.com

Sincerely,

Jamey Aebersold

135

Xiao Bao HE
A# 0

**PROOF OF SERVICE**

I, Laura Berger, hereby certify that on October 28, 2024, I made to be served a copy of the foregoing REQUEST FOR CUSTODY REDETERMINATION via ECAS to the Department of Homeland Security, Immigration and Customs Enforcement, Office of Chief Counsel at the following address:

Office of Chief Counsel
4250 Federal Drive
Batavia, NY 14020

10/28/2024
Date

Laura Berger

136

Laura Berger                                                          **DETAINED**
Staff Attorney
The Legal Aid Society
49 Thomas Street
New York, NY 10013
D: (917) 921-4210
F: (646) 616-4188
LBerger@legal-aid.org

### UNITED STATES DEPARTMENT OF JUSTICE
### EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
### BATAVIA IMMIGRATION COURT
### BATAVIA, NEW YORK

In the Matter of:                          )
                                           )
                                           )
HE, Xiao Bao                               )          File No.:
                                           )
In Custody Proceedings                     )
                                           )


Hon. Immigration Judge Eric Schultz        Bond Hearing: 10/31/2024 at 10:00AM


### ADDITIONAL EVIDENCE IN SUPPORT OF RESPONDENT'S
### CUSTODY REDETERMINATION HEARING

137

**INDEX OF DOCUMENTS IN SUPPORT OF MR. HE'S BOND REQUEST**
**A# 247-018-510**

| EXHIBIT | DOCUMENT DESCRIPTION | PAGES |
|---|---|---|
| EE | Updated Printout from DOCCS Showing that Mr. He has no disciplinary record from his time in custody 2011 through October 2024 | 110 |
| FF | Letter of Support from Former Superintendent of Sing Sing Correctional Facility, Michael Capra, with attached email thread for authentication | 111 |
| GG | Letter of Support from Alfred Roberts | 115 |
| HH | Letter of Support from Sarah Elizabeth Charles, Lead Teaching Artist at Sing Sing Correctional Facility with Musical Connections | 119 |
| II | Letter of Support from David Nieves, Clinician at Exodus Transitional Community | 122 |
| JJ | Links to Video Evidence of Mr. He's Musical Compositions | 123 |
| KK | Copies of Unpublished BIA Decisions cited in Bond Letter | 124 |
| LL | Relevant Articles Published by Dr. Monit Cheung | 147 |

138

# EXHIBIT EE

NO DISCIPLINARY HISTORY TO PRINT FOR FACILITY SING SING GN FOR INMATE 14A4742

NOTE: ONLY COMPLETED HEARINGS ARE SHOWN

***SUCCESSFUL PRINT COMPLETION***

# EXHIBIT FF

**U.S. Immigrations and Customs Enforcement**
**Office of the Principal Legal Advisor, New York**
**26 Federal Plaza Room 1130**
**New York, NY 10278**

October 27, 2024

Dear U.S. Immigration and Customs Enforcement,

My name is Michael Capra, and I am the former Supervising Superintendent of Sing Sing Correctional Facility in Ossining, NY. For over 42 years, I worked for the New York State Department of Corrections and Community Supervision ("DOCCS"), having risen the ranks from Officer to Superintendent through 15 different DOCCS facilities and assignments I also oversee 4 four other correctional facilities in the southern district of New York . **With this experience in mind, I am writing to urge you to not detain Xiaobao He while he is in the process of resolving his immigration status.**

I first met Mr. Xiaobao when he arrived as an inmate to Sing Sing Correctional Facility in 2018. I worked directly with Mr. Xiaobao during his tenure as the Special Subjects Clerk at Sing Sing. To work in Special Subjects, an incarcerated individual must come highly recommended by both correctional staff and other incarcerated individuals. The reason for this is because the people we hire need to work closely with security staff, volunteers, other staff and civilians. He was entrusted by Special Subjects to carry out this specialized job precisely because he is uncommonly courteous, reliable, honest, and dedicated to ensuring our programming ran safely and smoothly.

Throughout his incarceration, Mr. He was known to correctional officers, prison volunteers, civilians and his peers as a force for peace and a role model for others' rehabilitation. He dedicated himself to programming and became a positive influence on others by encouraging them to engage in rehabilitative and educational programming. He is consistently helping others, doing positive things for his community and ensuring the safety and wellbeing of those around him. I have personally witnessed Mr. He's interactions with many people and I can affirm wholeheartedly that he poses no danger to others. In fact, to my knowledge, there has never been a complaint registered against Mr. He as an inmate worker or as a person, and he never had a single disciplinary infraction while incarcerated.

As someone who has worked with thousands of inmates over the course of my career, I can state with certainty that Mr. He is exceptional among the inmates I have worked with in that I could always trust him to work hard to help others and support the Sing Sing community. If released on bond, I believe Mr. He would be a productive and safe member of our community. And, as someone who directly supervised his work, I also believe he would be highly employable and has both the skill set and the mindset to contribute greatly to our society and workforce if permitted the opportunity.

It is with this personal knowledge and experience that I urge you to not continue to detain Xiaobao He and allow him to be released on bond. Please do not hesitate to contact me should you need any further information.

Sincerely,

Michael Capra

142

 Outlook

**Fwd: Support Letter**

**From** Colin Absolam <colinabsolam@gmail.com>
**Date** Tue 10/29/2024 3:39 PM
**To**    Celia Givens <cgivens@legal-aid.org>

---------- Forwarded message ---------
From: **Colin Absolam** <▓▓▓▓▓m@gmail.com>
Date: Tue, Oct 29, 2024 at 3:12 PM
Subject: Re: Support Letter
To: Michael Capra <▓▓▓▓▓b@outlook.com>

Received, thank you Supt. Xiaobao truly appreciate it, as do I. On a side note, most of the guys are going to greet Julian tomorrow when he is released.

On Tue, Oct 29, 2024, 2:34 PM Michael Capra <▓▓▓▓▓@outlook.com> wrote:
  Here you go Colin.. Hope this helps!

  Best,

  Respectfully,

  Michael Capra
  Superintendent Sing Sing C.F. (Retired)
  Supervising Superintendent NYC HUB
  ▓▓▓@outlook.com
  845-▓▓▓▓

  **From:** Colin Absolam ▓▓▓▓▓@gmail.com>
  **Sent:** Tuesday, October 29, 2024 1:29 PM
  **To:** Michael Capra ▓▓▓▓up@outlook.com>
  **Subject:** Re: Support Letter

  Good afternoon Supt.
  My apologies for any inconvenience. Just following up on the letter. The lawyer reminded me that tomorrow is the last day to submit it.

  On Sun, Oct 27, 2024, 4:59 PM Michael Capra <▓▓▓▓Sup@outlook.com> wrote:
    Thank you. I will write a letter.

    Respectfully,

    Michael Capra

https://outlook.office.com/mail/inbox/id/AQMkAGNIODk4YmZhLTBmZTQtNGU5MS1hNGYwLWU0MDg0ODViOWIwMwBGAAADsKlmDR3jGE2N5G8xS3U...    1/3

**From:** Colin Absolam <█████████@gmail.com>
**Sent:** Sunday, October 27, 2024 3:46:38 PM
**To:** ███████████ <Mcapra.sup@outlook.com>
**Subject:** Support Letter

Good afternoon Supt.
I spoke with Andre yesterday and explained the situation Xiaobao He, is in at this moment.
Based on our conversation I reached out to Xiaobao's attorney and she drafted the attached
letter. It is believed that a letter from you would greatly impact the immigration court's decision
in Xiaobao's favor. He has a bond hearing on Thursday and his attorney is trying to get as many
support letters as possible.
Please feel free to make changes as you see fit. And contact me if you have any questions.

Below is the instructions I received from Xiaobao's attorney for submitting a letter of
recommendation.

### Part 1 - support letter guidelines

1. **Address it to "Attn: Immigration and Customs Enforcement,"**
2. Current date
3. Establish your credibility as a reference for Xiaobao.
4.    a. who you are, name, title, accomplishments (if relevant)
   b. Letterhead if you have one
5. Explain how you know (and how long you have known) Xiaobao.
6. **The thing you're asking the court to do is to "request Xiaobao He's release from detention"**
7. **Then address these areas (most important for immigration court)**
8.    a. Xiaobao's ties to NYC / his support system here (ie his likelihood of staying local and attending court)
   b. Xiaobao's lack of dangerousness/how he is not a danger to public safety
   c. Xiaobao's good character (specific details are helpful!)
   d. Anything about his remorse/contrition

### Part 2 - declaration/copies of ID

In order for your letters to receive full credit in immigration court, we will also need—**a signed declaration and photo copy of the front and back of your IDs**. I have attached a template of the declaration for you to this email – **please change the date and add your name to it, delete the part that says signature (or add a line if you'd like) then print/sign and scan so you can email it back to me with the photos of your ID**. If there are any issues with printing/scanning, please let me know and I can help trouble shoot as needed.

**Note:** if you are able to get someone high up in DOCCS to write a supporting letter, then don't worry about part 2/the declaration and ID copies—the letter on its own will be fine.

Thank you so much again—and please let me know if you get any other info about other support letters! Have a great weekend!

**Celia Givens**
DVSJA Staff Attorney
Criminal Appeals Bureau

144

Legal Aid Society
199 Water Street
New York, NY 10038
**P:** (917) 890-2278
**E:** cgivens@legal-aid.org

pronouns: she/her/hers

# EXHIBIT  B-4

EXHIBIT  B

```
                    UNITED STATES DEPARTMENT OF JUSTICE
                 EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
                            IMMIGRATION COURT
                    4250 FEDERAL DRIVE, ROOM F108
                          BATAVIA, NY  14020
```

The Legal Aid Society
Berger, Laura
49 Thomas Street
New York, NY  10013


In the matter of            File A ▮▮▮▮▮▮▮▮        DATE: Nov 4, 2024
HE, XIAO BAO


\_\_ Unable to forward - No address provided.
X\_ Attached is a copy of the decision of the Immigration Judge. This decision
   is final unless an appeal is filed with the Board of Immigration Appeals
   within 30 calendar days of the date of the mailing of this written decision.
   See the enclosed forms and instructions for properly preparing your appeal.
   Your notice of appeal, attached documents, and fee or fee waiver request
   must be mailed to:   Board of Immigration Appeals
                        Office of the Clerk
                        5107 Leesburg Pike, Suite 2000
                        Falls Church, VA 22041
\_\_ Attached is a copy of the decision of the immigration judge as the result
   of your Failure to Appear at your scheduled deportation or removal hearing.
   This decision is final unless a Motion to Reopen is filed in accordance
   with Section 242b(c)(3) of the Immigration and Nationality Act, 8 U.S.C. §
   1252b(c)(3) in deportation proceedings or section 240(b)(5)(C), 8 U.S.C. §
   1229a(b)(5)(C) in removal proceedings.  If you file a motion to reopen, your
   motion must be filed with this court:
                        IMMIGRATION COURT
                        4250 FEDERAL DRIVE, ROOM F108
                        BATAVIA, NY  14020
\_\_ Attached is a copy of the decision of the immigration judge relating to a
   Reasonable Fear Review. This is a final order. Pursuant to 8 C.F.R. §
   1208.31(g)(1), no administrative appeal is available. However, you may file
   a petition for review within 30 days with the appropriate Circuit Court of
   Appeals to appeal this decision pursuant to 8 U.S.C. § 1252; INA §242.
\_\_ Attached is a copy of the decision of the immigration judge relating to a
   Credible Fear Review. This is a final order. No appeal is available.
\_\_ Other: _____


                              _____dmp_____
                              COURT CLERK
                              IMMIGRATION COURT                      FF
      cc: PETER MARCHE-ASSISTANT CHIEF COUNSEL
          4250 FEDERAL DRIVE
          BATAVIA, NY,  14020


146

**UNITED STATES DEPARTMENT OF JUSTICE**
**EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**
**UNITED STATES IMMIGRATION COURT**
**BATAVIA, NEW YORK**

**IN THE MATTER OF:**                    **In Bond Proceedings**

**XIAO BAO HE**                          FILE NUMBER: ████████

<u>**BOND MEMORANDUM**</u>

**Factual and Procedural Summary**

Xiao Bao He ("Respondent") is a 38 year-old native and citizen of the People's Republic of China.  By Notice to Appear dated October 9, 2024, removal proceedings were commenced against Respondent, charging him with failure to maintain or comply with the conditions of his admission as an F-1 nonimmigrant student on December 30, 2009, in violation of §237(a)(1)(C)(i) of the Immigration and Nationality Act (INA or Act).  His removal matter remains pending before this Court at this time.

Respondent requested bond redetermination by motion filed with the Court on October 22, 2024.  A hearing was held on October 31, 2024, at which this Court received evidence from the parties and heard oral argument regarding the issues presented as well as testimony from three (3) witnesses on behalf of Respondent.  Following completion of oral argument and the hearing, this Court reserved decision, for issuance of the present written decision.

**Evidence**

The following is a summary of the evidence received by the Court in this bond hearing. All evidence has been considered by the Court in making its decision, even if not specifically referred to below.

**Ex. 1:  Respondent's Motion, filed October 22, 2024.**

**Ex. 2:  DHS Evidence, filed October 25, 2024, with tabs A--F**.

**Ex. 3:  Respondent's Letter Brief and Evidence filed October 28, 2024, with tabs A-DD.**

**Ex. 4:  Respondent's Evidence filed October 30, 2024, with Tabs EE-LL**.

**Ex. 5:  DHS Evidence dated October 30, 2024, with tabs G—H.**

1

**Ex. 6:  Respondent's Witness List, filed October 30, 2024.**

## Preliminary Findings

At the beginning of the proceeding, DHS confirmed that it detains Respondent pursuant to § 236(a) of the Act, and that it was raising "danger to the community" and "risk of flight" arguments regarding Respondent's amenability to release and redetermination of bond.  The Court admitted all of the above listed evidence without objection of the parties into the record, applying the general precepts described in *Matter of Guerra,* 24 I&N Dec. 37, 40 (BIA 2006), in determining that because all of the evidence listed above is probative and specific to Respondent, it warranted admission and consideration as evidence.

Respondent, through counsel, argues in his letter brief that the burden of proof is properly placed on DHS to demonstrate that Respondent poses a danger or risk of flight.  *See* Ex. 2 at EOIR-2.  The Court disagrees. The regulations provide, and the Board has long held, that the respondent carries the burden of proof in custody redetermination proceedings.  This Court, of course, resides within the jurisdiction of the Second Circuit.  However, Respondent's counsel's attempt to cite authority for the premise that there is a shifting of the burden to the Department is unpersuasive. While it is true that the Second Circuit found that, where a respondent is facing prolonged detention under INA §236(a), the Due Process clause requires that DHS bear the burden to establish by clear and convincing evidence that the respondent is a danger or a flight risk, it declined to create a bright-line rule for at what point in a detention this burden shift should occur.  *Velasco Lopez v. Decker,* 978 F.3d 842, 853 (2d Cir. 2020).  Instead, the Second Circuit looked in dicta to guidance from the Supreme Court in *Zadvydas v. Davis,* 533 U.S. 678, 701 (2001), in which detention was scrutinized more closely after six (6) months.  *Velasco Lopez v. Decker,* 978 F.3d at 855 n. 13. Here, per Respondent's letter brief, Respondent has been detained by DHS since October 10, 2024. Ex. 3 at EOIR-1.  This after having been in the custody of NYS DOC for a term of imprisonment. Thus, his detention is not prolonged, and does not trigger any concern that there should be a shifting of the burden to the Department to justify his detention, which burden shifting would be in contravention of clear regulatory and Board precedential guidance.  Thus, this Court holds that the burden of proof rests on the Respondent.

## Application of § 236(a) of the Act to Respondent's Motion.

For the reasons which follow, the Court **DENIES** Respondent's motion for bond redetermination on the basis that he has failed to meet his burden to demonstrate to this Court's satisfaction that his release would not pose a danger to property or persons.

At the hearing held on October 31, 2024, DHS argued that Respondent had failed to meet his burden of proof that his release would not pose a danger to persons or property, and that he failed to meet his burden to prove that he does not pose a risk of flight.  Counsel for Respondent argued that Respondent did not pose a danger to the community despite his prior conviction.  First, Respondent argued that his conviction for Criminally Negligent Homicide in violation of NYPL 125.10, which occurred in October 2024 after his prior 2014 conviction for manslaughter had been vacated, should not constitute a basis for a finding that he poses a present danger due to the fact

2

that the current legal basis for his conviction is neither a crime of violence nor one involving moral turpitude. In addition, Respondent's counsel argued that the offense underlying the initial manslaughter conviction (which carried a term of imprisonment of 18 years) and the currently valid conviction occurred in 2011, and was the result of an abusive intimate relationship with a woman who Respondent stated abused, controlled, and trafficked him to the point of his losing control and killing her and attempting suicide on August 16, 2011. *See* Ex. 2 at EOIR-3; Ex. 3 at Tab B. Respondent stated in his declaration at Ex.3-B that he has tried to turn his life around while also remembering and being haunted by his prior experience and what he had done. Also, through counsel, Respondent submitted an evaluation from Monit Cheung, PhD, LCSW, at Ex. 3-D (Dr. Cheung also testified at the October 31, 2024 hearing), in which Dr. Cheung concluded that Respondent, despite having killed his partner, did not fit the prototype of being a "DV perpetrator" but instead fit the model of that of a DV victim. Ex. 3 at EOIR-38. She also concluded that, based on her analysis, he had addressed the psychological issues and is "ready to reenter society", and thus not at risk of re-offense. Id. at 39. Further information was provided regarding his record without disciplinary incident while incarcerated, his theology studies, and his advancement of his talents as a musician. Moreover, he voluminous support documentation from people supportive of his release and reintegration to society, including from Cardinal Timothy Dolan, Archbishop of New York, and his plan for reintegration, including his participation in a transitional programming home, operated by "Thrive for Life". Ex. 3-N, O (Executive Director Zachariah Presutti, SJ, and Brad Balliett also testified at the hearing). Thus, due to the remoteness in time of the offense, Respondent's rehabilitation, and strong community support, a plan for release, and his prospects, Respondent argued that release was warranted as he does not pose a current risk of danger, and has no reason for flight.

DHS, for its part, relied upon the underlying facts of the 2011 offense, argued that Respondent's subsequent marriage to a U.S. citizen that now forms the basis for Respondent's intention to apply for "VAWA" Cancellation of Removal pursuant to sec. 240A(b)(2)(A), is an indicator of a continued concern over Respondent's decision-making that calls into question his rehabilitation, thus arguing that he had not amply demonstrated that he does not pose a danger to the community if released. DHS also argued that Respondent remained a risk of flight, despite the community support, due to his lack of ties to the United States, the questionable viability of his immigration relief, and his unsteady employment prospects.

In these proceedings, Respondent has the burden of proof in a custody redetermination hearing under § 236(a) of the INA to establish to the satisfaction of the Immigration Judge that he or she does not pose a danger to persons or property and does not pose a risk of flight. See 8 C.F.R. § 1236.1(c)(8); *Matter of Fatahi*, 26 I&N Dec. 791, 793 (BIA 2016); *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006). Dangerous respondents are properly detained without bond pending the completion of proceedings to remove them from the United States. *See Matter of Urena*, 25 I&N Dec. 140, 141 (BIA 2009) (citing *Matter of Guerra*, 24 I&N Dec. 37, 38 (BIA 2006); *Matter of Adeniji*, 22 I&N Dec. 1102, 1113 (BIA 1999); *Matter of Drysdale*, 20 I&N Dec. 815, 817 (BIA 1994)). In this regard, dangerous respondents have no constitutional right to be at liberty in the United States pending the completion of their removal proceedings. *See Urena*, 25 I&N Dec. at 141; *Carlson v. Landon*, 342 U.S. 524, 537-42 (1952).

An Immigration Judge should only set a bond if he or she first determines that the respondent does not present a danger to the community. *See Urena*, 25 I&N Dec. at 141; *Guerra*, 24 I&N Dec. at 38. The respondent bears the burden of proving to the satisfaction of the Immigration Judge that his or her release would not pose a danger to property or persons. See 8 C.F.R. § 1236.1(c)(8); *Urena*, 25 I&N Dec. at 141; *Adeniji*, 22 I&N Dec. at 1113. In determining whether a respondent presents a danger to the community at large and thus should not be released on bond pending removal proceedings, an Immigration Judge should consider both direct and circumstantial evidence of dangerousness, including whether the facts and circumstances present national security considerations. *Matter of Fatahi,* 26 I&N Dec. 791 (BIA 2016).

Only if a respondent demonstrates that he or she does not pose a danger to the community should an Immigration Judge continue to a determination regarding the extent of flight risk posed by the respondent. *See Urena*, 25 I&N Dec. at 141; *Drysdale*, 20 I&N Dec. at 817-18. An Immigration Judge can properly deny bond based on flight risk where the respondent recently arrived in the United States, has no family or community ties to the country, no employment, no prior immigration status, and no probable path to obtaining lawful status, despite a pending asylum application and the purported support of a friend. *See Matter of R-A-V-P-*, 27 I&N Dec. 803 (BIA 2020). General criteria for consideration of bond include a fixed address in the U.S.; length of residence in the U.S.; local family ties and whether the ties may entitle the applicant to reside in the U.S.; record of appearances in court; employment history; criminal record; pending criminal charges; history of immigration violations; attempts to flee prosecution or authorities; manner of entry; membership in community organizations; and immoral acts of participation in subversive activities. *Matter of Guerra*, 24 I&N Dec. 37, 40 (BIA 2006); *see also Matter of Patel*, 15 I&N Dec. 666, 667 (BIA 1976). However, family and community ties, while significant to whether the respondent is a flight risk, generally do not mitigate a respondent's dangerousness where the issue is whether the respondent is a danger to the community. *Matter of Siniauskas*, 27 I&N Dec. 207, 210 (BIA 2018).

Here, the Court finds that Respondent has failed to meet his burden to prove that his release does not pose a danger to persons or property and thus denies his request for bond redetermination on this basis. The Court commends Respondent for his model disciplinary record while incarcerated since 2011, and for his efforts to deal with the psychological issues that may have been at the root of the situation that led to the tragic death of his then-girlfriend in 2011. The Court understands Respondent's testimony in his declaration that he was in an abusive situation for which he saw no escape and understands that this tragic event is something that, as he said in his statement, will continue to haunt him. However, the Court cannot ignore the underlying facts of what occurred in 2011, as described in the DHS evidence at exhibit 2. Without going into unnecessary detail, the Court notes that the incident that occurred on August 16, 2011 is very violent in nature, and that he did initially plead guilty to manslaughter after having been charged with second-degree murder. Ex. 2 at 12, 15, and 22—23. The Court can consider these underlying circumstances despite the vacatur and re-conviction to criminally negligent homicide in 2024. *Guerra, supra; Fatahi, supra*. While Respondent asserts that he is very different now, and should not be considered a present threat, the Court shares DHS's concern that, apparently, he was married, divorced, and is intending to apply for cancellation of removal as a battered spouse. This indicates a possible continued propensity to place himself in dangerous circumstances where he is victimized, and if released, he would not have the guardrails of incarceration to prevent him from

4

acting on this victimization in an inappropriate, if not worse, manner. The Court discounts the probative nature of Dr. Cheung's testimony for this very reason: when DHS asked her questions that seemed to suggest these facts, she did not appear to be aware of his subsequent marriage and divorce, and it does not appear to be reflected in her written evaluation or in Respondent's declaration. Exs 3-B, D. She also testified that a person in a domestic violence relationship can be both a perpetrator and a victim, and, to this Court's observation, did not seem to completely dismiss the concept of malingering applying at some level in this matter when asked that question by the Court. The Court thus finds that, based on this record, Respondent has failed to meet his burden to establish that he does not pose a risk of danger to the community, as the weight of the underlying nature and facts of the criminal offense is not overcome by his rehabilitation efforts while incarcerated.

Because the Court finds that Respondent has not met his burden to prove his release would not pose a danger to the community, it need not address the risk of flight issues. *Matter of Urena, supra.* However, if it were to reach this issue, the Court would not be so concerned with risk of flight to deny bond on that basis, and would grant his release on an appropriate bond amount, given the strong community support and what appears to be a solid plan for reintegration into the community, as well as a promising future in a musical career. The viability of Respondent's potential eligibility for immigration relief, either before this Court via VAWA Cancellation or before USCIS with a T visa status, is unclear, but would not be factored so heavily by this Court that it would deny bond for this reason. However, it cannot reach this issue, as it finds that Respondent has failed to meet his burden to show that his release would not pose a danger to the community.

SO ORDERED:        The Respondent's request for bond redetermination is denied.

ERIC
SCHULTZ

Digitally signed by
ERIC SCHULTZ
Date: 2024.11.04
08:07:05 -05'00'

_____
Eric W. Schultz
Immigration Judge

Dated: November 4, 2024

5

151

CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:  MAIL (M)    PERSONAL SERVICE (P)
ELECTRONIC SERVICE (E)
TO: [ ] [NONCITIZEN]  [ ] [NONCITIZEN] c/o Custodial Officer
[ ] [NONCITIZEN]'s ATT/REP  [ ] DHS
DATE: _____  BY:  COURT STAFF _____
Attachments:  [ ] EOIR-33  [ ] EOIR-8  [ ] Legal Services List  [ ] Other

6

RE: HE, XIAO BAO

File: A█████████████

---

                    CERTIFICATE OF SERVICE
THIS DOCUMENT WAS SERVED BY:  MAIL [M]  PERSONAL SERVICE [P]  ELECTRONIC SERVICE [E]
TO: [ ] ALIEN  [ ] ALIEN c/o Custodial Officer  [e ] ALIEN's ATT/REP  [ e] DHS
DATE:  __11/04/24__  BY:  COURT STAFF _____dmp_____
     Attachments:  [ ] EOIR-33  [ ] EOIR-28  [ ] Legal Services List  [ ] Other

---

                                                      C1

153

# EXHIBIT  B-5

**DETAINED**

Laura Berger, Esq.
Staff Attorney
The Legal Aid Society
49 Thomas Street
New York, NY 10013
EOIR ID: VG893004

## UNITED STATES DEPARTMENT OF JUSTICE
## EXECUTIVE OFFICE FOR IMMIGRATION REVIEW
## BOARD OF IMMIGRATION APPEALS

|  |  |  |
|---|---|---|
| In the Matter of: | ) | |
| | ) | |
| HE, Xiao Bao | ) | File No.: ███████ |
| | ) | |
| In Custody ██████ ████ | ) | |

---

### MR. HE'S BRIEF IN SUPPORT OF BOND APPEAL

---

i

HE; A███████

## TABLE OF CONTENTS

INTRODUCTION......................................................................................................1

PROCEDURAL HISTORY ......................................................................................1

STANDARD OF REVIEW .......................................................................................5

ARGUMENT ..............................................................................................................6

    **A.**    **IJ Schultz failed to consider numerous mitigating and rehabilitation factors in his dangerousness analysis.** ................................................8

    **B.**    **IJ Schultz misconstrued Dr. Cheung's expert testimony and erred in discounting its probabite value in his dangerous analysis** ..............................10

**CONCLUSION** .....................................................................................................13

HE; ▇▇▇▇▇▇

## INTRODUCTION

Respondent, Xiao Bao He ("Mr. He"), is a 38-year-old trafficking and domestic violence survivor who originally came to the United States to study at Northeastern University as a graduate student in 2009. At Northeastern, he met a fellow Chinese grad student and entered into a relationship with her. She turned out to be extremely abusive and controlling. During their relationship, she slapped him, stalked him, isolated him, economically abused and exploited him, and labor trafficked him. In the summer of 2011, she started purposely depriving Mr. He of sleep and denying him food or money to buy himself food. He grew emaciated and started hallucinating and hearing voices. On August 17, 2011, Mr. He's girlfriend attacked him after not allowing him to sleep for several nights. Mr. He was in a state of severe physical and mental decompensation due to the persistent abuse when he killed his abuser and tried to commit suicide. He has a conviction for criminally negligent homicide due to this incident and upon release from prison was detained and placed in removal proceedings on October 10, 2024.

On October 31, 2024, Mr. He was provided a custody redetermination hearing before Immigration Judge ("IJ") Eric Schultz. After that hearing, IJ Schultz denied Mr. He's request for bond in a written decision issued on November 4, 2024. In his decision, IJ Schultz clearly erred by weighing Mr. He's victimization and a second experience of domestic violence as factors against him and failing to consider Mr. He's exceptional and extraordinary mitigating factors and rehabilitation evidence. The Board should reverse and remand the IJ's decision for consideration of a reasonable bond amount.

## PROCEDURAL HISTORY

Immigration and Customs Enforcement ("ICE") detained Mr. He on or about October 10, 2024. He moved for a bond hearing on October 22, 2024. The hearing was held on October 31,

HE; A██████████

2024. IJ Schultz found that Mr. He was a danger to the community and denied his request for

bond. IJ Schultz conceded that Mr. He is unlikely to be a flight risk.

**STATEMENT OF FACTS**

Mr. He came to the United States to pursue higher education. He entered lawfully on an

F-1 student visa to attend a master's degree program at Northeastern University. *See* Exh. 2, Tab

B, Visa and Entry stamp submitted by DHS. As a child in China, Mr. He was beaten by his

father and placed under extraordinary pressure and stress, which led him to become both very

high achieving but also submissive to authority, passive, and vulnerable to future abuse. *See* Exh.

3, Resp't Evidence Tabs B, D, H.

In the United States, Mr. He began dating a fellow Chinese graduate student, Shuai Li, in

May 2010. Over the course of their relationship, Ms. Li became increasingly abusive towards

Mr. He, stalking him, slapping and scratching him, coercing him into turning over all his savings

and paychecks, isolating him from friends and family, and withholding food and interrupting his

sleep. *See* Exh. 3, Tabs B, D, F, H, I, J.

In the summer of 2011, Mr. He and Ms. Li lived together, and her abuse and control over

every aspect of his life intensified. *See* Resp't Aff. At Exh. 3, Tab B, ¶¶ 24-40. Ms. Li took Mr.

He's passport, bank card, and cell phone, and monitored his movements via GPS only allowing

him to travel to and from work so she financially benefit from his earnings. *See Id.* at ¶¶ 24-26.

On August 16, 2011, Mr. He had been completely without sleep for three days and food-deprived

due to Ms. Li's ongoing abusive tactics. *See Id.* at ¶ 41. He had begun hallucinating, hearing

voices, and feeling dazed. *See Id.* at ¶ 40. That night when he returned from work, Ms. Li

punched Mr. He, broke his guitar, and hit him in the face. *See Id.* at ¶ 40.  Mr. He snapped and

killed Ms. Li and attempted to kill himself. *See Id.* When he woke up in the early hours of

HE; A

August 17, he realized what he had done and asked his neighbor to call the police. *See Id.* at ¶¶ 41-43. He was then hospitalized at Bellevue Hospital, where he was placed on suicide watch, and diagnosed with depression and recurring psychotic episodes. *See* Exh. 3 Tabs B, F.

Multiple affidavits from acquaintances and friends who knew Mr. He at the time of his relationship with Ms. Li show clearly that he was experiencing severe domestic violence. *See* Exh. 3, Tabs H, I, J. The hospital records from Bellevue from 2011 lay out clearly how Mr. He had physically and psychologically suffered abuse in his relationship with Ms. Li. *See* Exh. 3, Tab F. Specifically, the medical records state that Mr. He experienced significant conflicts with his girlfriend, leading to insomnia, feelings of guilt, decreased energy, lost weight, psychomotor slowing, suicidal thoughts, psychotic symptoms, and hallucination / delusion. *See Id.* pg. 42-43.

Mr. He initially pleaded guilty to manslaughter and was sentenced to 18 years of incarceration in 2014. However, in 2024, that conviction was vacated due to a constitutional defect and on October 8, 2024, he re-pleaded to Criminally Negligent Homicide, and was sentenced to a period of incarceration of 1 year and 4 months to 4 years making him immediately eligible for release from prison. *See* Exh. 2, Tab D. During the custody redetermination hearing, DHS conceded that this conviction did not make Mr. He ineligible for bond and did not argue that the manslaughter conviction is still viable.

From 2011 to 2024, Mr. He was incarcerated by the State of New York. During that time, he had a spotless disciplinary record and made a positive impression on every individual and community that he came in contact with. He never had a single disciplinary ticket while in state custody for 13 years. *See* Exh. 4, Tab EE. Corrections Officers at Sing Sing, all the way up to the superintendent, grew to trust and rely on him and wrote letters praising him as a force for peace among his fellow inmates. *See* Exh. 4, Tab FF; Exh. 3, Tabs T, U, V, BB, CC.

HE; A███████

Mr. He also became a devout Catholic and was an active and generous member of the Catholic community at Sing Sing. While incarcerated, Mr. He met several religious figures who wrote letters of support for him, including Cardinal Timothy Dolan, the Archbishop of New York. *See* Exh. 3, Tabs G, K, N, O, W, X. He used his musical talents to volunteer doing music therapy in the mental health units at Sing Sing. *See* Exh. 3, Tab T. He also studied for and received a master's degree in theology from the New York Theological Seminary. *See* Exh. 3, Tabs K, O, X. Mr. He also became involved in the Carnegie Hall Musical Connections and Musicambia programs at Sing Sing, where he developed his skills as a guitar player and developed new skills as a composer. His music was so impactful that many members of the Carnegie Hall and Musicambia community wrote letters of support and independent musicians are eager to collaborate with him once he is released. *See* Exh. 3 Tabs L, M, P, Q, R, Z, AA, DD; Exh. 4, Tabs HH, JJ.

Mr. He's sole criminal conviction stems from a situation where he was in an abusive relationship, being tortured, isolated, and economically exploited. He was confirmed by New York State as a human trafficking survivor and has a pending application for T Nonimmigrant Status. *See* Exh. 3, Tabs A, C. Mr. He never committed any violent act prior to August 16, 2011, and he has been a model of peace and service to the community in the years after that date. Mr. He has an extraordinary level of support from fellow inmates, corrections officers, the superintendent of the prison, religious figures, music teachers and musicians, and others who are available to give him a strong level of support upon his release, further reducing any likelihood of him reoffending in the future.

A psychological evaluation by Dr. Monit Cheung, PhD, LCSW, clearly shows through multiple CDC factor analysis and her personal interviews with Mr. He, that he fits the

HE; A███████

characteristics of a victim of domestic violence. She stated in her evaluation and in Court that Mr. He does not fit the profile of an abuser. Dr. Cheung also evaluated Mr. He's likelihood of reoffending and found that he has a very low likelihood to reoffend. *See* Exh. 3, Tab D. She testified at length in Court to this, and how she came to that conclusion.

Two other witnesses testified in Mr. He's custody redetermination hearing: Father Zachariah Presutti, SJ, the Executive Director at Thrive For Life, which runs a reentry home that Mr. He has been offered a place in; and Brad Balliett, a faculty member of the Juilliard School and teacher in the Musicambia program. Both testified that Mr. He would have a stable support network and place to live if he were released, and that he would have educational and employment opportunities that would allow him to serve the community.

Mr. He presented overwhelming evidence in his bond hearing that he is a peaceful, studious, community-oriented man whose sole conviction stems from a completely out-of-character action taken in the context of his severe victimization. DHS's evidence focused solely on the actions taken on August 16, 2011. Despite this disparity, IJ Schultz ruled in his written decision issued November 4, 2024, that Mr. He failed to meet his burden to demonstrate that his release would not pose a danger to others.

**STANDARD OF REVIEW**

The Board reviews IJ findings of fact for "clear error." 8 C.F.R. § 1003.3(f); *see Matter of S-H-*, 23 I&N Dec. 462, 464 n.2 (BIA 2002); *Matter of V-F-D-*, 23 I&N Dec. 859 at n.1 (BIA 2006). An IJ's finding of fact is clearly erroneous "when, although there is evidence to support it, the reviewing Board member or panel is left with the definite and firm conviction that a mistake has been committed." 67 FR 54878 at 54889; 8 C.F.R. § 1003.1(d)(3)(iii); *see also United States v. Iodice*, 525 F.3d 179, 185 (2d Cir. 2008) ("Where there are two permissible views of the

HE; A███████

evidence, the fact finder's choice between them cannot be clearly erroneous") (citation omitted). IJs have wide discretion in what evidence they may consider in bond proceedings.

The Board only reviews *de novo* questions of law, discretion, judgment, and all other issues on appeal. *See* 8 C.F.R. § 1003.1(d)(3)(ii)(2011); *see also Matter of A-S-B-*, 24 I&N Dec. 493 (BIA 2008).

## SUMMARY OF ARGUMENT

The Board should reverse the Immigration Judge's decision denying the respondent bond. The Immigration Judge committed reversible error in finding that Respondent is a danger to the community because the Immigration Judge committed several clear factual errors upon which he relied, overlooked extensive evidence of rehabilitation and mitigating facts in the record, applied the wrong legal standard, and failed to articulate facts that support the conclusion that he represents a present danger to the community.

## ARGUMENT

I.    **The Immigration Judge Erred in Finding that the Respondent is a Danger to the Community**

In this case, it was clear error to find Mr. He a danger to society and deny him a bond, and thus the Board should reverse the Immigration Judge's determination. "In general, an Immigration Judge must consider whether an alien who seeks a change in custody status is a threat to national security, a danger to the community at large, likely to abscond or otherwise a poor bail risk." *Matter of Guerra,* 24 I&N Dec. 37, 40 (BIA 2006) (citing *Matter of Patel,* 15 I&N Dec. 666 (BIA 1976)). This standard cites to "national security threats" and "danger" because it is intended to balance the community's physical safety and protecting immigrants' fundamental rights to liberty. An IJ's decision relating to custody must always be based on a "reasonable foundation" and reliable evidence that is probative of factors relevant to flight risk

HE; A████

and danger. *Carlson v. Landon*, 342 U.S. 524, 534 (1952). *See also Matter of Guerra*, 24 I&N

Dec. 37, 40-41 (BIA 2006) (only evidence that is "probative and specific" may support a finding

of dangerousness). While courts' weighing of the factors laid out in *Guerra* involve some degree

of discretion, the exercise of discretion must be "reasonable." *Id. See also, Carlson v. Landon*,

342 U.S. 524, 534 (1952) (quoting *United States ex rel. Potash v. District Director*, 169 F.2d

747, 751 (2d Cir. 1948)) (discretion must be based on a "reasonable foundation" and reliable

evidence that is probative of factors relevant to flight risk and danger).

In addition, just as, when predicting the likelihood of future harm in the context of claims

for relief from removal, so in the bond context the court may not rely on a "series of

suppositions" to determine future danger or flight risk. *Matter of J-F-F-*, 23 I. & N. Dec. 912,

917 (BIA 2006). Rather, a denial of bond or conditional parole "must be based upon some

*specific fact* pointing to" the existence of flight risk or danger. *Mangaoang v. Boyd*, 186 F.2d

191, 196 (9th Cir. 1950) (emphasis added). With respect to a finding of danger, it is not

sufficient to find that the respondent presents only a "'potential' danger." *Matter of Urena*, 25 I.

& N. Dec. 140, 141 (BIA 2009) (reversing denial of bond based on this determination).

In this case, it is clear that the Immigration Judge both committed clear error with respect

to several factual findings, as well as failed to properly consider the totality of the evidence

before the Court in concluding that Mr. He presents a current danger to the community. While it

is not disputed that Mr. He's sole criminal conviction is the result of a serious and tragic crime,

the Immigration Judge clearly erred in the analysis of the mitigating circumstances and extensive

evidence that this incident was extremely out of character for Mr. He and the extremely low

likelihood of him reoffending. In the written decision, the IJ "commends" Mr. He for his model

HE; A████████

disciplinary record exceptional evidence of rehabilitation, but discounts this evidence without explanation, giving the facts of his 2011 crime more weight.

    **A.**    **IJ Schultz failed to consider numerous significant mitigating and rehabilitation factors in his dangerousness analysis.**

IJ Shultz's written decision relies heavily on the underlying facts of this tragic incident in the criminal records submitted by DHS regarding Mr. He's 2011 arrest and prosecution, but fails to recognize the numerous exhibits submitted by Mr. He giving context to that crime and the mitigating circumstances which simply cannot be overlooked. Specifically, IJ Schultz fails to acknowledge the Notice of Confirmation of Human Trafficking issued by the New York Office of Temporary and Disability Assistance, confirming Mr. He as a survivor of trafficking; the three affidavits submitted in Exh. 3, Tabs H, I and J, from acquaintances of Mr. He with contemporaneous knowledge of the abuse he suffered at the hands of Ms. Li, and the hospital records showing his decompensated physical and mental state at the time of his arrest, submitted at Exh. 3 Tab F. These documents all show that Mr. He's crime was committed in the context of an extreme situation which is unlikely to reoccur.

IJ Schultz also skips over the extraordinary evidence of mitigation submitted, aside from a brief mention of the letters of support written by Cardinal Dolan, Archbishop of New York, and the leadership of Thrive For Life, a reentry program. Mr. He's letters of support from no fewer than five employees of the New York State Department of Corrections and Community Supervision ("DOCCS"), including the former Supervising Superintendent of Sing Sing, are much more probative of his recent peaceable behavior than documents submitted by DHS that date to 2011-2014. Most notable is IJ Shultz's failure to mention must less address what if any weight was accord to the supporting letter of Michael Capra, former Supervising Superintendent of Sing Sing with 42 years of experience at DOCCS. He has known Mr. He since 2018 and

HE; A███████

affirms "wholeheartedly that he poses no danger to others" and "if released on bond, would be a productive and safe member of the community." Who better to opine as to whether or not Mr. He poses a future danger, then someone in Mr. Capra's position with his experience and personal knowledge of Mr. He. Furthermore, Mr. He submitted letters of support from several Catholic chaplains and over a dozen musical colleagues and teachers, which were not mentioned by IJ Schultz in his decision at all.

This is clearly erroneous and completely ignores numerous mitigating facts and rehabilitation evidence in the record that are relevant to a bond analysis. *See, e.g.*, *Matter of Patel*, 15 I&N Dec. 666; *see also Matter of Guerra*, 24 I&N Dec. 37 (BIA 2006). A legal analysis that only contemplates and assesses the negative factors at the time of arrest is not a consideration of "the specific circumstances surrounding the [noncitizen's] conduct." *Matter of Siniauskas*, 27 I&N Dec. 207, 208-10 (BIA 2018). IJ Schultz's decision cannot be based upon a preponderance of the evidence if it ignores almost all the mitigating evidence. *Matter of Guerra*, 24 I&N Dec. at 40; *Matter of Locicero*, 11 I&N Dec. at 808.

Mr. He has only one arrest, stemming from him killing his abuser and trafficker, Shuai Li. Though Mr. He acknowledges the seriousness of that crime, the record clearly shows that he was in an extremely decompensated state, physically and mentally, when he committed that crime, due to Ms. Li's horrific treatment of him. Both before and after that offense, he has lived an exceptionally peaceful and community-focused life, as a high academic achiever and talented musician. He is an obedient, rule-following, peaceful individual, as shown by his lack of any infractions while in New York state custody and the numerous letters of support from DOCCS employees. *See* Resp't Evid. at Exh. 4, Tab FF; Exh. 3, Tabs T, U, V, BB, CC. None of this was considered by IJ Schultz in his written analysis.

HE; A█████████

Most appallingly, IJ Schultz's decision cites Mr. He's subsequent experience of domestic violence victimization by his wife while incarcerated as evidence that he may reoffend in the future. The fact of Mr. He's abuse, which was only raised in the context of Mr. He's potential relief under VAWA Cancellation of Removal, was twisted by IJ Schultz to imply that Mr. He's repeated victimization makes him more dangerous, when IJ Schultz wrote, "the Court shares DHS's concern that, apparently, he was married, divorced, and is intending to apply for cancellation of removal as a battered spouse. This indicates a possible continued propensity to place himself in dangerous circumstances where he is victimized, and if released, he would not have the guardrails of incarceration to prevent him from acting on this victimization in an inappropriate, if not worse, manner." *See* Bond decision pgs. 4-5. This statement displays an ignorance of the cycle of abuse that many survivors of domestic violence experience and is a horrifying example of blaming a victim for their victimization. Moreover, IJ Shultz erroneously relies heavily on this fact to speculate how Mr. He would act if released, discounting the overwhelming probative evidence in the record which demonstrates quite the opposite – that Mr. He is not a present danger to society. Most notably, Dr. Cheung, in her written report and testimony before the court, stated clearly that Mr. He has learned from his past and is likely to recognize early signs of abuse in the future and seek help, testimony that IJ Schultz ignored in his analysis.

    **B.**    **IJ Schultz misconstrued Dr. Cheung's expert testimony and erred in discounting it's probative weight in his dangerousness analysis.**

IJ Schultz erred in discounting the probative weight of Dr. Cheung's testimony on the basis of her not knowing about Mr. He's second abusive relationship after being incarcerated. However, Dr. Cheung made clear in her report and testimony that the focus of her report was to evaluate the extent and severity of the domestic violence victimization by Ms. Li which led to

HE; A0▬▬▬▬

Mr. He's conviction. *See* Resp't Evid. at Exh. 4, Tab D at pgs. 20-23.  Whether or not she was

aware of Mr. He's subsequent abusive relationship does not undermine that in her expert opinion

that Mr. He fits the mold of a victim of domestic violence rather than a perpetrator. In fact, the

fact that he had another abusive relationship is consistent with Dr. Cheung's finding that "the

likelihood of Mr. Xiaobao He being a DV victim is very high, while that of him being a DV

perpetrator is extremely low." *See Id.* at p. 28.  Dr. Cheung's finding here is particularly relevant

because it takes into account the confluence of factors that existed *at the time* of his tragic

offense, including his psychosocial development and mental health, male DV victimization

syndrome, emotional exhaustion and cultural influence on delayed help-seeking, and likelihood

to offend.  *See Id.* at pgs. 19-25.

      Finally, Dr. Cheung concludes in her report that that there are three main points which

support that Mr. He is unlikely to reoffend, including his rehabilitation efforts, cultural value

toward successful healing, and his educational and professional aspirations.  *See Id.* at p. 25.

These are amply corroborated throughout the other evidence submitted by Mr. He in support of

his bond redetermination request.

      However, in his written decision, IJ Shultz misconstrued Dr. Cheung's testimony

regarding whether a person in a domestic violence relationship can be both a perpetrator and a

victim. While she acknowledged that someone *could* be a victim and perpetrator in this scenario,

she never testified that Mr. He himself was both.  Thus, IJ Shultz's decision to rely on this point

to extrapolate Mr. He's *current* dangerous is flawed and certainly not a basis to dismiss the

probative value of Dr. Cheung's detailed report and lengthy testimony.

      IJ Shultz also misconstrued Dr. Cheung's testimony in determining she "did not seem to

completely dismiss the concept of malingering applying at some level in this matter when asked

HE; A██████

that question by the Court." While she acknowledged malingering as a concept, she did not testify that it was applicable in Mr. He's case. To the contrary, she discussed at length her conclusions as to why she found Mr. He to be a victim of severe domestic violence and why his actions that led to his offense do *not* fit a perpetrator profile. Her expert opinion was based on her extensive interviews with Mr. He as well as a review of many records related to his offense and psychiatric hospitalization afterwards. Most notably, Dr, Cheung emphasized that in her over forty-year career focused on male domestic violence survivors, she has *never* testified for a male perpetrator of domestic violence and wouldn't do so. If anything, Dr. Cheung was struck by the fact that the Court and government were raising this concept given her report and testimony at that point which was grounded in probative evidence in the record.

Ultimately, IJ Schultz's decision to discount Dr. Cheung's expert opinion in her report and testimony because she did not know about Mr. He's second experience with domestic abuse, as well as his finding that Mr. He is a present danger to the community because he was abused in not one, but two romantic relationships are an abuse of discretion and a clear error. Mr. He has presented significant evidence that his sole conviction stems from an extraordinary circumstance that is unlikely to reoccur, and that he is strongly inclined towards peace and community service. He should not be denied liberty due to his sole conviction, stemming from an abusive relationship and occurring more than 13 years ago.

HE;▮

## CONCLUSION

For the foregoing reasons, Mr. He respectfully requests the Board reverse and remand the IJ's decision for consideration of a reasonable bond amount.

Dated: December 5, 2024                    Respectfully submitted,

_____
Laura Berger, Esq. (she/her)
Staff Attorney
The Legal Aid Society
49 Thomas Street
New York, NY 10013
EOIR ID: VG893004

13                              HE; A███████1

**Xiao Bao He**
**A** ▬▬▬▬▬▬

## <u>CERTIFICATE OF SERVICE</u>

I, Laura Berger, hereby certify that I electronically filed the MR. HE'S BRIEF IN SUPPORT OF BOND APPEAL through the EOIR Courts and Appeals System (ECAS) on December 5, 2024. Because ECAS will automatically send service notifications to both parties when a new document is filed, I also caused to be served a copy on US Department of Homeland Security, US Immigration and Customs Enforcement through my electronic filing. BIA Practice Manual 3.2(a)(1).

Dec. 5, 2024
New York, NY

**Laura Berger**

14                                    HE; A ▬▬▬▬▬